# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

CHRISTOPHER LEE PRICE,               )
                                     )
                 Petitioner,         )
                                     )
        vs.                          )     6:03-cv-01912-LSC-JEO
                                     )
RICHARD F. ALLEN, Commissioner,      )
Alabama Department of Corrections,   )
                                     )
                 Respondent.         )

## MEMORANDUM OPINION

## TABLE OF CONTENTS

I.      PROCEDURAL HISTORY................................................................ 5
II.     FACTUAL BACKGROUND.......................................................... 8
III.    STANDARDS OF REVIEW............................................................ 9
        A.    The Antiterrorism and Effective Death Penalty Act of 1996......... 9
        B.    Claims of Ineffective Assistance of Counsel............................... 14
              1.    The performance prong.......................................... 15
              2.    The prejudice prong.............................................. 17
              3.    Deference accorded state court findings of historical fact........ 18
        C.    Procedural Defaults....................................................... 18
              1.    Generally.......................................................... 18
              2.    The "cause and prejudice" standard............................... 21
              3.    The "fundamental miscarriage of justice" standard............ 22
IV.     DISCUSSION.......................................................................... 22
        A.    Mr. Price did not receive effective assistance of counsel at the
              sentencing phase of his trial. ......................................... 22
              1.    Mr. Price's trial counsel did not conduct, nor did they engage an
                    investigator to conduct, the reasonable investigation into mitigating
                    circumstances the law requires.......................................... 23
                    a.    Counsel were ineffective for failure to seek out or contact any
                          family member other than Price's mother........................... 23
                    b.    Counsel were ineffective for failure to seek out or contact
                          Price's friends and acquaintances....................................23
                    c.    Counsel were ineffective for failure to seek out or contact
                          Price's school teachers and obtain Price's school records...... 23

1

       d.     Counsel were ineffective for failing to adequately interview and properly prepare Price's mother for her penalty phase testimony...................................................................... 33

       e.     Counsel were ineffective for failing to engage an independent psychologist to evaluate him.............................. 35

       f.     Discussion of the merits......................................... 36

    2.     Counsel did not accompany Price to, or advise him in preparation for, critical pre-trial and pre-sentencing proceedings.......................... 51

    3.     Trial counsel requested no penalty phase instructions from the trial court.................................................................................... 51

B.    Ineffective assistance of counsel at guilt phase .............................. 53

    1.     Trial counsel did not litigate an important pre-trial motion............... 53

    2.     Trial counsel did not conduct nor ensure that the trial court conducted adequate voir dire of potential jurors................................. 55

C.    The trial court erred when it denied Price's motion for change of venue despite a clear showing of prejudicial and pervasive media coverage and potential juror knowledge of the case, thus violating his right to a fair trial and due process of law........................................................... 55

    1.     Pre-trial Publicity and Change of Venue-General Constitutional Law............................................................................ 56

    2.     Price's case............................................................................ 58

       a.     The state appellate court's opinion.......................... 58

       b.     Price's claim and argument.................................... 59

           i.     Actual prejudice.................................... 60

           ii.     Presumed Prejudice.............................. 61

               1.     Media Coverage.............................. 61

               2.     Voir Dire........................................ 68

D.    The trial court's exclusion of five jurors based on erroneous applications of the *Witherspoon/Witt* standard, violated Mr. Price's rights to due process, to a fair trial, and to a fair and impartial jury, as guaranteed to him by the federal constitution...........................................................70

    1.     Ray Enis.............................................................................. 75

    2.     Harriet Kemp.......................................................................76

    3.     Ruby Little..........................................................................77

    4.     Ruby Nalls...........................................................................78

    5.     Christopher Savage........................................................... 80

E.    The prosecution's pervasive misconduct during closing arguments [at the guilt phase of trial] requires reversal under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution........................81

    1.     Improper reference to the "tireless effort" of law enforcement..........82

    2.     Vouching for State Witness Micah Donaldson's Credibility.............87

    3.     Personal opinion...................................................................91

    4.     Inflammatory comment........................................................93

    5.     Conflating the role of the prosecutors with that of the jurors.............93

F.      The trial court's charge on evaluating the credibility of witnesses was flawed inasmuch as it created a presumption that witnesses were truthful, and impermissibly diluted the State's burden of proof of guilt beyond a reasonable doubt, in violation of the Fifth, Eighth and Fourteenth Amendments..................................................................................102

G.      The arresting officer's warrantless seizure of Mr. Price's suitcase, the source of a black pair of pants entered into evidence as a prosecution exhibit, violated the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments because it cannot be considered to have occurred incident to Mr. Price's arrest.......................................................................108

H.      By arguing, without any basis in the evidence, that Mr. Price would likely kill again unless put to death, the prosecutor sullied the trial with inflammatory and unsupported speculation....................................................109

I.      Because the State failed to meet its burden of proving that Mr. Price waived his *Miranda* rights before giving statements to Tennessee authorities and to Alabama officials, the trial court's failure to suppress the statements violated the Fifth, Sixth, Eighth and Fourteenth Amendments..................................................................................120

J.      The introduction of cumulative, inflammatory photographs of the decedent's body vitiated the fairness of the trial and deprived Christopher Price of the reliable verdicts to which he was entitled under the federal constitution.........................................................135

K.      The "heinous, atrocious or cruel" aggravating circumstance applied in Mr. Price's sentencing lacked a sufficient limiting instruction and is therefore unconstitutionally vague as applied, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and of Alabama law...............................................................................139

L.      The trial court's repeated failure to question prospective jurors adequately about their ability to set aside bias arising from publicity, personal relationships, or past events, violated Mr. Price's right to due process, to a fair trial, to a fair and impartial jury, and to freely exercise his peremptory challenges, contravening the federal constitution....148

M.      The double counting of robbery as an element of the offense and aggravating circumstances violated Christopher Price's right to an individualized sentence and his protection against double jeopardy guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama law.......................................156

N.      The trial court's finding that the defense failed to present a prima facie case of racial discrimination in the exercise of the State's challenges to prospective jurors was erroneous and contrary to the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution....................157

3

O.   Comments by the prosecutor and the trial court allowed the jury to convict Mr. Price of capital murder without the requisite intent to kill, depriving Mr. Price of due process and rendering the verdict unreliable within the meaning of the Fifth, Sixth, Eighth and Fourteenth Amendments.................................................................. 169

P.   The trial court's failure to ask each prospective juror whether he or she had heard or been affected by improper discussions outside the courtroom during jury selection, violated Mr. Price's rights under the federal constitution and Alabama law.........................................................175

Q.   Mr. Price did not receive effective assistance of counsel during his direct appeal........................................................................................... 178

V.   CONCLUSION..................................................................... 179

This is a petition for writ of habeas corpus brought by a person in custody under a judgment of a court of the State of Alabama.  *See* 28 U.S.C. § 2254.  Upon consideration, the court finds that the petitioner is not entitled to any relief.

## I.     PROCEDURAL HISTORY

On February 5, 1993, after a four (4) day trial, petitioner Christopher Lee Price ("Price" or "the petitioner"), was convicted of murder during the commission of a robbery, a capital offense, in the Circuit Court for Fayette County, Alabama.  The court immediately convened the penalty phase of trial, and the jury returned a 10-2 recommendation that Price be sentenced to death.

After conducting a sentencing hearing on February 12, 1993, the trial court found two aggravating circumstances: (1) the murder was committed during the course of a robbery, and (2) the murder was heinous, atrocious and cruel.  (C.R. Vol. 1, 214-15).[1]  The court also found two statutory mitigating circumstances: (1) Price had no significant criminal history, and (2) he was nineteen (19) years old when the crime was committed.  *Id.* at 216-17.  The court additionally found several non-statutory mitigating circumstances, including: (1) Price's father was murdered when Price was three years old, (2) after his father was murdered, Price was verbally, physically and possibly sexually abused by a string of his mother's live-in companions, and (3) that a psychological evaluation revealed Price had an anti-social personality and an

---

[1]The court adopts the following method of referencing documents and transcript excerpts. References to specific pages of the court record on direct appeal are designated "C.R.____," and references to the transcript on direct appeal are designated "R. _____."   References to the supplemental record on direct appeal are designated "S.R. ____."  References to the court record of the Rule 32 proceedings are designated " Rule 32 C.R. ____," and references to transcripts pertaining to testimony taken during the collateral process are designated "Rule 32 R.____."  References to the record in the respondent's checklist (document 19) are designated "Tab _____."

emotional disturbance from an early age in conjunction with his difficult childhood. *Id.* at 217-18. Still, the trial court found the aggravating circumstances outweighed the mitigating circumstances and sentenced Price to death. *Id*. at 219.

On June 20, 1997, the Alabama Court of Criminal Appeals affirmed Price's capital conviction and death sentence. *Price v. State*, 725 So. 2d 1003 (Ala. Crim. App. 1997). The Alabama Supreme Court affirmed the conviction and sentence on September 4, 1998. *Ex Parte Price*, 725 So. 2d 1063 (Ala. 1998).

A petition for a *writ of certiorari* was denied by the United States Supreme Court on May 24, 1999. *Price v. Alabama*, 526 U.S. 1133 (1999).

On May 23, 2000, Price filed a Petition for Relief from Judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. (Rule 32 C.R., Vol. 11, Tab. 39 at 1-39). On June 26, 2000, the State of Alabama filed an Answer, and five months later, on December 11, 2000, the State filed a motion requesting dismissal of some of Price's claims, on the grounds that they were insufficiently pled and/or procedurally barred. *Id*. at Tab 40 at 41-80, and Tab 41 at 80-87.

The motion to dismiss was granted by the trial court on the same day it was filed. However, it also contained instructions that Price could, within "21 days from the date of this order[,] . . . supply the information necessary to comply with Rule 32's full-fact pleading requirements and . . . have [the claim now known in the habeas petition as Claim A.1.(a)-(c)] reinstated into the petition." *Id.* at Tab 42 at 1.

Protracted litigation pertaining to the aforementioned instructions and claim from January 2, 2001, to April 1, 2002, finally gave way to an amended dismissal order. *Id.* at Vol. 12 at 304-64. The State's proffered reasons to support the dismissal, as quoted below, adequately

6

summarize the substance of the trial court's final order.

        The only ground raised by Price calling into question the validity of the Court's [dismissal] order was that the allegation that the Court's order did not take into account the amendments to [claims A.1. (a)-(c) of the Rule 32 petition, filed in January, 2001.  Because the amendment did not cure the defect of the Rule 32 petition - that it was insufficiently pleaded and insufficiently specific - the State's failure to brief on the issue of amendment does not affect the validity of the Court's order finding that the petition was not specific enough.  *See, Swicegood v. State*, 646 So. 2d 159 (Ala. Cr. App. 1994) (noting that a trial judge's ruling on a Rule 32 petition may be affirmed on appeal if it is correct for any reason).

        The amendment did nothing to affect the fact that, as pleaded, Price had failed to allege the facts necessary to establish that he was entitled to relief.  *See.* A.R.Cr.P., 32.3.  In addition, without the names of the missing witnesses, Price's petition did not contain the full disclosure of the factual basis for his claim.  *See.* A.R.Cr.P., 32.6(b).  By requiring the State of Alabama to go through the substantial cost of noticing and attending his deposition at Holman prison in order to get this information, Price caused prejudice to the State.  Accordingly, as it currently reads the Court's order correctly dismisses the Rule 32 petition and the sole amendment.

*Id*. at 301-02.

        The Alabama Court of Criminal Appeals affirmed the denial of relief on May 30, 2003.

*Price v. State*, CR-1-1578 (Ala. Crim. App. 2003).  On July 25, 2003, Price filed a petition for

writ of certiorari in the Alabama Supreme Court.

        Three days later, Price filed the current action seeking 28  U.S.C. § 2254 relief from the

state court's judgment.  (Doc. 1).  However, this matter was stayed until a ruling was made on the

petition for writ of certiorari still pending before the Alabama Supreme Court.  On June 26,

2006, the Alabama Supreme Court rejected certiorari review.  *Ex Parte Price*, No. 1021742 (Ala.

2006).  On August 7, 2006, Price filed his "Third Amended Petition" ("Petition"), which is

presently before the court.  (Doc. 16).  The parties have had a full opportunity to brief the

applicable issues.

## II.    FACTUAL BACKGROUND

The Alabama Court of Criminal Appeals, in its decision on direct appeal, set out a

concise rendition of the facts in this case.  This outline of the facts is more than adequate for

purposes of this opinion.  Therefore, those facts are set out *in toto* as follows:

> Through the testimony of Bessie Lynn and through the admission of a
> statement the appellant gave to authorities in Chattanooga, Tennessee,
> approximately one week after the offense, the State established evidence tending
> to show the following:

> On the evening of December 22, 1991, Bill and Bessie Lynn returned to
> their home following a church service at the Natural Springs Church of Christ,
> where Bill Lynn had served as minister.  The victims' home was located in the
> Bazemore community of north Fayette County.  Bill Lynn had begun assembling
> Christmas toys for his grandchildren, while Bessie Lynn had dressed for bed and
> was upstairs in her bedroom watching television.  The electricity suddenly failed
> and, because the security lights outside remained on, and because the electricity
> was still on in a neighbor's home, Bill Lynn told his wife to call the power
> company to report the outage.  He then walked outside to check the power box.
> Bessie Lynn heard a noise outside and, upon looking out of her window, saw an
> individual in what she called a "karate stance," holding what appeared to be a
> sword in his right hand, high above his head in a striking position.  Bessie Lynn
> testified that the individual was dressed completely in black.  Bill Lynn yelled for
> his wife to telephone the police, and, upon discovering that the telephone lines
> had been cut, she hurried downstairs, where she picked up a candle and armed
> herself with a pistol that the Lynns kept in a kitchen drawer by a bank deposit bag.
> The bank deposit bag contained cash and checks received from an automobile
> parts business operated by Bill Lynn.  Bessie Lynn testified that she then hurried
> outside and that when she did someone struck her and knocked her to the ground.
> She testified that she got up and fired a gunshot into the air and began calling for
> her husband.  She found him in the yard and tried to give him the gun, telling him
> to shoot the people, but Bill Lynn, who had been severely wounded told her there
> were no bullets left in the gun.  She then told her husband that she was going for
> help; he told her to give the culprits anything that they wanted.  Bill Lynn had told
> his wife at that point that he knew he was going to die.  Bessie Lynn, who was in
> their van and attempting to insert the key into the ignition, became aware of two
> men, one on each side of the van.  They ordered her out of the van, and when she
> got out she was beaten with an object.  One of the individuals was demanding
> money.  They ordered her back into the house, where the two individuals, both
> dressed in black, demanded her money and jewelry.  They took a rifle and shotgun
> from the house, the pistol that Bill Lynn still had, and the checks and cash from

the bank deposit bag.  They also ordered Bessie Lynn to give them her jewelry.
She responded that she did not wear jewelry other than her two rings and asked if
she might keep her wedding ring.  She was instructed to take her rings off and to
drop them in a bag, which they took.  The culprits instructed Mrs. Lynn to remain
where she was and they searched for something in the kitchen and then outside the
house.  Bessie Lynn testified that when the two men came back in the house, a
vehicle apparently drove by the house.  The two men then went out the back door,
and Bessie Lynn testified that she then ran out the front door.  She ran back to her
husband to tell him that she was going to go for help.  He asked her to hurry, and
she ran to her father's house, which was located nearby.  From her father's house
she telephoned for help.  Bill Lynn died before he reached the hospital.  Bessie
Lynn was treated for wounds to her head, her hands, her chest, and her thighs.

Several days later, the appellant was arrested in Chattanooga, Tennessee,
where he had been visiting friends.  He gave a statement to the authorities in
Tennessee, admitting his participation in the offenses, but claiming that his
accomplice had actually killed Bill Lynn and wounded Bessie Lynn.  He
subsequently gave another statement to Alabama authorities.

*Price v. State*, 725 So. 2d at 1011-12.

## III.    STANDARDS OF REVIEW

### A.    The Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act ("AEDPA") amended the federal

habeas corpus provisions of 28 U.S.C. § 2254 on April 24, 1996.  The present petition was filed

after that date.  Accordingly, AEDPA's amendments apply to the claims in this case.  *See* Pub. L.

No. 104-132, § 107(c), 110 Stat. 1214, 1226 (1996); *Penry v. Johnson*, 532 U.S. 782, 792

(2001); *see also McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005); *Hightower v.*

*Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004).[2]

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications

---

[2]*Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not
apply to habeas petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156,
1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

9

in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). *See* 28 U.S.C. § 2254(e)(2);[3] *McNair*, 416 F.3d at 1297 (observing that § 2254(e)(2) as amended by AEDPA "mandates that a petitioner who failed to develop the factual basis for a claim in state court shall not be granted a federal evidentiary hearing absent extraordinary circumstances").

Further, a state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1);[4] *McNair*, 416 F.3d at 1297.

Moreover, AEDPA requires federal courts to give greater deference to state court determinations of federal constitutional claims than required by previous law. *See*, *e.g.*, *Fugate*

---

[3]28 U.S.C. § 2254(e)(2) provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

[4]28 U.S.C. § 2254(e)(1) provides that: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

10

*v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (holding that AEDPA's amendments to § 2254

established "a more deferential standard of review of state habeas judgments"); *Spreitzer v.*

*Peters*, 114 F.3d 1435, 1441 (7th Cir. 1997) (same).  28 U.S.C. § 2254(d) provides that whenever

a state court fairly addresses the legal merits of a federal constitutional claim, and adequately

explains the basis for its decision, this court cannot grant habeas relief *unless* the state court's

adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The statutory phrase "clearly established federal law, as determined by the

Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the

Supreme Court's] decisions as of the time of the relevant state-court decision."  *Williams v.*

*Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion); *see also*, *e.g.*, *Warren v.*

*Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist

today, but rather as they existed as of the time of the relevant state-court decision.") (internal

quotation marks and citation omitted).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have been

"interpreted as independent statutory modes of analysis."  *Alderman v. Terry*, 468 F.3d 775, 791

(11th Cir. 2006) (citing *Williams v. Taylor*, 529 U.S. at 405-07).[5]  A state-court determination

---

[5]*See also Williams v. Taylor*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section
2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief
with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court
may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to

can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. *Second*, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. at 405 (emphasis supplied).  *See also*, *e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).  The Eleventh Circuit has observed that the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above; rather, the statutory language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'"  *Alderman v. Terry*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405).

On the other hand, a state-court determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams v. Taylor*, 529 U.S. at 407.  *See also*, *e.g., Putman v. Head*, 268 F.3d 1223, 1240-41

---

. . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.")).

(11th Cir. 2001) (same).[6]  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."  *Williams v. Taylor*, 529 U.S. at 409 (emphasis added).

In other words, the question that should be asked is *not* whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue, but whether the state court's determination was "reasonable," *even if incorrect*.  *See*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 694 (2002) (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one"); *Williams v. Taylor*, 529 U.S. at 411 (holding that a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

In addition to the companion provisions of § 2254(d)(1), subsection (d)(2) regulates federal court review of state court findings of fact.  That provision limits the availability of relief

---

[6]The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule."  *Alderman v. Terry*, 468 F.3d at 791 (quoting *Williams v. Taylor*, 529 U.S. at 406).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."  529 U.S. at 409, 120 S. Ct. at 1521 (emphasis added).

*Alderman v. Terry*, 468 F.3d at 791.

to decisions that were "based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

B.     **Claims of Ineffective Assistance of Counsel**

The Supreme Court established a two-pronged standard for judging ineffective assistance

of counsel claims under the Sixth Amendment in *Strickland v. Washington*, 466 U.S. 668

(1984).[7]

> A convicted defendant's claim that counsel's assistance was so defective
> as to require reversal of a conviction or death sentence has two components.
> *First*, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> *Second*, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable. Unless a defendant
> makes both showings, it cannot be said that the conviction or death sentence
> resulted from a breakdown in the adversary process that renders the result
> unreliable.

*Id*. at 687 (emphasis supplied); *see also Williams*, 529 U.S. at 390 (same). The two parts of the

*Strickland* standard are conjunctive, and a petitioner accordingly bears the burden of proving

*both* "deficient performance" *and* "prejudice" by "a preponderance of competent evidence."

*Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a court is not

required to address both aspects of the *Strickland* standard when a habeas petitioner makes an

insufficient showing on one of the prongs. *See, e.g., Holladay v. Haley*, 209 F.3d 1243, 1248

---

[7]Ineffective assistance of counsel claims are specifically limited to the performance of
attorneys who represented a defendant at trial or on direct appeal from the conviction. *See* 28 U.S.C.
§ 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral
post-conviction proceedings shall not be a ground for relief in a proceeding arising under section
2254."). *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right
to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim
constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

(11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

## 1.    The performance prong

To establish that counsel's performance was deficient, a defendant "must show that counsel's representation fell below an objective standard of reasonableness":  a rule that is defined in terms of "reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688; *see also Williams*, 529 U.S. at 390-91 (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same).  The *Strickland* Court instructed lower federal courts to be "highly deferential" when engaging in such assessments, and to "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance":

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation marks omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (holding that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's

15

performance was reasonable and adequate") (internal quotation marks omitted)).

To overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance, the habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315 (footnote and citation omitted).  The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and, in light of all the circumstances. *See, e.g., Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317.  Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence-which is also constitutionally protected-and would restrict the wide latitude counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

In short, an attorney's performance will be deemed deficient only if it is objectively unreasonable (*i.e.*, falls below the wide range of competence demanded of attorneys in criminal cases), and it is shown that no competent attorney would have taken the action that petitioner's counsel did take.  *See, e.g., Chandler*, 218 F.3d at 1315; *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990).

16

### 2.     The prejudice prong

To satisfy the prejudice prong, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694; s*ee also Williams*, 529 U.S. at 391 (same).  Stated somewhat differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect."  *Johnson*, 256 F.3d at 1177 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986)) (internal quotation marks omitted); *see also*, *e.g*., *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (holding that, to show prejudice, "a defendant must show that counsel's errors were so serious that they rendered the defendant's trial unfair or unreliable, not merely that the outcome would have been different").

When an ineffectiveness claim is based upon counsel's failure to properly investigate and present additional evidence, *Fortenberry v. Haley*, 297 F.3d 1213, 1225 (11th Cir. 2002), advises that "counsel has a duty to make reasonable investigations or to make a reasonable decision that make particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 1225, (citing *Strickland*, 466 U.S. at 691).  Additionally, when examining an ineffectiveness claim during the sentencing phase of the trial, it is understood that

> where a petitioner's counsel was deficient at sentencing, the relevant question for determining prejudice is whether the
>
> > "entire postconviction record, viewed as a whole and cumulative of

> mitigation evidence presented originally, raised a reasonable
> probability that the result of the sentencing proceeding would have
> been different if competent counsel had presented and explained
> the significance of all of the available evidence."

*Fortenberry,* 297 F.3d at 1229 (quoting *Williams v. Taylor,* 529 U.S. at 399).

A habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'" *Gilreath v. Head,* 234 F.3d 547, 551 (11th Cir. 2000) (quoting *Strickland,* 466 U.S. at 693). The fact that counsel's error may have "had some conceivable effect on the outcome of the proceeding" is not sufficient to show prejudice. *Strickland,* 466 U.S. at 693; *see also Gilreath,* 234 F.3d at 551 (same); *Tompkins v. Moore,* 193 F.3d 1327, 1336 (11th Cir. 1999) (same). Instead, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones,* 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland,* 466 U.S. at 687). Accordingly, "[t]he benchmark for judging any claims of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or subsequent direct appeal] cannot be relied upon as having produced a just result." *Strickland,* 466 U.S. at 686.

### 3. Deference accorded state court findings of historical fact

"State court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley,* 255 F.3d 1292, 1297 (11th Cir. 2001).

### C. PROCEDURAL DEFAULTS

### 1. Generally

It is a well-settled principle of law that a state prisoner "may not obtain federal habeas

corpus relief on a claim that the state courts refused to hear because the petitioner did not raise

his claim seasonably at trial or on direct appeal from his conviction, unless the petitioner shows

cause for not raising the claim and resulting prejudice." *Presnell v. Kemp*, 835 F.2d 1567, 1567-

68 (11th Cir. 1988) (citations omitted); *see also*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 750

(1991) (holding that the procedural default doctrine "applies to bar federal habeas when a state

court declined to address a prisoner's federal claims because the prisoner had failed to meet a

state procedural requirement"); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) ("A state

prisoner seeking federal *habeas* relief cannot raise a federal constitutional claim in federal court

unless he first properly raised the issue in the state court system.").

This so-called "procedural default doctrine" bars federal habeas review of state court

rejections of a state prisoner's claim when three circumstances coexist: (1) the last state court to

review the claim (2) states clearly and expressly that its disposition of that claim rests on a state

procedural bar, and (3) that state law ground "is *independent* of the federal question and

*adequate* to support the judgment." *Coleman*, 501 U.S. at 729-30 (emphasis supplied); *see also*,

*e.g.*, *Harris v. Reed*, 489 U.S. 255, 262-63 (1989); *Johnson v. Singletary*, 938 F.2d at 1173.  The

rule applies with equal force "regardless of 'whether the state-law ground is substantive or

procedural.'" *Lee v. Kemna*, 534 U.S. 362, 374 (2002) (quoting *Coleman*, 501 U.S. at 729).

A state procedural rule is "independent of the federal question" when it "rests solidly on

state law grounds [that are] not intertwined with an interpretation of federal law." *Judd,* 250

F.3d at 1313 (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).

A state court's procedural rule is deemed to be "adequate to support the judgment" when

it is "firmly established and regularly followed," *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir.

2005),[8] and, it is not "applied in an arbitrary or unprecedented fashion" that is "'manifestly

unfair' in its treatment of the petitioner's federal constitutional claim." *Judd*, 250 F.3d at 1313

(quoting *Card*, 911 F.2d at 1517).  This does not mean that the procedural rule must be applied

rigidly in every instance, or that occasional failure to do so eliminates its "adequacy."  Rather, the

"adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary

or unprecedented fashion." *Judd*, 250 F.3d at 1313.

There are only three circumstances in which an otherwise valid state-law ground will not

bar a federal habeas court from considering a constitutional claim that was procedurally defaulted

in state court: (1) where the petitioner had good "cause" for not following the state procedural

rule and was actually "prejudiced" by not having done so; (2) where the state procedural rule was

not "firmly established and regularly followed"; and (3) where failure to consider the petitioner's

claims will result in a "fundamental miscarriage of justice."  *See Edwards v. Carpenter*, 529 U.S.

446, 455 (2000) (Breyer, J., concurring).  *See also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding

that a state procedural default "will bar federal habeas review of the federal claim, unless the

habeas petitioner can show cause for the default and prejudice attributable thereto, or

demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of

justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496

(1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is

actually innocent, a federal habeas court may grant the writ even in the absence of a showing of

cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v.*

---

[8]*See also*, *e.g.*, *Lee*, 534 U.S. at 376; *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996); *Cochran v. Herring*, 43 F.3d 1404, 1408, *modified on reh'g*, 61 F.3d 20 (11th Cir. 1995).

*Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental

miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one

who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting

*Murray v. Carrier*, 477 U.S. at 496)).

        **2.**      **The "cause and prejudice" standard**

The "cause *and* prejudice" standard clearly is framed in the conjunctive and, therefore, a

petitioner must prove both parts.  To show cause, a petitioner must prove that "some objective

factor external to the defense impeded counsel's efforts" to raise the claim previously.  *Murray*,

477 U.S. at 488.

> Objective factors that constitute cause include "'interference by officials'" that
> makes compliance with the State's procedural rule impracticable, and "a showing
> that the factual or legal basis for a claim was not reasonably available to counsel."
> *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is
> cause."  *Ibid*.  Attorney error short of ineffective assistance of counsel, however,
> does not constitute cause and will not excuse a procedural default.  *Id*., at 486-88,
> 106 S. Ct., at 2644-45.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  *See also Murray*, 477 U.S. at 488-89

("Ineffective assistance of counsel . . . is cause for a procedural default."); *Reed v. Ross*, 468 U.S.

1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably

available to counsel, a defendant has cause for his failure to raise the claim in accordance with

applicable state procedures.").

Once cause is proved, a habeas petitioner also must prove prejudice.  He must show "not

merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his

*actual* and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

21

### 3.    The "fundamental miscarriage of justice" standard

In a "rare," "extraordinary,"[9] and "narrow class of cases,"[10] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, if (1) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting, respectively, *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. at 496[11]), or if (2) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323-27 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. at 537-38.

With these elemental precepts in mind, the court now turns to the petitioner's claims.

## IV.    DISCUSSION

### A.    Mr. Price did not receive effective assistance of counsel at the sentencing phase of his trial.  (Paragraphs 21-41 of the petition).

---

[9] *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

[10] *McClesky v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default.   These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.  We have described this class of cases as implicating a fundamental miscarriage of justice.") (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

[11] Specifically, the *Murray v. Carrier* Court observed that, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  477 U.S. at 496.

1. **Mr. Price's trial counsel did not conduct, nor did they engage an investigator to conduct, the reasonable investigation into mitigating circumstances the law requires.**

Price alleges he "was prejudiced by trial counsel's failure to seek and find readily available evidence relevant to both statutory and non-statutory mitigating factors in his case through the testimony of Price's family, friends and teachers as well as an independent psychological evaluation." He also contends that this claim is not procedurally defaulted. (Petition at 19 and Reply Brief[12] at 13-32). The respondent subdivides this claim into sections A.1.(a)-(e).[13] This court will follow the respondent's subdivision of the claims.

a. **Counsel were ineffective for failing to seek out or contact any family member other than Price's mother.**

b. **Counsel were ineffective for failure seek out or contact Price's friends and acquaintances.**

c. **Counsel were ineffective for failure seek out or contact Price's school teachers and obtain Price's school records.**

Sub-claims A.1.a.-c. are almost identical to the Rule 32 claims quoted in the appellate court's opinion on collateral review, differing only in that the habeas petition identifies Price's witnesses by name as opposed to relationship. The appellate court addressed these claims:

. . . . After being granted opportunity to amend claims no. [A.1.(a)-

---

[12]The reply brief is located at document 28 in the record.

[13]The respondent enumerates the petitioner's allegations as counsel's failure to:

a. seek out or contact any family member other than Price's mother,
b. seek out or contact Price's friends, acquaintances and school teachers,
c. obtain Price's school records,
d. adequately interview and properly prepare Pr ice's mother for her testimony, and
e. engage an independent psychologist to evaluate Price.

(c)[14]] the following was presented in Price's first amendment to his Rule 32, Ala. R. Crim. P., petition.

"[A.1.a.].  Trial counsel did not seek out or contact any of Mr. Price's family members other than his mother, although his aunts, uncles, cousins, grandparents and step-grandparents were located within the immediate vicinity.  Had counsel spoken with these members of Mr. Price's family, counsel would have discovered a detailed history of dislocation, abuse and neglect that far exceeded the terse, incomplete description provided by Mrs. Files at Mr. Price's sentencing.  Mr. Price and his mother relocated across state lines over half a dozen times before Mr. Price was in junior high school.  Mrs. Files and Mr. Price lived in Mississippi, Florida and Texas, in addition to Alabama, at different times while he was growing up.  Mr. Price's paternal grandmother saw his father physically abuse both Mr. Price and his mother.  This grandmother recalls specific instances of physical abuse and neglect that Mrs. Files did not testify to at trial.  Mr. Price lived with this grandmother for some time when he was very young, and spent weekends at her house when he was older; thus, she was a valuable resource that counsel should have contacted in preparation for Mr. Price's sentencing hearing.[15]  Aunts and uncles, as well as grandparents had contact with Mr. Price throughout his childhood.  In addition to the abuse and neglect they witnessed, these family members could have testified about their love for Mr. Price and of the pride they shared in his extraordinary drawing skills.  The family could have provided examples of pictures created by Mr. Price over the years.  This artistic skill was relevant evidence in mitigation and should have been uncovered.  Because of trial counsel's failure in this regard, this relevant mitigation evidence was not presented at sentencing.

"[A.1.b.].  Trial counsel did not seek out or contact any of Mr. Price's friends or acquaintances, although Mr. Price had lived and attended school in the Jasper-Winfield area for eight years and his friends were located in the immediate vicinity. Had counsel contacted these friends and acquaintances, counsel would have discovered that Mr. Price was known as a nice kid who did not get

_____

[14]For clarity's sake, the court has substituted its categorization of the claims for those in the opinion.

[15]Underlined portion added by appellate court.

24

in fights. Mr. Price had a girlfriend at the time of this crime who could have testified about Mr. Price's interest in marriage, family, and a career after high school.  Mr. Price's friends from junior high school and high school would have told counsel that Mr. Price was known to be a follower who would go along with what other people wanted to do; copying what others wore, how they spoke, and what activities they liked to pursue.  These friends would have talked about how Mr. Price seemed to have changed in the summer and fall leading up to his arrest, when he was associating with Co-defendant 'Bookie' Coleman.  Because of trial counsel's ineffectiveness in this regard, this relevant mitigation evidence was not presented at sentencing."

"[A.1.c.].  Trial counsel neither located and gathered Mr. Prices's school records nor attempted to contact Mr. Price's former teachers.  Had counsel obtained these records and interviewed Mr. Price's teachers, counsel would have discovered that Mr. Price did well in school and was generally well-behaved in class.  Mr. Price maintained good grades and was not remembered as a disciplinary problem or as a student who got into fights.  This relevant mitigation evidence was not presented at sentencing because of trial counsel's failure in this regard."

([Rule 32] C.[R.] 97-100).

After careful consideration of Price's claim and after oral argument[16], we find that with the possible exception of the pleadings concerning the paternal grandmother, the circuit court correctly ruled that these claims were not specifically pleaded.[17]

———————————————

[16]There is no transcript or tape recording of the oral argument before the Alabama Court of Criminal Appeals in the record.

[17]The language of the circuit court's final order pertaining to Claims A.1.(a)-(c), issued on April 2, 2002, summarily dismissed these claims pursuant to Rule 32.7(d) of the A. R. Crim. P. "for failure to comply with [the specificity requirements of] Rule 32.6. . . ." Specifically, the court stated the claims were due to be dismissed

for  failure to comply with [the specificity requirements of] Rule 32.6. . . Price filed an amendment to his petition on January 2, 2001.  This amendment affected [sub-claims (a)-(c).  Even though this amendment offered more wording than . . . the original petition, the Court finds that Price again failed to supply the information to bring the petition into compliance with Rule 32.6(b).  This constitutes undue delay

> ". . . Considering all the evidence introduced during the guilt and penalty phases of the trial, we cannot see how the evidence that the appellant argues should have been elicited at the penalty phase would have had any impact on his sentence. It certainly would not have changed the outcome, and it did not render the sentencing fundamentally unfair or unreliable."

*Pierce v. State*, [Ms. CR-96-1668, Mar. 2, 1999] ___ So. 2d ___ (Ala. Crim. App. 1999), rev'd on other grounds, [Ms. 1981270, Sept. 20, 2002] ___ So. 2d ___ (Ala. 2002)[.]

Regarding the paternal grandmother, to the extent that it may have been sufficiently pleaded, we agree with the circuit court's finding that the paternal grandmother's testimony would have been cumulative to the testimony of Mrs. Files. Apparently the paternal grandmother would have testified that she saw Price's father physically abuse both Price and his mother. After review of the record from direct appeal, we agree with the circuit court's findings, that this would have been cumulative to Mrs. Files's testimony.

(Vol. 24, Tab 61 at 27-29).

---

and the Court finds that the State of Alabama has been prejudiced.

. . . .

The [relatives, friends, acquaintances and teachers] . . . alluded to in [sub-claims A.1. (a)-(c)] were known to Price and could have been provided in the original Rule 32 petition [filed in May 2000] or the amendment to the petition [filed January 2, 2001]. Price did nothing to supply these names until the State of Alabama deposed petitioner [on November 8, 2001]. . . . Thus, Price has acted with undue delay.

. . . .

Furthermore, the school records referred to in [sub-claim A.1.(c)] are not attached to the Rule 32 petition or the amendment, nor have any been submitted to the court since the Rule 32 petition was filed. . . . [N]othing in the petition informs the Court of what in these records constitutes mitigating evidence, and copies of these alleged records are nowhere to be found. Thus, the court finds that [sub-claim A.1.(c)] is subject to summary dismissal for failure to comply with Rules 32.3 and 32.6(b) of the *Alabama Rules of Criminal Procedure*.

(Rule 32 C.R., Vol. 12, at 314-17).

In his habeas petition, Price now identifies his relatives, girlfriend, friends and teachers by name.[18]  (Petition at 15-17).  The respondent declares that these legal names constitute new factual support for his claim in the present petition.  (Doc. 21 at 18; Doc. 22 at 6).  The respondent also contends that the Alabama Court of Criminal Appeals properly affirmed the trial court's summary dismissal for "failure to comply with the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure."  (Doc. 22, at 7 (citing *Price*, mem. op., at 27-29 and C.R. 314-16)).[19]

Price replies that

[a] claim can be procedurally defaulted only if all three of the following conditions are met: (1) the state's rule must have been applied independently of an interpretation of federal law; (2) the rule must have been clearly and explicitly identified as the primary basis for the judgment of the last court to rule on a claim; and (3) the rule must not have been applied in an "arbitrary or unprecedented" manner,  such that barring litigation of the petitioner's federal claims on the merits would be "manifestly unfair."  *Card v. Dugger*, 911 F.2d 1494, 1516-17 (11th Cir. 1990).  None of these three conditions are satisfied here.  The Court of Criminal Appeals routinely tangles its unfair application of Rule 32.6(b) with an analysis of the merits of Mr. Price's claims under federal law.  Moreover, even if all of those conditions were satisfied, a petitioner who, like Mr. Price, "substantially complied" with a state rule remains entitled to federal review.  *Lee,* 534 U.S. at 382; *Meagher v. Dugger,* 861 F.2d 1242, 1247 (11th Cir. 1988).

(Doc. 28 at 34).

To determine whether a claim is procedurally defaulted or subject to § 2254 examination,

_____

[18]They are Hoyt and Louise Price, Teena Barnett, Amy Collins Crosby, Jessie Chaney, Chris Hadder, James Dockins, Alan Davis, Wayne Hamilton, Brenda Edgil and Dale Sears.  (Petition at pp. 15-17).

[19]However, as can be seen in previous footnote number 17, with the exception of the school records portion of sub-claim A.1.(c), the trial court summarily dismissed all sub-claims on the basis of Rules 32.6(b) and 32.7(d).  Only the school records aspect of the claim was dismissed pursuant to Rules 32.3 and 32.6(b).

27

the court must determine if "it fairly appears that the state court rested its decision primarily on federal law," and if the state court's opinion contains a "'plain statement' that [its] decision rests upon adequate and independent state grounds." *Harris v. Reed*, 489 U.S. 255,  261 (1989).[20]

This court must therefore determine whether the appellate court's order in Price's case as to these claims fairly appears to rest primarily on resolution of, or to be interwoven with the federal claim, and whether it clearly and expressly relies on an independent and adequate state ground.  *See Coleman v. Thompson*, 501 U.S. 722, 735 (1991).  Contrary to Price's argument, and excepting the paternal grandmother, the appellate court's decision regarding sub-claims A.1.(a)-(c) was based primarily on Alabama procedural rules independent of federal law.  The court made a plainly stated decision expressly based on state procedural rules.[21]

---

[20]The Supreme Court reiterated this test in *Coleman v. Thompson*, 501 U.S. 722, 723 (1991), writing,

> Since ambiguous state court decisions can make it difficult for a federal habeas court to apply the independent and adequate state ground doctrine, this Court has created a conclusive presumption that there is no such ground if the decision of the last state court to which the petitioner presented his federal claim fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not "clearly and expressly" rely on an independent and adequate state ground. See *Harris, supra*, 489 U.S. at 261, 266, 108 S.Ct at 1042, 1045; *Michigan v. Long*, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 3476, 3477, 77 L.Ed.2d 1201.  Pp. 2555-2557.

[21]Admittedly, after the procedural default ruling (and without contextual explanation), the appellate court launched into the following quotation:

> ". . . Considering all the evidence introduced during the guilt and penalty phases of the trial, we cannot see how the evidence that the appellant argues should have been elicited at the penalty phase would have had any impact on his sentence.  It certainly would not have changed the outcome, and it did not render the sentencing fundamentally unfair or unreliable."

(Vol. 24, Tab 61 at 29 (citations omitted)).  This simply appears to be an observation or afterthought

The petitioner raises a reviewable issue, however, with regard to the claim concerning the paternal grandmother. The appellate court dedicated six pages in its opinion to reviewing the mitigating testimony presented at the penalty phase of the trial and concluded that her testimony would have been cumulative. (Vol. 61, Tab 24 at 29-35). This court finds that the portion of the court's opinion regarding the paternal grandmother relies primarily on or is intertwined with federal law and there is no plain statement by the court that its decision was based upon an independent state procedural rule. Thus, this claim is subject to substantive review.

Before addressing the merits of the claim concerning the parental grandmother, this court will address the petitioner's other arguments as to why these witness claims are not procedurally barred. Price asserts two more arguments to support his position that the state's opinion is not adequate to preclude federal review of these claims. Specifically, he alleges the state court arbitrarily and capriciously applied state procedural specificity requirements to procedurally default this claim, and even if it did not, he is still entitled to 2254(d) review because he substantially complied with the state pleading rules.

The conflict over the sufficiency of Price's state court pleadings initially concerns the fact that Price only identified individuals by their relationship to him as opposed to their legal names in the pleadings. Price believes that substitution of a relative, friend or teacher's legal name was

---

by the appellate court. Stretched to its best limits, it is but a cursory, shorthand examination of the claim. Still, neither the statement standing alone, nor a reading of the procedural default finding and statement together supports a conclusion that the appellate court's decision primarily rested on or was so intertwined with federal law that the *Harris* presumption should apply.

*Assuming arguendo*, that *Harris* does apply, for reasons stated *infra.,* the state court's decision was neither contrary to or an unreasonable application of clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence before it.

not necessary to satisfy pleading requirements, while respondent disagrees.

Price argues, "Rule 32.6(b) was applied here with unprecedented harshness in a manner inconsistent with established Alabama case law. . .".  (Doc. 28 at 23).  In its motion to dismiss Price's first Rule 32 petition, the State asserted that Price had not properly provided the names of his witnesses.  (Rule 32 C.R., Vol. 11, Tab. 41 at 81).  The trial court dismissed the claim in the first petition with strict instructions that the claim could be reinstated if Price corrected the deficiency about which the State complained.  *Id*., Tab 42 at 1.  Price filed an amended petition which contained additional factual support for the claim, but still did not include the names of his mitigating witnesses.  The State did not file an amended answer, and it did discover the proper names of individuals by way of deposition.[22]  This court fails to see how the State was prejudiced by the delay, however, the fact remains that Price was instructed to amend his petition to include

---

[22]While being questioned by the State during the deposition, Price identified the family members that should have been contacted as his mother, Judy Files, his stepfather Danny Files, his Aunt Jerri Scott, and his grandmother, Louise Price.  (Rule 32 R., Vol. 12, pp. 392-93).  Price identified the friends that should have been contacted as Billy Wethington, Jesse Cheney and Kevin Cheney, and the teachers as Mrs. Weeks and Coach Seals.  *Id.* at 394-395.  The State did not, however, inquire as to the specific mitigating information that would be elicited from each witness.

Later in the deposition, he conferred with his own counsel and at her behest Price identified additional witnesses, those being his grandmother Evelyn Sexton, and friend Danny Ray Davis. *Id* at 444.  He answered that those were the witnesses he could remember, but agreed that it was "possible" there could be other witnesses that could have been contacted during the trial, but that he could not recollect them on the day of the deposition.  *Id*. at 444-445.

Several months after the deposition, the State pointed to the deposition as evidence of Price's failure to disclose and undue delay in support of a second motion to dismiss.  (Rule 32 C.R., Vol. 11-12, Tab 43 at 193-245).

As an aside, the reader is reminded that in the habeas petition, Price describes these witnesses as Hoyt and Louise Price, Teena Barnett, Amy Collins Crosby, Jessie Chaney, Chris Hadder, James Dockins, Alan Davis, Wayne Hamilton, Brenda Edgil and Dale Sears.  (Doc. 16 at 15-17).

the legal names of his mitigating witnesses and he did not do so.

The present inquiry, therefore, invites a determination of whether the Alabama courts, in their application of 32.6(b), have routinely required a petitioner in order to meet his burden of pleading to include identification of witness names when factual disclosure of all other aspects of the claim have been met.  Although Price offers numerous Alabama state cases as proof that Rule 32.6(b) was arbitrarily applied in his case, none of them involve the pleading insufficiency identified in this case.  (Reply (doc. 28) at 24-27).  This court cannot find whether Alabama courts have or have not consistently dismissed cases in Price's particular posture for lack of specificity.

The only provided indication that such an application, if it does exist, has been inconsistently enforced is within Price's own case, when the Court of Criminal Appeals lauded the trial court's summary dismissal of the claim for lack of specificity, but simultaneously found a possibility that Price met the pleading requirements with regard to the "paternal grandmother,"[23] and then proceeded to conduct a merits review with regard to all evidence pertaining to her.

Other than this instance, however, there is no information upon which it can be determined that the state courts' application of Rule 32.6(b) under these circumstances is inadequate simply because the state court used it in Price's case to dismiss the claim.  It would be inappropriate under these facts for this court to find for federal preclusionary purposes that the state procedural rule at issue here must be applied in such a manner that either requires a Rule 32

---

[23]Perhaps because only one individual in the world could possibly be Price's paternal grandmother.  Nevertheless, it still remains identification by relationship as opposed to legal name in a claim where all other factual support for the claim has been fully disclosed.

petitioner to identify or excuses him from identifying a witness by legal name under all circumstances.

Price is also not entitled to a merits review premised on his contention that he substantially complied with the rules. The only basis upon which the state courts ever found his pleadings to lack specificity was on his failure to adequately identify his mitigation witnesses. Yet, Price continually refused to follow the court's written instruction to identify his witnesses by name, and he had a lengthy amount of time and plenty of opportunities to do so. He also had the assistance of counsel, but still failed to act. These actions are not commensurate with an effort to substantially comply with state procedural rules, and Price cannot benefit from this argument. Additionally, the court is not persuaded by the cases[24] cited by Price to support his position. (Reply at 26-28).

As to the school records portion of Claim A.1.(c), Price offers no reply to the state court's

---

[24]Particularly, the court is not impressed with the citation to *Lee v. Kemna*, 534 U.S. 362 (2002) and *Meagher v. Dugger*, 861 F.2d at 1242 (11th Cir. 1988). In *Lee v. Kemna*, the petitioner's counsel was in the middle of a jury trial when he discovered several of the witnesses had left the courthouse. These witnesses had been present at all times during the trial up to that point, and there was some indication that a court official told them to leave. Counsel moved for a continuance in order to secure the witnesses, but same was denied. The state court justified the denial of the motion on the grounds that such motions are required to be in writing. The Supreme Court held that, because the circumstances necessitating the motion unfolded before the trial court's eyes during the middle of a jury trial, it was a manifestly unfair for petitioner's counsel to have to file a written motion supporting his need for additional time to secure the witnesses.

*Meagher* involved an attempt to withdraw a guilty plea by a *pro se* petitioner. The applicable post-conviction rules required such a motion to be made under oath. Meagher did so. Meagher's supporting memorandum was sworn to and notarized. The Florida appellate court refused to acknowledge Meagher had complied with the rule because he did not incorporate his memorandum by reference in his motion to withdraw the guilty plea. The Eleventh Circuit reversed, finding that Meagher had substantially complied with the rule and also commented *pro se* pleadings are held to less stringent requirements.

32

ruling that this claim was properly dismissed for lack of specificity under Rule 32.6(b). He does strenuously argue throughout the brief that Rule 32.6(b) was improperly applied in his case. The state court dismissed the school records portion for lack of specificity on the ground that Price never described the beneficial information purportedly contained in the record. In light of the contentions advanced in the Rule 32 pleadings by Price on this claim,[25] this court finds that the state court determination was arbitrary and capricious. However, as will be discussed below, this court is of the opinion that Price is not entitled to habeas relief as to this claim.

> **d.      Counsel were ineffective for failing to adequately interview and properly prepare Price's mother for her penalty phase testimony.**

The court addresses sub-claim (d) by examining its appearance in the Rule 32 petition, as quoted in the appellate court's opinion on collateral review. The Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> Claim [A.1.d.] of Price's petition alleged that he received ineffective assistance of counsel during the penalty phase of his trial because trial counsel failed to conduct, or engage an investigator to conduct, a reasonable investigation into mitigating circumstances.

>> "[A.1.d.]. Trial counsel did not adequately interview Mr. Price's mother, Mrs. Judy Files, or prepare her for her penalty phase testimony. Counsel did not inform Mrs. Files of the nature of the questions the defense and prosecution would put to her. As a result of counsel's and Mrs. Files' lack of preparation, Mrs. Files provided short, incomplete answers to the mostly narrow, leading questions that trial counsel herself posed. Had Mrs. Files been adequately interviewed and properly prepared, she would have been able to provide many details about Mr. Price's life,

---

[25]The petition alleged that had counsel obtained "records and interviewed Mr. Price's teachers, counsel would have discovered that Mr. Price did well in school and was generally well-behaved in class. Mr. Price maintained good grades and was not remembered as a disciplinary problem or as a student who got into fights." (Rule 32 C.R., Vol. 11, Tab 42 at 99-100).

upbringing, and character that were not otherwise presented to the jury and the Court, but which would have been relevant mitigation evidence."

([Rule 32] R. 5.)

Price "has not shown that there was any additional evidence that would have convinced the trial court to change its decision regarding sentencing." *Pierce v. State*, ___ So. 2d at ___, rev'd on other grounds, ___ So. 2d ___ (Ala. 2002). Thus, the trial court correctly ruled that the claim had not been sufficiently pleaded.

Moreover, the judge presiding over the Rule 32 proceedings dismissed this claim based on his "personal knowledge" that defense counsel adequately questioned Mrs. Files during the penalty phase of the trial. ([Rule 32 C.R.] 313.)

"'Thus, the appellant has not shown that there is a reasonable probability that the outcome of his trial would have been different, but for trial counsels' performance.'" *Hamm v. State*, ___ So. 2d at ___ (quoting *Williams v. State*, 782 So. 2d 811, 825 (Ala. Crim. App. 2000), quoting in turn *Brooks v. State*, 695 So. 2d 176, 182 (Ala. Crim. App. 1996). Because Price failed to state a claim upon which relief could be granted, summary disposition of this claim was appropriate.

(Vol. 24, Tab 61 at 26).

This court finds no fault with the state court's decision that the claim was insufficiently pled. To the extent the Court of Appeals also conducted a short "merits" review, that does not entitle the petitioner to further review by this court. It is entirely appropriate for an appellate court to make an alternate ruling without sacrificing the independence of its procedural default decision. *Thigpen v. Thigpen*, 926 F.2d 1003, 1009 n.17, (11th Cir. 1991).

Additionally, in making this claim in state court, Price alleged his mother only provided short answers to narrow questions elicited at the penalty phase, when she could have been able to provide many details about Mr. Price's life, upbringing, and character if she had been adequately interviewed and properly prepared. Price never provided any factual support for this conclusory statement. There is absolutely nothing arbitrary in the appellate court's adherence to the trial

34

court's finding that this claim was insufficiently pled under state procedural rules.   The state court therefore properly dismissed the claim for failure to follow adequate, independent and fairly applied state procedural rules, and this claim is procedurally defaulted.

Price now also adds that Mrs. Files "failed to disclose" that she frequently whipped him until he was seventeen (17) years old, when his grandmother intervened on the basis that such punishment was "inappropriate and too severe."  (Petition at 17).  He also alleges that she did not reveal that she often engaged in sexual relations with men while an adolescent Price was in the same room.  *Id.*[26]  Price complains "there [is] no evidence to suggest [his] counsel had performed a basic investigation to reveal this information."  *Id.* at 18.  These are facts that were not timely presented in support of the claim in state court, and as such, are procedurally defaulted from consideration in this habeas petition.  Further, the court notes that since the substance of the information pertains to purported abuse by his mother - facts that were well known to Price himself and which could have been easily communicated to counsel - Price's claim that counsel failed him because the information was not discovered because trial counsel failed to perform "a basic investigation," particularly when his mother was the only mitigating witness called to testify in his behalf and could have easily been examined on the subject is not persuasive.  There is simply no excuse for the delay in failing to raise these particular factual allegations before now.

> **e.**     **Counsel were ineffective for failing to engage an independent psychologist to evaluate him.**

Price next alleges his trial counsel were ineffective because they did not hire an

---

[26]This allegation made its first appearance in a petition for writ of certiorari on collateral review.  (Rule C.R. Vol. 22 at 7).

independent psychologist, nor did they make any effort to "rebut the report of Dr. Karl Kirkland prepared on behalf of the State." (Petition at 18). Even worse, counsel specifically requested, and was granted permission to hire an independent psychologist for the express purpose of contesting Dr. Kirkland's report and to prepare a mitigation case, but "inexplicably failed" to do so. *Id*.

Price believes this error was objectively unreasonable and prejudiced his defense because an independent psychologist would have uncovered abuse that Mrs. Files withheld at trial, and additionally would have been able to establish and explain to the jury the causal connection between Price's piteous childhood, its effect on his "personality and choices as he grew," and his "family history of mental illness." *Id*. Such an expert also "may have rebutted Dr. Kirkland's competency assessment." *Id*. at 19. He concludes that counsels' failure to employ a psychologist for him could not have been a matter of strategic decision making "on any level." *Id*. Because this claim was properly presented in the state courts, it will be examined on the merits.

### f.    Discussion of the merits[27]

The court begins its merits discussion with the opinion of the Court of Criminal Appeals on collateral review in connection with the mitigating evidence actually presented at trial, that being the testimony of Price's mother, Judy Files. The record shows the following:

> [t]he defense obtained the following mitigating evidence from Judy Files, Mr.

---

[27]Subclaim A.1.(e) is the only claim for which there is no dispute that § 2254(d) review is necessary. To the extent the merits discussion involves subclaims (a)-(d), (excepting the paternal grandmother and Price's school records), it shall be understood to be an alternate ruling to the finding that subclaims (a)-(d) are procedurally defaulted.

Price's mother, at his sentencing hearing.[28]

> "Q  [by defense counsel]:  "And tell the Court about your early life with Wallace [Lee Price, Mr. Price's father] after Chris was born.

> "A  [by Mrs. Files]:  "Well, **when Chris was two we moved to Florida and** . . . Wallace drank a lot.  And he made [Mr. Price at age two, drink] a pint of liquor one night till [Mr. Price] got to staggering so bad and he put him in the shower.

> " . . . .

> **"Q  He made Chris drink a pint of liquor?**

> **"A  Yes, ma'am.  Then we moved back to Fayette somewhere around '74.  And he still drank and ran up and down the roads and beat us."**

> "Q  The early years, then of Chris's life, were you a victim of domestic violence at that time?

> "A  Yes, ma'am.

> "Q  Was Wallace Price a batterer?  Did he batter you?

> "A  When he was drinking.

> **"Q  When he was drinking.  If he wasn't drinking,  what was Wallace's condition?**

> **"A  Good as gold.**

---

[28]Mrs. Files' testimony was redacted by the Alabama Court of Criminal Appeals in its opinion.  This court has reviewed the entire examination of Mrs. Files during the penalty hearing. (R. Vol. at 895-908).  If there is any testimony by Mrs. Files pertinent to the nature and gravity of Price's piteous childhood that was omitted by the Court of Criminal Appeals, said testimony or summarization thereof will be inserted in bold face type at the appropriate place in the transcript as set out in the appellate court's version.

Additionally, the Alabama Court of Criminal Appeals inserted a footnote in this portion of its opinion, advising that one (1) page of Mrs. Files' testimony (R. Vol. at 904) was absent from the collateral record.  Said page is present in the trial record and also will be inserted in bold face type.

**"Q     Was he a good daddy at that time?**

**"A        Yes, ma'am.**

**"Q  [Did the times when he was a good daddy become fewer and farther between?]**  Was he drinking more?

"A  Yeah.  He drank quite a bit there at the last up before I left.

"Q  And you've said he abused you.  Did he abuse Chris in those early years?

"A  Yes, ma'am.  He poured a bowl of hot macaroni and cheese on his head one night [when Chris was four].

". . . .

"Q  What happened when you tried to stop him?

"A  I got whipped.

". . . .

**"Q   Were there occasions of daily emotional abuse as well as physical abuse?**

**"A        Well not every day, no."**

"Q  . . . . There [was] emotional abuse as well as physical abuse that Chris endured?

"A  Yeah.  He saw things that [Wallace] done to me, pulling knives and guns.

"Q  There were times when there were violent episodes that happened in your home that Chris witnessed at an early age?

"A  Yes, ma'am.

"Q  These were numerous?

"A  . . . .  They got to being regular at the end.

". . . .

38

"Q  Did the abuse get worse and worse for Chris?

"A  Yes.

"Q  Tell the Court what happened in the summer of 1975 when you and Chris and Wallace were in the channel swimming.

"A  [Wallace] tried to drown me in front of [Chris] and he told him, 'Please, daddy, don't.'

"Q  How old was Chris at that time?

"A  Three years old.

"Q  And he attempted to intervene –

"A  Yes, ma'am.

"Q  - when Wallace tried to drown you.  Were there times when Chris witnessed Wallace with weapons that he held to your head?

"A  Yes, ma'am.

"Q  What happened to Wallace Price?

"A  He was shot and killed in '77.

"Q  And where were you and Chris at that time?

"A  Amarillo, Texas.

"Q  Why were you there?

"A  We had left — fled for our life.

"Q  For fear of what?

"A  Fear [Wallace] was going to kill us.

". . . .

"Q  After Wallace Price died, was there someone else that lived in your home that mistreated Chris?

"A  Yes, ma'am. John Harris moved in with us [about a year and a half after Wallace died].

". . . .

"Q  What happened when Johnny Harris lived there and Chris was there?

"A  . . . . [H]e whipped him one day till he like to beat him to death, and mental abuse, verbal.

**"Q  Were you working two jobs to support the three of you at that time?**

**"A  Yes, ma'am.**

"Q  When you discovered that he had nearly beaten Chris to death, what happened to Johnny Harris?

"A  I sent him home.

"Q  And he was no longer a part of your life?

"A  No, ma'am.

**"Q  Following - what happened during the time he lived with you all?  Was he a substance abuser, alcohol, drugs?**

**"A  Johnny drank beer is all.**

"Q  After Johnny, who was the next person in Chris' life?

"A  I married Ted Sills from Monticello, Mississippi.

"Q  And how long did you and Chris live with him?

"A  Nearly four years.

"Q  What were the conditions when you lived with Ted?

"A  He drank and smoked pot.

"Q  Did he do those things in front of Chris?

40

"A  Yes, ma'am.

"Q  Did he verbally abuse Chris?

"A  Yes.

**"Q  Did he physically abuse Chris?**

**"A  Well, I never did see that.**

"Q  Did Chris ever tell you that he had been physically abused when you were not home?

"A  Yes, ma'am.

"Q  And when did you divorce him?

"A  In 1984.

"Q  When did you marry Danny Files?

"A  In August of '85.

". . . .

"Q  . . . . [H]e was a positive influence, was he not?

"A  Yes, ma'am.

"Q  During these several years in limbo after Wallace died, were there occasions when you were having to work two jobs and there was sometimes not enough for food or very little money for food?

"A  Well, we always had plenty to eat, but I had to work two jobs sometimes to make ends meet.

"Q  And there were occasions when the men in your life didn't work and you were supporting them as well?

"A  Yes, ma'am.

". . . .

"Q  . . . . [T]here were long periods of time when you'd be gone for

41

two shifts and [Chris would] be left with someone you now know was a physical abuser?

"A  Yes, ma'am.

"Q  Were there other significant incidents in Chris' life that have had a profound effect on him?

"A  Well, that just went on, like I said, while I was with them others, long periods of time, you know. . . .

". . . .

**"Q . . .  Were there occasions where you had to seek law enforcement intervention to protect yourself and your child from Wallace Price?**

**"A  Yes, ma'am.**

**"Q  Would that happen on more than one occasion?**

**"A  Well, only one time we had him locked up for trying to - - He was trying to kill me that day.**

**"Q  Were there occasions when you had to call them when the violence escalated?**

**"A  (Witness nodding head)**

**"Q  Were there times when you had to leave your home because you knew the violence was going to escalate?**

**"A  Yes.  I had to leave several times.**

**"Q  And Chris would see these escalations?**

**"A  Yes, ma'am.**

**"Q  More than one occasion that Chris would intervene?**

**"A  Several times.**

**"Q  And would sometimes he take the beating and sometimes you would take the beating?**

42

"A  Well, he would just get slapped and I would take the beating.

"Q  Were you ever hospitalized from these beatings?

"A  No, ma'am.

"Q  Judy, tell the Court overall what kind of a child that Chris has been for you.

"A  He didn't give me any trouble till he was seventeen years old.

"Q  Was he polite?

"A  Yes, ma'am.

"Q  Was he respectful?

"A  (Witness nodding head).

"Q  Did he do what you told him to do?

"A  (Witness nodding head).

"Q  Did he carry his load in your home?

"A  Yes, ma'am.

"Q  Did he go to school?

"A  On a regular basis.

"Q  Make fairly good grades?

"A  And he had a job.

"Q  He worked when he was in high school?

"A  Yes, ma'am.

"Q  Isn't it a fact that he was still in high school, the middle of his senior year, in fact, when this incident happened?

43

"A  Yes, ma'am.

"Q  Was [Chris] working [at the time Mr. Lynn was killed]?

"A  Yes, ma'am.  He worked at D's Pizza in Winfield.

"Q  He was not a lazy child?

"A  No, ma'am.

"Q  Is there anything else you'd like to tell this Court about Chris?

"A  . . . . I know he's not heartless and I just want things to work out for him.

"Q  He is a good, mourningful [sic] individual in your opinion.

"A  Yes, ma am. I think he's worth saving."

(Record from sentencing hearing on direct appeal 896-905. [footnote  omitted])

**[On cross-examination, Ms. Files denied that she had ever noticed, or that Price had informed her, that he was disturbed by his experiences.  On redirect, however, she admitted  that during his adolescence, she and Price did have some discussion about the death of his father and history of abuse, but provided no details.  *Id.* at 906-07.  Additionally, the following colloquy was had between the prosecutor and Ms. Files:**

**"Q  Was Chris himself ever hospitalized on any of these [abuse] occasions?**

**"A  No, sir.**

**"Q  He never had any injuries that required him to be treated by a doctor?**

**"A  He just blacked his eyes sometimes and just bruised him, that's all.[29]"**

---

[29]*Id*. at 907.

44

(Vol. 24, Tab 61 at 29-35).

Nothing in the record before this court meets the § 2254(d) standards entitling the petitioner to any relief on the various allegations included in this first claim (Claim A.1.). The state court's conclusion that trial counsel was not constitutionally ineffective is neither contrary to nor an unreasonable application of federal law, nor an unreasonable determination of the facts in light of the evidence presented to it. With regard to the allegations that trial counsel did not seek out other family members, friends, acquaintances, and school teachers, this court agrees that when all the evidence from both the guilt and penalty phases of the trial are considered, the court cannot conclude that this evidence would have had any impact on his sentence. Contrary to Price's contention, his mother's testimony was neither terse nor incomplete. At trial, Price's mother described, and the jury and trial court heard testimony about a childhood riddled with turmoil. None of the purported mitigating evidence Price would have offered during collateral proceedings constituted information that had not already been revealed by his mother at trial. In addition to describing his piteous childhood, Price's mother also stated that Price attended school regularly, was a good student, was employed and had never been a disciplinary problem until he was seventeen. There is no reasonable probability, given all of the aggravating and mitigating factors in this case, that testimony from Price's aunt and paternal grandmother as to their love for him and his artistic skills (in addition to abuse testimony already given by his mother), would have swayed the jury or the trial court to recommend or sentence Price to life without parole. In sum, this court agrees with the conclusion of the Alabama Court of Criminal Appeals, "It certainly would not have changed the outcome, and it did not render the sentencing fundamentally unfair or unreliable." (Vol. 24, Tab 61 at 29).

45

Additionally, there is no factual support for the proposition that Price's teachers or his school records would have led to any information that was not cumulative to that given by his mother. Finally, with regard to Price's friends and girlfriend, calling these witnesses could have been a double-edged sword. Prior to the murder, Price already had adult felony criminal convictions on his record. Additionally, in his pre-sentence investigation report, Price informed the probation officer that, at the time of the murder, his teenage girlfriend had been threatening to turn him into authorities for having sexual relations with her as a minor, that she was pregnant, and that he did not have enough money to pay for the abortion. (C.R. Vol. 1 at 196-97). In short, none of the information that could have been offered by his friends, as Price has presented it, would have been compelling, persuasive character evidence in light of Price's record, and calling his former girlfriend could have been a catastrophe in the making.

Turning to the petitioner's claim involving the paternal grandmother, the Court of Criminal Appeals stated:

> Trial counsel was not ineffective because the paternal grandmother's testimony, as plead in the petition (and as presented to this Court in oral argument), would have been cumulative of evidence actually presented at the sentencing hearing by Mrs. Files. That is, that Price was beaten by his father and stepfathers, and had, in general, a very bad early childhood. Unpresented cumulative testimony does not establish that counsel was ineffective. *See Pierce v. State*, — So. 2d at —, rev'd on other grounds, — So. 2d — (Ala. 2002) (" 'Trial counsel's performance was not "outside the wide range of professionally competent assistance simply because they failed to present evidence that would have been cumulative of other evidence presented at trial." ' ")

> Thus, Price has not shown how his trial counsel's conduct was deficient or how the outcome of his trial would have been different had his trial counsel performed differently regarding this claim. Therefore, Price has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Because Price failed to state a claim upon which relief could be granted, summary disposition of this claim was appropriate.

46

(R. Vol. 24, Tab 61 at 35).   This court agrees with the Court of Criminal Appeals and finds the purported testimony sufficiently cumulative to preclude any relief.

As to the allegation that trial counsel failed to present mental health testimony as mitigating evidence, the Court of Criminal Appeals made the following findings of fact and conclusions of law:

> . . . . The circuit court found trial counsel's actions to be a tactical choice. Here, pursuant to the circuit court's order, an outpatient forensic evaluation report was prepared for Price by Dr. Karl Kirkland, a licensed psychologist and a certified forensic examiner.  Dr. Kirkland's report concluded that there was no evidence "of any mental disorder that would, affect [Price's] ability to appreciate the criminality of his behavior or to be able to distinguish right from wrong at the time of the offense."  ([Rule 32]C.[R.] 462.)
>
> . . . .

The circuit court concluded in its order that:

> "Based on Dr. Kirkland's report, it is entirely impossible for Price to establish that a reasonable lawyer would have sought to obtain a psychologist to testify as to any effect that Price's upbringing had on committing this crime.  Dr. Kirkland's report was a guarantee to defense counsel that any such psychologist would face cross-examination on the issue. In addition, defense counsel could be sure that the State of Alabama would call Dr. Kirkland in rebuttal . . . . Thus, where Dr. Kirkland would testify without hesitation that, even considering Price's upbringing and social conditions as a child, there are no mental problems present that would have ever reached the level of severity that would have rendered this individual incapable of appreciating the criminality of his behavior at the time of this particular offense, 'a reasonable attorney could decide not to call a psychologist to attempt to draw a line between Price's upbringing and the capital murder of Bill Lynn.'"

([Rule 32] C.[R.] 322.)

The circuit court continued by stating that it appeared to be reasonable strategy to allow the jury to draw its own conclusions regarding the circumstances of Price's childhood based on Mrs. Files's description of Price's childhood

47

> without opening the door for the State to present the opinion of Dr. Kirkland.
> Counsel's tactical decision to not present possible mitigating evidence does not
> render counsel ineffective.

(Vol. 24, Tab 61 at 46-48).

To the extent that Price claims that counsel were constitutionally ineffective for failing to hire and call to the stand a psychologist to testify in his behalf.  This court disagrees.  First, Price's statement that his expert could have rebutted Dr. Kirkland's competency assessment is vague, general and conclusory.  There is no indication or factual support, much less an independent claim, made by Price to support that he was legally incompetent at the time the crimes were committed.

As for an expert designed solely to explain Price's personality disorders for mitigating purposes, it is clear counsel requested, was granted money to hire an expert, and then failed to hire an expert to examine Price's mental history from a mitigating standpoint.  Even if this error constitutes objectively deficient counsel under *Strickland* and *Wiggins*, Price must still show he was prejudiced by the error.  This he cannot do.  During collateral proceedings, the trial court granted discovery pertaining to his physical and mental health from various corrections facilities, as requested by Price's counsel.  Since none of these medical records, or even a factual allegation that could be purportedly supported by the records, has appeared in the record or been made by Price, the court can only assume the records revealed no additional mitigating mental health evidence beneficial to Price.

The appellate court's contention that the jury and trial court had the ability, within each of their decision-making processes, to make the causal connection between Price's grossly piteous childhood and the development of personality disorders, was not an unreasonable interpretation

of the facts in light of the evidence before it.  Since no expert was called to testify specifically about mental health issues, if anything, Price was afforded an inference in his favor, if for no other reason than the lack of explanation and further elucidation of his mental issues.

Additionally, close examination of the trial court's sentencing order shows that the trial judge indeed made those inferences, in favor of Price.  The order reads, *in pare materia*,

## STATUTORY MITIGATING CIRCUMSTANCES

The Court find that the statutory mitigating circumstances listed in Ala Code § 13A-5-51 (2)(3)(4)(5)(6) are inapplicable.  The Court finds that the mitigating circumstance[s] listed in Ala Code § 13A-5-51(1)(7) are applicable.

1.  The defendant has no significant history of prior criminal activity.

The Court finds that this statutory mitigating factor is applicable.  The certified records of the Circuit Clerk of Walker County, Alabama show that the defendant plead guilty to charges of: criminal trespass; auto burglary; criminal mischief; and receiving stolen property in September of 1990.  All of these crimes appear to be related and arise out of the same series of events.

The record does not show that an application for the defendant to be treated as a youthful offender was filed in these cases.  If the convictions were to be set aside, they could still be used to show a history of criminal activity to some degree, however, the court finds that they are not sufficient to indicate a significant history of prior criminal activity.

. . . .

7.  The age of the defendant at the time of the crime.

The Court finds that this statutory mitigating factor is applicable.  The defendant in this cause was nineteen years of age when he committed the crime and this age was considered by the Court as a mitigating factor.

## OTHER RELEVANT MITIGATING CIRCUMSTANCES

The defendant offered evidence of the following non-statutory mitigating circumstances that the Court deemed to be relevant and which were considered by the Court in weighing the aggravating and mitigating circumstances in determining the sentence to be imposed.

49

1.   The defendant's father was murdered when the defendant was a small child.  The Court considered this factor and the possible impact that such a traumatic event could have on the emotional stability of the defendant.

2.   The defendant was verbally, physically and possibly sexually abused by a string of live in companions of his mother that occupied his house after the murder of his father.

3.   The court file contained and the Court considered a psychological evaluation that indicated that the defendant has been diagnosed as having an antisocial personality and was emotionally disturbed at an early age.  This report was considered in conjunction with the evidence of the instability of his home life and the traumatic events that occurred during his early years.

(R. Vol. 1 at 215-18).

It is clear that any evidence that could have been interpreted to be mitigating evidence in Price's favor was construed in that manner by the trial judge.  As articulated above by the trial court judge, Price had no significant criminal history, and detailed his finding by revealing Price had not been offered youthful offender status and that his criminal convictions arose from one continuing act.   Additionally, although Price's mother did not testify that Price had been sexually abused, the court surmised the same was possible, and considered this too, as mitigating evidence.  Finally, the trial court actually found Dr. Kirkland's assessment of Price's personality disorders to be mitigating evidence in favor of Price because he considered the assessment in conjunction with (*i.e.,* to establish a causal connection to) the evidence of Price's piteous childhood.  In fact, the trial judge also expressly reiterated that he found Price's anti-social personality disorder to be a mitigating factor in his Rule 32 opinion.  (Rule 32 C.R., Vol. 12 at 323).[30]

---

[30]The court has examined Price's submission of an affidavit of Dr. Kimberly Ackerson, a licensed psychologist.  (See Doc. 28, Ex. B)  He alleges the affidavit shows the penalty phase of his

In conclusion, even if it could be said that counsel's investigation was desultory in some areas, examination of the aggravating and mitigating factors actually presented at trial and the evidence Price desired to present during the post-conviction proceeding does not show that there exists a reasonable probability the jury would have recommended life without parole and the trial court would have not sentenced Price if Price's counsel had presented it.  Accordingly, Price cannot show that the state court's decision was contrary to or an unreasonable application of clearly established federal law, nor can he show same was an unreasonable interpretation of the facts in light of the evidence before it.  Price's  request for habeas relief with regard to Claim A.1.(a)-(e) is due to be denied.

> **2.** **Counsel did not accompany Price to, or advise him in preparation for critical pre-trial and pre-sentencing proceedings.  (Paragraphs 42-45 of the petition).**

> **3.** **Trial counsel requested no penalty phase instructions from the trial court.  (Paragraphs 46-47 of the petition).**

Price contends that counsel failed to advise him about or accompany him to the probation office in anticipation of the preparation of his pre-sentence investigation report, nor did counsel accompany him to his mental health examination by Dr. Karl Kirkland.  (Doc. 16 at 20).  He also alleges that "[a] criminal defendant is entitled to the assistance of counsel at all critical stages of pre-trial and trial proceedings under the Sixth Amendment to the United States Constitution."  *Id*.  According to Price, his trial counsel's failure to prepare him to speak with Dr. Kirkland violated his Sixth Amendment right to counsel and constituted ineffective assistance.  *Id*.

---

case would have been "strengthened significantly" by an independent psychologist.  (Doc. 28 at 42).  The affidavit offers nothing of the sort.  It is, for the most part, a repeat of Price's petition, and does not sway the court's position.

Price also asserts that his trial counsel failed to object to "the admission into evidence of Dr. Kirkland's report." *Id.* at 21.  Specifically, he asserts he was entitled to a warning that any incriminating statements made by him to Dr. Kirkland could "be used against him at trial, and to counsel's assistance in evaluating whether to waive his Fifth Amendment protection against compelled testimonial self-incrimination." *Id.*  Further, counsel did not test "the effectiveness of the waiver asserted by the State," even though it was the State's burden to show Price's waiver was "knowing, intelligent and voluntary." *Id.*  Price asserts he was prejudiced as a result of this failure because

> [t]he report included an incriminating summary statement of the offense and an incomplete psychological profile.  Had counsel objected to the admission of Dr. Kirkland's report, there is a reasonable probability that the trial court would have excluded the report in whole or in part, and that Mr. Price's sentence would have been different.

*Id.*  Price further asserts that his counsel failed to provide him assistance at a critical stage of his proceedings because they requested no penalty phase instructions.  *Id.*

The respondent asserts that these claims fail to satisfy federal pleading requirements. (Doc. 21 at 51-58).  Alternatively, the respondent contends some of the subclaims are procedurally defaulted or that Price has not shown that the state court's decisions are contrary to or an unreasonable application of clearly established federal law.  *Id.*

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c."  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted)).  The petitioner must specify all the grounds for relief available to the petitioner, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254 Rule 2(c)(1)(2) & (3).

52

A "general reference to the transcripts, case records and brief on appeal patently fails to comply with Rule 2(c)."  *Phillips v. Dormire*,  2006 WL 744387, *1, (E.D. Mo. 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)).  With regard to the facts supporting his case, the burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983).  Consequently, a petitioner must at least state the evidence establishing the alleged constitutional violation.  The mere assertion of a ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

Claims A.(2) and (3) are simply a series of conclusory statements, and as such are due to be dismissed pursuant to the procedural rules governing habeas proceedings.  Price offers no factual support for what counsel should have done as reasonably competent counsel in those circumstances and proffers no support for why he was suffered any prejudice.  Thus, the claims are insufficiently pled for habeas purposes.  Because the state court arrived at the same finding, the claims are procedurally defaulted because they were dismissed pursuant to adequate and independent state procedural rules.  Even if these claims were not due to be dismissed for failure to comply with federal pleading requirements or because they are procedurally defaulted, they would also be due to be denied on the merits.

**B.     Ineffective assistance of counsel at guilt phase**

**1.     Trial counsel did not litigate an important pre-trial motion. (Paragraphs 48-50 of the petition)**.

Price declares that defense counsel failed to litigate or request a continuance to gather factual evidence in support of a pre-trial motion for change of venue due to "overwhelming

53

pretrial publicity." (Doc. 16 at 22-23). Specifically, he states that counsel did not even seek

"expert assistance to investigate the extent to which the overall county had been saturated with

accounts of the crime in the media . . .," even though

> [t]he victim was a much loved clergyman of a local church to which a large
> portion of the jury venire belonged.[31] The crime itself was sensational, occurred
> days before Christmas, and culminated in a multi-state manhunt that led to the
> out-of-state arrest of Mr. Price approximately ten (10) days after the crime. The
> petit jury venire was selected for a specially scheduled session of criminal
> court.[32] When the trial was continued for one week, the entire special session
> was postponed; even the State was aware that a substantial portion of the venire
> would be disqualified during voir dire because of the controversial and high-
> profile exposure of Mr. Price's case.

*Id.* at 23.

Price has not shown that the denial of his ineffectiveness claim pertaining to the motion

for change of venue, as it was presented to the state court in collateral proceedings, in any way

violates or unreasonably applies the *Strickland* standard and its progeny, nor does it represent an

unreasonable determination of the facts in light of the evidence. Price has failed to present a

factually or legally supported claim of ineffectiveness. He further proffered no evidence of any

media coverage at the Rule 32 hearing other than the newspaper articles already presented at

trial. Thus, Price has not shown his trial counsel were objectively deficient for failing to further

research and present evidence concerning the subject, nor has he presented any evidence to show

there was a reasonable likelihood the outcome of his trial would have been different had that

evidence been presented. This claim is due to be denied.

---

[31]There is no citation to the record to support this bald assertion.

[32]While there are hints in record that Price's case was specially set, Price provides no citation
to the record showing that the case was specially set simply because of publicity concerns. Again,
this is a bald assertion.

**2.      Trial counsel did not conduct nor ensure that the trial court conducted adequate voir dire of potential jurors.  (Paragraphs 51-53 of the petition).**

Price complains that his trial counsel conducted an inadequate individual *voir dire* of the jury venire by "fail[ing] to ask routine questions designed to discover relationships potential jurors may have had with witnesses at trial and organizations to which the victims or witnesses belonged."  (Doc. 16 at 23-24).  Specifically, he asserts that counsel was unable to tell if certain venire persons held biases as a result of their personal relationships with witnesses, and/or affiliations with law enforcement or religious entities.  *Id.* at 23-24.  Price also complains that counsel failed to "object to the inadequacy of the trial court's *voir dire*" after the parties and the court were made aware of a glib conversation that had taken place between two jurors, in the presence of other venire persons, concerning the type of murder weapon purportedly used in the crime.  *Id.* at 24.

The respondent answers that the foregoing allegations fail to satisfy federal pleading requirements; the claims are procedurally defaulted because they were summarily dismissed pursuant to state procedural rules; and, the petitioner has not shown that any state court ruling on the merits is contrary to or an unreasonable application of clearly established federal law.  (Doc. 21 at 67-74**)**.

The court's review of this claim shows that it is due to be dismissed as vague and conclusory.  Alternatively, it is procedurally defaulted.  Still further, the court finds that Price has failed to show he is entitled to any federal relief pursuant to 28 U.S.C. § 2254(d).

**C.      The trial court erred when it denied Price's motion for change of venue despite a clear showing of prejudicial and pervasive media coverage and potential juror knowledge of the case, thus violating his right to a fair trial and due process of law.  (Paragraphs 54-60 of the**

55

**petition)**.

Price next declares the trial court erroneously denied his motion for change of venue, even though he presented sufficient evidence to show the "county [in which he was convicted was] soaked with prejudicial publicity[.]" (Doc. 16 at 24-27). In support of his contention, he quotes portions of trial counsel's *argument* in support of the motion for change of venue and refers to newspaper articles - both of which were delivered and admitted immediately after the jury was selected. *Id*. at 25 and (R. Vol. 3, at 364-67). He also declares that every juror except Joey Simmons had heard of the case before trial, and it is "likely" that six jurors may have been prejudiced by a glib exchange that took place about the perpetrator and the use of an axe during the crime. *Id.* at 27.

### 1. Pre-trial Publicity and Change of Venue-General Constitutional Law.

In *Meeks v. Moore,* 216 F.3d 951, 960-61 (11th Cir. 2000), the Eleventh Circuit announced:

> The law on pretrial publicity as it relates to the necessity for a change of venue is clear. The standards governing this area derive
>
>> from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors. The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere. In such a case, due process requires the trial court to grant defendant's motion for a change of venue. . . . .
>
> *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985) (internal citations and quotation marks omitted). [FOOTNOTE OMITTED] This does not mean, however, that a defendant is entitled to a change of venue whenever potential jurors have been exposed to the facts of the case.
>
>> It is not required . . . that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse

56

> methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961).

A defendant is entitled to a change of venue if he can demonstrate either "actual prejudice" or "presumed prejudice."

> To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided[33] the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court.

*Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (internal citations and quotation marks omitted). If a defendant cannot show actual prejudice, then he must meet the demanding presumed prejudice standard.

> Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation . . . . [W]here a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, jury prejudice is presumed and there is no further duty

---

[33]The word "decided" references only those individuals who are chosen as jurors in a defendant's case. *See Spivey v. Head,* 207 F.3d 1263, 1270 (11th Cir. 2000). Therefore, venirepersons who are not chosen as jurors are immaterial to the actual prejudice standard.

to establish bias.

> *Kemp*, 778 F.2d at 1490 (internal citations and quotation marks omitted); *see also*
> *Manning v. State*, 378 So. 2d 274, 276 (Fla. 1979) ("[A] determination must be
> made as to whether the general state of mind of the inhabitants of a community is
> so infected by knowledge of the incident and accompanying prejudice, bias, and
> preconceived opinions that jurors could not possibly put these matters out of their
> minds and try the case solely on the evidence presented in the courtroom.").

*Meeks v. Moore,* 216 F.3d at 960- 61.[34]

> To determine whether [a petitioner] has established presumed prejudice,
> we examine whether: (1) the pretrial publicity was sufficiently prejudicial and
> inflammatory; and (2) the publicity saturated the community in which the trial was
> held.  *See Coleman,* 708 F.2d at 544 (relying on *Murphy v. Florida,* 421 U.S. 794,
> 798-99, 95 S. Ct. 2031, 2035-36, 44 L. Ed. 2d 589 (1975); *Rideau v. Louisiana,*
> 373 U.S. 723, 726-27, 83 S. Ct. 1417, 1419-20, 10 L.Ed.2d 663 (1963); and
> *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913,
> 101 S. Ct. 1986, 68 L. Ed. 2d 303 (1981)).  This court has repeatedly noted that
> the principle of presumed prejudice "is rarely applicable and reserved for extreme
> situations."  *Bundy v. Dugger,* 850 F.2d 1402, 1424 (11th Cir.1988), *cert. denied*,
> 488 U.S. 1034, 109 S. Ct. 849, 102 L. Ed. 2d 980 (1989); *Woods v. Dugger*, 923
> F.2d 1454, 1459 (11th Cir.), *cert. denied*, 502 U.S. 953, 112 S. Ct. 407, 116 L. Ed.
> 2d 355 (1991).

*Mills v. Singletary,* 63 F.3d at 1010.  A proper inquiry involves review of a "number of factors

[to] determin[e] whether the totality of the circumstances raise" the presumption of prejudice.

*Patton v. Yount*, 467 U.S. [1025,] 1030 [(1984)].  A trial court's findings concerning this issue

will be overturned "only for 'manifest error.'"  *Id.* (citing *Irvin v. Dowd*, 366 U.S. at 723).

> 2.    **Price's case.**
>
>     a.    **The state appellate court's opinion**.

The Alabama Court of Criminal Appeals examined this claim and found as follows:

---

[34]*See also,  Mills v. Singletary*, 63 F.3d 999, 1009 (11th Cir. 1995) (quoting *United States
v. De La Vega,* 913 F.2d 861, 864-65 (11th Cir. 1990), *cert. denied*, 500 U.S. 916 (1991); *United
States v. Lehder-Rivas,* 955 F.2d 1510, 1525 (11th Cir. 1992), *cert. denied*, 506 U.S. 924 (1992)).

XV.

The appellant argues that the trial court improperly denied his motion for a change of venue, because, he says, he made a clear showing of media saturation and because of the potential jurors' familiarity with the facts of the offense. In his brief on appeal, the appellant cites language by defense counsel in his motion for a change of venue specifically alluding to the fact that the victim was well known in the community, and that the crime was very sensational based on the fact that the victim was a preacher and it was committed during the Christmas season.

. . . .

In the present case, in support of his motion for a change of venue, the appellant introduced a number of newspaper articles from the Fayette County Times-Record and the Tuscaloosa News. The articles introduced by the appellant were released approximately a year before the appellant was brought to trial. They were neither inflammatory nor prejudicial to the appellant. There was no showing that the pretrial publicity had so saturated the community as to have a probable impact on the prospective jurors.

. . . . An extensive and thorough voir dire examination was conducted wherein 6 veniremembers indicated that they had not heard or read about the offense. Of the remaining veniremembers, 8 prospective jurors who indicated that they may have been partial were struck for cause. The remaining veniremembers were individually questioned; 4 of these potential jurors were thereafter excused as the questioning revealed possible partiality. The others all stated that they could disregard any pretrial publicity and render a fair and impartial verdict based solely on the evidence presented at trial. Thus, the appellant has also failed to show the existence of any actual jury prejudice.

There has been no showing of "manifest error" by the trial court concerning the findings of impartiality of the jury and there has been no showing of abuse of discretion by the trial court in overruling the appellant's motion for a change of venue.

*Price v. State*, 725 So. 2d at 1049-51.

### b.   Price's claim and argument.

In his petition and reply brief, Price fails to recognize the distinction between actual prejudice and presumed prejudice. In doing so, he also fails to separate those facts that are pertinent to the actual prejudice standard from those that are pertinent to the presumed prejudice

59

standard.

###    i.    **Actual prejudice**.

The only facts alleged by Price that are pertinent to the actual prejudice standard are: (1) his declarations that every juror except Joey Simmons had heard of the case before trial, and (2) that it was "likely" six jurors may have been prejudiced by a comment about the perpetrator and an axe that occurred during voir dire. (Doc. 17 at 27). These facts are insufficient to demonstrate actual prejudice for a number of reasons.

First, simply asserting that a juror "heard" of the case before trial completely fails to state a constitutional claim under the actual prejudice standard. In order to show actual prejudice, Price must demonstrate that a particular juror (or jurors) held a fixed opinion about the case because of the publicity, and said juror(s) could not set aside that opinion in order to render a decision based solely upon the evidence and the law.

Second, the assertion that six (6) jurors "likely" were prejudiced by a glib courtroom comment by one venireperson about whether "the man, the gun, or the trigger" caused the murder, to which another venireperson responded that he heard it was the axe, also fails to state such a claim. Price has simply failed to show the jurors developed any opinion, much less a fixed opinion concerning the exchange, and he certainly has not shown that the jurors could not have decided the case according to the evidence and the law.

This court finds that Price has failed to show he suffered actual prejudice such that the trial court's refusal to change venue[35] was either contrary to or involved an unreasonable

---

[35]While this court agrees with the state court's conclusion that Price failed to show he was actually prejudiced by pre-trial publicity, it does not agree with the appellate court's inclusion of individuals who were not chosen as jurors in its actual prejudice analysis.

application of clearly established federal law, or was based upon an unreasonable determination of the facts in light of the evidence before it.

### ii.     Presumed Prejudice.

Price alleges he met the presumed prejudice standard through media coverage and *voir dire*.  The court will examine each factor, and Price's position, to determine whether the state court's decision was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts based upon the evidence before it.

### 1.     Media Coverage.

As factual support for this aspect of his claim, Price attempts to characterize trial counsel's oral argument as evidentiary proof that media coverage of his case was both prejudicial and pervasive.  (Doc. 16 at 25-26) and (R. Vol. 3 at 366-67).  In actuality, 16 pages of newspaper articles constitute the only media evidence counsel submitted in support of the motion.  (Doc. 26).[36]  Thus, trial counsel's oral argument shall only be considered to the extent that she alleged the newspaper articles established prejudicial and pervasive publicity.

Before continuing, it is important to note that in his reply brief, Price alleges that while he believes the "prejudicial pre-trial clippings" submitted at trial were sufficient evidence supporting the motion for change of venue, he also has supplemental evidence of additional

---

[36]Immediately after *voir dire*, defense counsel argued the motion for change of venue and in support thereof of offered "Defendant's Exhibit 1" into evidence.  She identified Exhibit 1 as "[A]ll the newspaper articles except for the last three days probably."  (R. Vol. 3 at 368).  The Exhibit was titled by the trial's court reporter as "Defendant's Hearing Exhibit 1," and is described as 16 pages of newspaper articles.  (See court reporter's index of trial exhibits at R. Vol. 2 at 7 of the record filed by the respondent).  These articles were not filed along with Price's habeas petition, so the court issued an order to expand the record to include "Defendant's Exhibit 1."  On January 17, 2007, the parties filed a copy of "Defendant's Exhibit 1."  (See Exhibit 1 to Doc. 26).

newspaper articles that have never before been presented.  (Doc. 28 at 57).  Attached to the reply

brief at Exhibit C is a six page list of various newspaper articles, revealing only the date,

newspaper and caption of each article.  Price offers to submit the articles at the court's behest and

insists that, "at the very least, [he] is entitled to an evidentiary hearing to supplement the record

demonstrating prejudicial pretrial publicity" because "[t]o the extent that 'the material facts were

not adequately developed at the state court hearing,' *Townsend* [*v. Sain*], 372 U.S. [293] at 313

[(1963)]," that failure should be attributed to "trial counsel's ineffectiveness and the trial court's

own failure to demand greater proof to support the motion for change of venue when it was

abundantly clear that such proof was available."  *Id*.

    Price additionally argues that his case is "exactly" like the petitioner in *Coleman v. Zant*,

708 F.2d 541, 546 (11th Cir. 1983), wherein the Eleventh Circuit ordered an evidentiary hearing

when, "through no fault of the petitioner, it was 'impossible to determine what kind of coverage

emanated from local television and radio programs to which Seminole County residents were

exposed.'  708 F.2d 546.  In that case, exactly as in this one, trial counsel had referenced

'extensive radio and television coverage' but did not submit documentary evidence to

substantiate it.  *Id*."  (Doc. 28 at 57).

    Price's argument is without merit for several reasons.  First, *Coleman* was decided prior

to AEDPA, which as stated earlier, places more stringent limitations on the scope of habeas

review.  This claim is presented as one of trial court error only, and pursuant to 28 U.S.C. §

2254(d), the scope of this court's review is limited to determining whether the state appellate

court's decision to uphold the trial court's denial of the motion was contrary to or an

unreasonable application of clearly established federal law, or based upon an unreasonable

determination of the facts in light of the evidence before it.  In short, based upon the manner in which Price has presented the substantive claim, this court has no authority to allow Price to expand the factual basis for his claim to the extent he proposes, and make a 2254(d) decision that includes those facts.

Price attempts to persuade this court otherwise by contending that "any incompleteness in the record was due to the failings of trial counsel and the circuit court, not Mr. Price."  *See* 28 U.S.C. § 2254(e)(2) (an evidentiary hearing can only be denied where the petitioner himself "failed to develop" the factual record below).  (Doc. 28 at 58).  Again, this argument is without merit.  Section 2254(e)(2) cannot be interpreted as applying only to Price as an individual.  If that were the case, then federal district courts would be constantly re-litigating substantive constitutional claims that have already been exhausted and decided on the merits during the direct review process.

Moreover, what Price fails to note is that the Eleventh Circuit granted Coleman's request for an evidentiary hearing because his state post-conviction attorney repeatedly tried, but

> was unable, through no fault of his own, to bring live witnesses to the state habeas hearing.  At the time of that hearing, Ga. Code Ann. § 38-801(e) limited the state habeas court's subpoena power by providing that a subpoena for attendance at a hearing or trial could be served only within 150 miles of the hearing or trial situs. The habeas judge rejected petitioner's constitutional attack on that statute.  Record on Appeal, at 251-53.  Since material witnesses resided more than 150 miles from the location of the state habeas hearing, and since many of these witnesses were hostile and unwilling to testify voluntarily, State Habeas Hearings, vol. I, at 18; *id.*, vol. II, at 22-23, it is clear that petitioner was unable to bring live witnesses to the state habeas hearing.  Petitioner was also effectively precluded from obtaining the testimony of such witnesses by oral deposition, because petitioner was indigent and the state habeas court declined to provide funds which would have been necessary to pay a court reporter or stenographer to transcribe such depositions.  State Habeas Hearings, vol. I, at 29 & 34-35; *id.*, vol. II, at 22. Although petitioner apparently could have compelled witnesses to answer written interrogatories or to file sworn affidavits, respondent has not argued either in brief

> or at oral argument that petitioner's failure to pursue such alternatives, or that any
> other acts or omissions, constituted inexcusable neglect or deliberate bypass.
> Moreover, it is uncertain at best whether such methods would have been effective
> to elicit from hostile witnesses the subtle and complex facts relative to the degree
> of prejudice in the community at the time of the trial.  Under the particular
> circumstances of this case, the failure to adduce the missing material facts "cannot
> realistically be regarded as ... [petitioner's] inexcusable default."  *Townsend v.*
> *Sain*, 372 U.S. at 322, 83 S. Ct. at 762.

*Coleman v. Zant*, 708 F.2d at 548.  Unlike *Coleman*, there is no evidence whatsoever that Rule

32 counsel (and certainly not trial counsel[37]) repeatedly attempted to obtain and present evidence

of additional media coverage, but were continually thwarted by any state court.

Additionally, federal precedent demands the burden be placed upon the defendant's trial

counsel to persuade the trial court that a motion for change of venue is necessary.  Price has not

previously alleged that the trial court must do so *sua sponte* and, in any event, points to no

Supreme Court case that places the onus on the trial judge to satisfy this burden.

For the foregoing reasons, Price has not established any federal constitutional or statutory

basis upon which this court can consider the supplemental evidence, and Price's motion for an

evidentiary hearing in which to do so is due to be denied.  The additional articles are nothing

more than an attempt to submit new facts in support of this claim, facts, which Price could have

presented or attempted to present at any time during direct or collateral review, but failed without

any explanation to do so.

---

[37]Admittedly, a reading of *Coleman* appears to show that the Eleventh Circuit ordered an
evidentiary hearing be held on the substantive motion for change of venue claim, even though it was
the post-conviction trial court who refused to allow counsel to obtain the records necessary to prove
that claim.  As stated earlier, *Coleman* was decided in a pre-AEDPA climate.  Regardless, it makes
no difference to the court's analysis, and to the extent *Coleman* and 28 U.S.C. 2254(e)(2) mesh with
regard to whether an applicant failed to develop the factual basis of a claim in State court
proceedings.

Regarding the 16 newspaper clippings admitted into evidence at trial, this court observes that the clippings constitute nine newspaper articles generated between December 24, 1991, and February 5, 1992 (within six weeks of the murder).  Seven of the articles were published in *The Tuscaloosa News*, a Tuscaloosa County, Alabama, newspaper and two of the articles were published in *The Times-Record*, a Fayette County, Alabama newspaper.  Price complains the articles are evidence of pervasive prejudice because

> . . . .  Mr. Lynn's funeral made the front page of the *Tuscaloosa News*, and the funeral director called it the most well-attended funeral he had seen in ten years. See Ex. A, [to Doc. 26] at 7.  ("Minister Touched Many Lives", Jan. 5, 1992). The local media focused on the gruesomeness of Mr. Lynn's death, the beating and robbery of Lynn's wife, and the fact that the crime took place just before Christmas. *Id*.[38]
>
> A large number of the articles dealing with the crime specifically discussed Mr. Price at length and always portrayed him in the most unsympathetic light.[39]  The front page article in the *Tuscaloosa News* reporting on Mr. Lynn's funeral referred to Mr. Price's prior criminal record for auto theft and reported that he had been see the day after the murder riding around in a pickup truck with the sign "Bad Boys" displayed in the back window. *Id*.[40]  Another story ran

---

[38]The court has carefully examined the January 5, 1992, article, and other than the title of the article, finds none of the information about which Price complains.  *See* Exhibit A to Doc. 26 at 7.

[39]This sentence is insufficient to state a claim for relief.  That the papers may have discussed Price extensively does not automatically suffice as evidence the discussion was prejudicial. Additionally, to the extent Price complains the articles portrayed him in the most "unsympathetic light," the sentence is too conclusory to satisfy federal pleading requirements. It is not the responsibility of the court to comb through the clippings and determine what might be unsympathetic comments and the number of those comments.   The court does acknowledge the sentence may simply be a prefatory one, with the remainder of the paragraph being Price's factual evidence in support thereof.

[40]Although not specifically cited by Price, this can be none other than the January 5, 1992 article in *The Tuscaloosa News*.  (Exhibit A to Doc. 26 at 7).  This front page article has a picture of Mr. Lynn's grave site, with the caption underneath stating that the flowers at his grave were "evidence of the deep community sentiment for the slain minister."  *Id*.  In the body of the article, the staff writer comments that the community was shocked for two reasons: first by Lynn's death

under the inflammatory headline "Stabbing Kills Their Christmas." *Id.* at 13
(*Tuscaloosa News*, Dec. 25, 1991).[41]  A third reported that clothes fitting the
description of what Mrs. Lynn said her attackers were wearing had been found at
Mr. Price's residence.[42]  The story even included an inflammatory picture of Mr.
Price laughing with his co-defendant, Bookie Coleman, while in custody, giving
the misleading impression he lacked all remorse.  *Id.* at 16 ("2 Bound Over in
Killing of Minister in Fayette," *Tuscaloosa News*, Feb. 4, 1991).[43]  Most telling
of all, perhaps, a December 30, 1991 editorial in the *Tuscaloosa News* reported
that Price and his codefendant were previously charged with "rape, sodomy,
receiving stolen property" - prior bad acts that would not have been admissible at
trial."[44]  *Id.* at 6; see also Ala. R. Evid. 404(b); *Marshall*, 360 U.S. at 313.  The
editorial summed up the sentiment that the local press conveyed to the potential
jury pool: "Why are bad people allowed to prowl the street, so often to stalk new
victims?"  Ex. A at 6.

(Doc. 28 at 54-55).

    After careful examination of the articles about which Price complains, this court cannot

say that the appellate court's denial of relief is contrary to or an unreasonable application of

clearly established federal law.  Some of the offending information Price contends is contained

within certain articles is simply nonexistent.  Other highlighted offensive information, such as

the "Bad Boys" sign and reports of clothing being found at Price's mother's residence, is largely

factual, and therefore cannot be deemed prejudicial under the present circumstances.  *See United

States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990) (relief intended for extreme situations).

---

and, "Another [reason] is a sign spotted by a resident on a suspects pickup truck the day after the
slaying.  It read, "Bad Boys."  *Id.*

    [41]This is from a December 25, 1991, article in *The Tuscaloosa News*.  *Id.* at 13.

    [42]This is from a February 5, 1992, article in *The Times-Record*, a Fayette County newspaper,
reporting the testimony from the preliminary hearing.  *Id.* at 11-12.

    [43]Price is incorrect. The photograph is from a February 4, 1992, article in *The Tuscaloosa
News*.  *Id.* at 16.

    [44]At this juncture, Price asserts in footnote that "In fact, Mr. Coleman alone had been charged
with rape and sodomy."  *Id.* at 55, n.27.

Prejudice is not presumed simply because jurors were exposed to inadmissible evidence in that the defendant's criminal record was publicized. *Mills v. Singletary*, 63 F.3d 999, 1012 (11th Cir. 1995) (quoting *Marsden v. Moore*, 847 F.2d 1536, 1543 (11th Cir.), *cert. denied*, 488 U.S. 983 (1988); *cf. Bundy v. Dugger,* 850 F.2d 1402, 1425 (11th Cir. 1988)).

This court does not find the headline ("Stabbing Killed Their Christmas") complained of by Price to be so inflammatory and sensational that it should be deemed constitutionally prejudicial. While the article describing Price as "laughing" on his way out of the courtroom is inflammatory, it was not, as alleged by Price, published in a Fayette County newspaper. It was actually published in *The Tuscaloosa News*.

Even if the articles did contain inflammatory and sensational information[45], Price has failed to show the community was saturated by it. The court has before it only nine newspaper articles, and only two out of the nine articles were published in the county where the crime occurred. Of the two articles published in Fayette County, he makes a specific complaint about one, and that was an article containing testimony from the preliminary hearing to the affect that clothing had been discovered at Price's mother's home. Price has never made an attempt to show the circulation numbers of either of these newspapers to residents in Fayette County, Alabama, during the time period at issue. He has not shown that any members of the jury venire read any of the offensive articles. Additionally, all of the offending articles were published within six weeks of the murder. Price's case came to trial approximately one year after the publication of

---

[45]For instance, although not mentioned by Price, the court finds that there is some information in the articles that could be considered inflammatory. An example would be an article in which Sheriff Turner comments that the Lynn case has been wrapped up by the arrests of Price and Coleman and that law enforcement were comfortable that Price and Coleman had committed the crime. (Exhibit 1 to Doc. 28 at 14-15 (December 30, 1991 article from *The Tuscaloosa News*)).

the last article.  The length of time between these publications and the trial significantly reduces

any prejudice Price could have possibly suffered.  "That time soothes and erases is a perfectly

natural phenomenon familiar to all."  *Patton v. Yount*, 467 U.S. at 1034 (other citations omitted).

Price has failed to show that the state court's determination on this issue was a decision

contrary to § 2254(d).  By way of example, the court compares Price's supporting evidence to

that presented in the landmark Supreme Court case of *Irvin v. Dowd*.  In *Irvin*, the defendant

showed that 46 articles, many containing very prejudicial information, were published and

delivered to 95% of the households in Gibson County, Indiana (pop. 30,000), during the seven

months immediately preceding Irvin's trial.  *See* 366 U.S. at 724.  *Irvin* demonstrates how

substantial and overwhelming prejudicial and pervasive pretrial publicity must be in order to gain

constitutional attention in the context of a motion for change of venue.

## 2.    **Voir Dire**.

Price next declares that "*voir dire* itself" showed the jury pool was "clearly prejudiced by

media saturation and local gossip[]" because only six members out of the 50 member pool[46]

had not heard of Price's case.  (Doc. 16 at 26).  Price also alleges that "[t]he jurors' answers

during individual questioning revealed an all out media blitz that included radio, television and

print coverage."  *Id*.  The only factual basis Price offers for this "blitz" assertion is that

venireperson Holliman said there had been radio, television and newspaper coverage of the

event, and that "everybody" was saying Price was guilty.  *Id*.  Venireperson Blackwell had read

five news accounts of the murder and "'specifically mentioned the Tuscaloosa News.'"  *Id*.

Venireperson Husk said the Fayette paper treated Price's upcoming trial as a "'big thing.'"  *Id*.

_____

[46]Number apparently derived from R. Vol. 3 at 368-72.

Finally, venireperson Sanderson said she had heard from her husband, a deputy sheriff, that Price confessed. (Doc. 28 at 55).

Additionally, Price alleges that all of the *jurors* in his case, except one, had heard of his case. Finally, during individual *voir dire*, six of the jurors may have overheard a glib conversation between venireperson Shepherd and another venireperson concerning the purported murder weapon. (Doc. 16 at 27).[47]

The relevant question at this juncture is "whether the jurors at [petitioner's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. at 1035. Price makes no comment regarding the relevant question, and certainly makes no argument that the state appellate court's decision that those potential jurors having fixed opinions failed to establish presumed prejudice.

The Eleventh Circuit has observed that a "low percentage of veniremen excused for prejudice resulting from pretrial publicity is strong evidence of the absence of prejudicial community bias." *Spivey v. Head*, 207 F.3d 1263, 1271 (11th Cir. 2000) (citation and internal quotation marks omitted). *Compare Patton v. Yount*, 467 U.S. at 1029 (77% of venire admitted they would carry an opinion into the jury box), and *Irvin v. Dowd*, 366 U.S. at 727 (62% excused for cause) *with Mills v. Singletary*, 63 F.3d 999, 1011-12 (11th Cir. 1995) (holding that the jury was not prejudiced, even though 70 of 84 venirepersons (83%) had some knowledge of the case, 55 (65%) had read at least one newspaper article about the case, and 24 (28.6%) were stricken for cause).

---

[47]Price also comments that the Grand Jury must have been affected by the publicity, and therefore the indictment should be dismissed as well. This conclusory allegation is insufficient to satisfy § 2254(d).

Faced with the foregoing statistics, and understanding that "a trial court's findings [regarding] juror impartiality may 'be overturned only for '"manifest error,"'"[48] Price has fallen short of showing that the appellate court's findings of fact and conclusions of law regarding pretrial publicity and *voir dire* are contrary to or an unreasonable application of clearly established federal law.  This claim is due to be denied.

> **D.    The trial court's exclusion of five jurors based on erroneous applications of the *Witherspoon/Witt* standard, violated Mr. Price's rights to due process, to a fair trial, and to a fair and impartial jury, as guaranteed to him by the federal constitution.  (Paragraphs 61-64 of the petition).**

Price alleges that his right to a fair trial, impartial jury, and due process of law were violated[49] during *voir dire* because the trial court erroneously granted the State's *Witherspoon/Witt* challenges against venirepersons Ray Enis, Harriet Kemp, Ruby Little, Ruby

---

[48]*Mu'Min v. Virginia*, 500 U.S. 415, 428-29 (1991) (citing *Patton v. Yount*, 467 U.S. 1025, 1031(1984) (quoting *Irvin v. Dowd*, 366 U.S. at 723).

[49]In his reply brief, Price claims "[t]he sole ground upon which these perspective jurors were excluded was that they had indicated, to varying degrees, that they would never consider voting to impose the death penalty - a position perfectly compatible with the Alabama death statutes and the applicable jury instructions." (Doc. 28 at 63-67).  Price then argues that Alabama statutory law does not *require* a juror to vote in favor of death; therefore a juror can state that he would never recommend death under any circumstances, and still be in compliance with his oath as juror to follow Alabama law.  *Id.*

After careful examination of this claim as presented by Price on direct appeal (C.R. Vol. 8, Tab. 26 at 27-28), it is apparent that this particular argument has never been presented before now, and as such, the court finds that it is procedurally defaulted.  Alternatively, the argument is dependent on state law, a topic beyond federal habeas corpus jurisdiction.  Finally, and as a second alternative, the argument has no merit.  The proper focus is not on the whether jurors are not required to recommend the death penalty under Alabama law, but whether the jurors will fairly and impartially consider evidence of aggravating and mitigating circumstances.  The ability of a juror to follow his oath by considering and giving effect to evidence of aggravating factors within the scheme of Alabama death penalty law is substantially impaired if the juror would never, under any circumstances, recommend the death penalty.

Nalls and Christopher Savage.  (Doc. 16 at 27).  Price admits these venirepersons "did express

reluctance to impose the death penalty," but argues the challenges should not have been granted

without discovering and properly deciding "whether they could obey their oath, notwithstanding

their views on capital punishment."  *Id.* at 28.  The respondent counters that the affirmation of

the trial judge's decision was neither contrary to or an unreasonable application of clearly

established Federal law, nor an unreasonable interpretation of the facts in light of the evidence

before it.  (Doc. 22 at 36 (citing 28 U.S.C. § 2254(d)).

This claim, as raised by Price on direct appeal, reads in pertinent part as follows:

> Prospective jurors <u>Ray Enis</u> (R. 145-48, 186), <u>Harriet Kemp</u> (R. 221-25),
> <u>Ruby Little</u> (R. 226-27), <u>Ruby Nalls</u> (R. 258-60), and <u>Christopher Savage</u> (R. 294-
> 98), were challenged for cause by the State after brief questioning about their
> beliefs on the subject of capital punishment.  None, however, was asked
> specifically whether they could obey their oath, notwithstanding their views on
> capital punishment.  Absent such an inquiry, the record cannot support an
> exclusion for cause.  *See Morgan v. Illinois*, 112 S. Ct. 2222 (1992).

(C.R. Vol. 8, Tab. 26 at 27-28) (underlined in original).  The Alabama Court of Criminal Appeals

made the following findings of fact and conclusions of law concerning this issue.

> The appellant also argues that the trial court erred by granting five of the
> prosecutor's challenges for cause of prospective jurors, based on their views
> concerning the death penalty.  One was challenged without exception, the removal
> of another was specifically objected to as the removal of a black potential juror,
> while the grounds for the objections to the challenges of the remaining three are
> unclear.
> Three of the potential jurors indicated clearly that they would never return
> an advisory verdict of the death penalty and that they could not consider that
> option.  Although the appellant argues that their removal was improper because, he
> says, they were never specifically asked whether they could obey their oath,
> notwithstanding their views on capital punishment, the record indicate (sic) that
> these potential jurors were fully informed of what their duties as jurors would be
> in considering all of the evidence, following the trial court's instructions, and
> arriving at an advisory verdict.
>
> Another of these prospective jurors, during her questioning, gave one

71

possibly equivocal response concerning whether she could look at both sentencing options; however, she subsequently reaffirmed her firm stand against the imposition of the death penalty.

The last of these prospective jurors was extensively questioned because, on follow-up questioning by defense counsel, he stated that the option of the death penalty "could pass through [his] mind." Defense counsel then echoed the potential juror's statement, acknowledging that he could then consider that option, to which the potential juror responded, "Yes." The trial court then questioned the potential juror in order to clarify his responses and explain his duty to consider the death penalty. The potential juror then responded that he could never consider imposing or recommending the death penalty, but apparently he could consider only the abstract concept of the death penalty.

Each of these potential jurors was fully informed as to their prospective duties and questioned as to the effect the consideration of the imposition of the death penalty might have on their ability to serve as a fair juror. These five jurors explained that they could not, under any circumstance, consider the death penalty as a possible sentence and were properly excluded. *Witherspoon v. Illinois, supra*. In *Wainright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), the United States Supreme Court held that the determination of whether a prospective juror in a capital murder case is properly excluded based on the juror's views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge's discretion, because the judge was present and capable of observing the potential jurors and their responses.

"Last Term, in *Patton* [*v. Yount*, 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)], we held that a trial judge's finding that a particular venireman was not biased and therefore was properly seated was a finding of fact . . . . We noted that the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review.

. . .

"*Patton's* holding applies equally well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause.

72

. . .

". . . The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominate function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. . . ."

469 U.S. at 428-29, 105 S. Ct. at 854-55.  *See also Reynolds v. United States*, 98 U.S. 145, 156-57, 25 L. Ed. 244 (1878) ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen below, but cannot always be spread upon the record.  Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.").  *See also Stewart v. State*, 405 So. 2d 402, 407-08 (Ala. Cr. App. 1981), overruled on other grounds, *Ex parte Cobb*, 703 So. 2d 871 (Ala. 1996); *Nobis v. State*, 401 So. 2d 191, 198 (Ala. Cr. App. 1981), cert. denied, 401 So. 2d 204 (Ala. 1981).

In the present case, there is no indication that the trial court abused its discretion in determining that these potential jurors should properly be excused for cause based on their views concerning the imposition of the death penalty.

*Price v. State*, 725 So. 2d at 1025-26.

Prior to engaging in discussion regarding whether the opinion of the Court of Criminal Appeals is contrary to or an unreasonable application of clearly established federal law, this court turns to the Supreme Court's developmental description of its *Witherspoon* jurisprudence as set out in *Morgan v. Illinois*, 504 U.S. 719 (1992).  The Supreme Court wrote,

*Witherspoon* limited a State's power broadly to exclude jurors hesitant in their ability to sentence a defendant to death, but nothing in that decision questioned "the power of a State to execute a defendant sentenced to death by a jury from which the only venire men who were in fact excluded for cause were those who made unmistakably clear  that . . . they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." 391 U.S., at 522, n.21, 88 S. Ct., at 1777, n.21 (emphasis in original); *see also id.,* at 513-514, 88 S. Ct., at 1772-1773.

In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), we revisited footnote 21 of *Witherspoon*, and held affirmatively that "the

73

State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths."  469 U.S., at 424, n.5, 105 S. Ct., at 852, n.5; *see also Lockett v. Ohio*, 438 U.S. 586, 595-96, 98 S. Ct. 2954, 2959-60, 57 L. Ed. 2d 973 (1978).  Indeed, in *Lockhart v. McCree* we thereafter spoke in terms of "'*Witherspoon*-excludables'" whose removal for cause "serves the State's entirely proper interest in obtaining a single jury that could impartially decide all of the issues in [a capital] case."  476 U.S., at 180, 106 S. Ct., at 1768. From *Witt*, moreover, it was but a very short step to observe as well in *Lockhart*:

> "[T]he State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence.  *Ipso facto*, the State must be given the opportunity to identify such prospective jurors by questioning them at voir dire about their views of the death penalty."  476 U.S., at 170, n. 7, 106 S. Ct., at 1763, n.7.

This passage in *Lockhart* expanded but briefly upon what we had already recognized in *Witt*:

> "As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  It is then the trial judge's duty to determine whether the challenge is proper."  469 U.S., at 423, 105 S. Ct., at 852 (citation omitted; emphasis added).

> . . . .

> [J]urors - whether they be unalterably in favor of, or opposed to, the death penalty in every case - by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding.

*Morgan v. Illinois*, 504 U.S. at 732-33.

Since the appellate court did not publish the names of the venirepersons in its opinion, this court has carefully reviewed the opinion in conjunction with the *voir dire* of Ray Enis, Harriet Kemp,  Ruby Little, Ruby Nalls and Chris Savage in order to determine whether the appellate court's findings of historical fact and its legal conclusion that the trial court did not

74

abuse its discretion by excusing them should afford Price 28 U.S.C. § 2254(d) relief.  The colloquies at trial show the following:

       **1.**    **Ray Enis**

Ray Enis, a black male, was the first person to answer when the State asked the entire venire who opposed the death penalty.  (R. Vol. 2, Tab. 45 at 145).  Mr. Enis stated,  "I'm a fixed mind.  I just don't believe in [it]."  *Id*.  Enis then answered twice that he would not vote for the death penalty under any circumstances.  *Id*.  All attempts by defense counsel to rehabilitate Enis were fruitless and he continued to answer unequivocally that he was a "fixed-minded" person when it came to his opposition to the death penalty, and that he would never recommend the death penalty, even if the defendant were Adolf Hitler.  *Id*. at 147-48.

Citing his fixed opinion against the death penalty, the State made a *Witherspoon* challenge.  *Id*. at 185-186.  Defense counsel objected to his disqualification, but *only* on *Batson* grounds because of Enis' race.  *Id*.  Mr. Enis was excused.

The Alabama Court of Criminal Appeals employed the correct legal standard, addressing whether Enis' views on the death penalty would prevent or substantially impair his duty as a juror in accordance with instructions given him by the court and his oath.  Not only was the court's resolution not "contrary" to Supreme Court precedent, it also was not an unreasonable application of it.  Enis unmistakably expressed the view that his opposition to the death penalty was even stronger than the obligations imposed by his oath as a juror.  There was no *Witherspoon* error in this case as to Mr. Enis' exclusion.  Consequently, it cannot be said that the Court of Criminal Appeals' rejection of this claim was contrary to, or an unreasonable application of, Supreme Court precedent.  This claim is due to be denied.

2.    **Harriet Kemp**

The trial judge asked Ms. Kemp, a black female, if she could consider both the death penalty and life without parole as punishment.  (R. Vol. 3 at 221).  She responded, "I'm afraid I would.  I'm against the death penalty."  *Id*.  After being asked three additional clarifying questions by the court, Ms. Kemp responded that she was "not for the death penalty," that she would only recommend life without parole as punishment and that she would not, under any circumstances, recommend death as punishment.  *Id*. at 222.  When defense counsel questioned Ms. Kemp regarding her anti-death stance, Ms. Kemp steadfastly answered that she would never consider the death penalty as punishment, even if the defendant were Adolf Hitler.  *Id*. at 224.

The State challenged Ms. Kemp on *Witherspoon* grounds.  *Id*.  Defense counsel responded, "And, Your Honor, for the record, I would put on the record that Ms. Kemp is a black female and that she's just been challenged for cause by the State."  *Id*. at 224-25.  The trial judge then asked the State if the challenge was based on the answers Kemp had just given, and the State answered, "Yes, sir."  *Id*. at 225.  The trial judge then asked, "You do not challenge her because of her race?", to which the State replied, "We challenge her . . . under the *Witherspoon* case, Your Honor, which says that they are properly excluded if they are against the death penalty under all circumstances.  And that's what she said."  *Id*.  The trial judge excused Ms. Kemp.  *Id*.

Like Mr Enis, Ms. Kemp expressed her complete opposition to the death penalty.  By default, therefore, it would have been impossible for her to satisfy her oath, as a juror, to follow the law.  This is precisely the type of juror envisioned by the Supreme Court when upholding the right of the state to have an impartial jury composed of people not automatically predisposed against the death penalty.  Furthermore, defense counsel proffered no opposition to the State's

76

*Witherspoon* challenge.  Accordingly, to the extent Price's claim pertains to Ms. Kemp, it is without merit, and is due to be denied.

### 3.   Ruby Little

The trial judge instructed Ruby Little, a white female, that Price's case was a capital case; *e.g.,* if Price were found guilty, "the jury would also be called upon to recommend one of two punishments, either the death penalty or life without parole." *Id*. at 225.  When asked if she could consider both the death penalty and life without parole as punishment, Ms. Little answered, "Life on parole." *Id*. at 225-26.  In response to further questioning by the trial judge, Ms. Little stated twice that she did not believe in capital punishment. *Id*. at 226.

Counsel were then given an opportunity to question Ms. Little.  The defense asked Ms. Little if she could ever consider the death penalty as an option, and she answered, "No, I don't think so." *Id*.  Additional defense questions resulted in Ms. Kemp responding that she "[didn't] know" if her opinion would make it difficult to listen to the evidence and make a decision in the case, and she "[didn't] know" and "couldn't say" if there were any cases in which she would think the death penalty was appropriate. *Id*.  The State asked no questions.

The trial judge again asked Little if she could, "[u]nder any circumstances", vote for the death penalty, and she replied, "I don't think I would vote for the death penalty." *Id*. at 227. The State immediately moved to strike Ms. Little for cause, and defense counsel objected "based on the Sixth, Eighth and Fourteenth Amendments to the United States constitution and the Alabama constitution." *Id*.  The trial court granted the challenge, whereupon the State made it a "point . . . for the record [to assert] . . . that [Ms. Little] is a white lady and that the State is consistent in challenging jurors who have fixed opinions against the death penalty under any

77

circumstances." *Id*.

The Alabama Court of Criminal Appeals employed the correct legal standard with regard to Ms. Little's ability to sit as a juror. Not only was the state court's resolution not "contrary" to Supreme Court precedent, it also was not an unreasonable application of it. Ms. Little's responses, even from the cold record[50], clearly showed the obligations imposed by her oath as a juror would be substantially impaired by her opposition to the death penalty. There was no *Witherspoon* error in this case. Consequently, it cannot be said that the Alabama Court of Criminal Appeals' rejection of this claim was contrary to, or an unreasonable application of, Supreme Court precedent. As such, Price cannot obtain *habeas* relief on this claim under § 2254(d), and it is due to be denied.

### 4.    Ruby Nalls

The trial court explained to Ms. Nalls, a black female, that if the jury found Price guilty of a capital offense, it would then have to recommend a punishment of life without parole or death. *Id*. at 257-58. He then asked Ms. Nalls if she could recommend or consider "each of these options," to which she responded, "I have to give you an answer?" *Id*. at 258. The court replied, "Yes, you do. I'll ask you very specifically, would you consider the death penalty, that being the most serious?" *Id*. Ms. Nalls said, "No." *Id*. The court then twice asked if there were any

---

[50]Assuming *arguendo*, it could be suggested that Ms. Little's answers were possibly ambiguous based on dry reading of the trial transcript, Price still cannot overcome the presumption of correctness accorded the state court in connection with its findings of historical fact, and as such, he has not provided sufficient evidence to entitle him to habeas relief. *See Hightower v. Schofield*, 365 F.3d 1008, 1040 (11th Cir. 2004) ("Given the difficulty of reviewing such equivocal answers from the cold record, years after they were uttered, it is obvious why [reviewing courts] accord great deference to trial judge determinations of juror bias.") (citing *Wainwright v. Witt*, 469 U.S. 412, 429-30 (1985) (holding that a trial court's determination of juror bias is a matter of fact, to be reviewed as such under 28 U.S.C. § 2254)), *vacated and remanded on other grounds*, 545 U.S. 1124 (2005).

circumstances under which she would consider the death penalty, and she answered, "No, I could not[]" and "No." *Id*. at 259.

Defense counsel then asked Ms. Nalls if she could consider the death penalty, and Nalls again replied, "No." *Id*. Twice more she was asked if she thought there were any circumstances under which death would be appropriate and she replied, "No, I don't know[]" and "No." *Id*. at 259-60. In fact, she agreed it would be difficult for her to listen to guilt evidence knowing that the death penalty option could follow. *Id*. at 260.

The State immediately challenged her for cause, to which defense counsel noted for record that Ms. Nalls was a black female, and objected on the Sixth, Eighth and Fourteenth Amendments to the United States constitution and its Alabama constitutional counterparts. *Id*. Nalls was excused.

Ms. Nalls repeatedly expressed her complete opposition to the death penalty and consideration of it as punishment under any circumstances. Therefore, it would have been impossible for her to follow the law. Consequently, it cannot be said that the Alabama Court of Criminal Appeals' rejection of this claim was contrary to, or an unreasonable application of, Supreme Court precedent. Price cannot obtain *habeas* relief on this claim under § 2254(d), and it is due to be denied.

### 5.    Christopher Savage

The trial court judge afforded Mr. Savage, a black male, the same preliminary instruction as Ms. Nalls. *Id*. at 293-94. He then asked if Savage could consider both life without parole and the death penalty as punishment options, to which Savage stated, "Probably life without parole." *Id*. at 294. The court then asked Savage if he was expressing that "under no circumstances"

79

would he consider the death penalty, and Savage answered, "No, sir.  No death penalty."  *Id.*

When asked again, Savage answered that he would only consider the death penalty if Price

wanted and requested to be sentenced to death.  *Id.* at 294-95.

Defense counsel then asked Savage several times if there were some circumstances under

which he would believe death was appropriate (including if the defendant were Adolf Hitler or

Charles Manson) and Savage replied, "No."  *Id.* at 295.  Questions thereafter by defense counsel

centered on whether Savage could "consider" the death penalty, and Savage stated yes, to the

extent it could "Pass through [his] mind."  *Id.* at 296.  The trial court then stated, "I think the

question has to be directed to whether or not you could consider imposing it . . .  not if you would

think that there is such a thing as the death penalty . . . ."  *Id.* at 297.  Savage interrupted,

asserting, "I would oppose it."  *Id.*  The conversation further went,

> THE COURT: You might consider it and recognize that it exists, but aren't you
> stating to this Court rather affirmatively that you would never under any
> circumstances consider imposing it - -
>
> [SAVAGE]: No, sir.
>
> THE COURT: - - or implementing or recommending?
>
> [SAVAGE]: Like I said, could pass through my mind, but I couldn't see frying
> somebody, committing murder.

*Id.* at 297.

The prosecutor even asked Savage if there were any circumstances he would vote for the

death penalty after a capital murder conviction where death or life without parole were options,

and Savage stated, "I still have to go for life without parole."  *Id.*

There was no *Witherspoon* error in this case in excluding Mr. Savage because he was

vehemently opposed to the death penalty and could not, under any circumstances, consider it as

punishment for a capital offense.  The Alabama Court of Criminal Appeals' rejection of this

claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  This

claim is due to be denied.

> **E.      The prosecution's pervasive misconduct during closing arguments [at the guilt phase of trial] requires reversal under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  (Paragraphs 65-70 of the petition).**

Price alleges the prosecutors, in violation of his right to a fair trial, due process of law and

a reliable verdict, engaged in "[five instances] of inflammatory, extraneous . . .  and unfounded

arguments" during closing at the trial's guilt phase - arguments that "[i]ndividually and

collectively" require his conviction to be reversed "under the Fifth, Sixth, Eighth and Fourteenth

Amendments."  (Doc. 16 at 29 and 32, respectively).  Price declares, in direct opposition to the

respondent's answer (doc. 22, pp. 40-48), that the Alabama Court of Criminal Appeals'

"holding[51] that these statements were not improper was contrary to and unreasonably applied

clearly established Supreme Court precedent[,]" and additionally denied him "a fundamentally

fair trial[.]"   (Doc. 28, p. 74).[52]

> **1.      Improper reference to the "tireless effort" of law enforcement.**

---

[51]No objections were voiced to any of the comments at trial.  When the comments were brought to the attention of the Alabama Court of Criminal Appeals, a plain error review was conducted pursuant to Rule 45A of the Alabama Rules of Appellate Procedure.  *Price*, 725 So. 2d at 1027.

[52] In his reply brief, Price contends that the appellate court found all prosecutorial comments about which he complained to be proper and thus made no findings regarding prejudice.  (Doc. 28 at 78-89).  *See also*, *Price v. State*, 725 So. 2d at 1026-32.  Based upon this premise, he argues that if this court finds appellate court's findings regarding propriety are contrary to or an unreasonable application of clearly established law, or based on an unreasonable determination of the facts in light of the evidence before it, then the habeas standard of review for the prejudice prong of the claim is *de novo*.

In his petition, Price characterizes the above allegation in the following manner:

[Prosecutor Johnston] talked to the jury about the amount of time and effort the police and sheriff's departments had put into prosecution of Mr. Price.  These remarks were improper.  The effort expended by law enforcement personnel in bringing a case to trial is irrelevant to the question of guilt.  When Mr. Johnston told the jury that law enforcement agents' work on the case would be "without any result" should they not consider the evidence, he was asking for a guilty verdict on the basis of - or at least heavily influenced by - the number of hours logged by the police rather than by whether the State had met its burden of proof.  In asking the jury to consider the evidence with an eye toward police workload, Mr. Johnston denied Mr. Price a fair trial.

(Doc. 16 at 29).  Price did not object to Johnston's statement at trial, and when the claim was raised on direct appeal, the Alabama Court of Criminal Appeals found "no error in this argument by the prosecutor [as it properly] concerned the strength of the State's case and implored the jurors to consider the acts and evidence presented."  *Price*, 725 So. 2d at 1027-28.  The court examined the pertinent portion of Johnston's statement in its entirety:

During his closing argument, the prosecutor made the following comments to the jury:

"Now, the Sheriff's Department and the--his people and the detectives in Chattanooga, the friends in Chattanooga, all these people have come here to testify.  They have gathered all the evidence that they know about in this case.  And we've done our best to trace it all the way through and bring it into the courtroom for your consideration.  But, of course, the jury has the authority to decide this case, whether Chris Price is guilty or innocent.  Whatever the police officers have done, whatever the detectives have done, whatever all these witnesses have done, whatever the laboratory people have done, is without any result unless the jury will seriously consider these facts and this evidence."

The appellant argues that these comments served to pressure the jury to convict the appellant because of the prosecutor's exhortations that all of the prosecution personnel had put a great deal of work into obtaining this conviction; thus, the inference to be drawn was that it was the jury's duty to convict the appellant and that justice could be done only by returning a conviction.  The appellant cites *Arthur v. State*, 575 So. 2d 1165, 1185 (Ala. Cr. App. 1990), *cert.*

*denied*, 575 So. 2d 1191 (Ala. 1991), in support of his argument.[53]  However, this case is distinguishable from *Arthur*.  In *Arthur* the prosecutor erroneously argued to the jury that it could do its job only by convicting the appellant, "regardless of its duty to weigh the evidence and to follow the court's instructions on the law."  [FN3]  In the present case, however, the prosecutor clearly stated that the work done by the prosecution would be "without any result unless the jury will seriously consider the facts and this evidence."  Thus, the prosecutor did not argue that the jury should convict the appellant, despite the evidence and law. Rather, his argument was that, a consideration of the facts and evidence presented by the prosecution should persuade the jury that a prima facie case had been presented to support a conviction.

> FN3. It should be noted that this language from *Arthur* was not the basis for reversal in that opinion, but was quoted to "draw[ ] attention to statements made by the prosecutor, which should be avoided.  In finding these comments were inappropriate and improper, this court did not hold that they constituted reversible error.  This court continued, in dicta, to make mention of other possible and potential problems to be addressed on retrial."  *Arthur v. State*, 711 So. 2d 1031, 1073 (Ala. Cr. App. 1996).

*Price*, 725 So. 2d at 1027-28.

The present claim fails to identify any Supreme Court precedent to support his conclusion that the Court of Criminal Appeal's decision was contrary to or an unreasonable application of clearly established federal law.  (Doc. 16 at 29 & 32).  Although his reply brief somewhat repeats the initial claim by alleging that prosecutor Johnston's statement improperly suggested "that the State's 'effort' in gathering evidence . . . was relevant to the jury's assessment of the weight of

---

[53]Price's appellate brief reads,

Arguments which, in effect, exhort the jury to "do justice" by returning a conviction imply that "in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law."  *Arthur v. State*, 575 So. 2d 1165, 1184 (Ala. Cr. App.) (citing *U.S. v. Young*, 470 U.S. 1, 18 (1985)), *cert. denied*, 575 So. 2d 1191 (Ala. 1990).

(R. Vol. 8, Tab. 26 at 34).

that evidence[,]" the brief also is devoid of any precedential support.

Nevertheless, since Price's appellate brief relied on *Arthur v. State* (which in turn quoted *United States v. Young*), and the appellate court arrived at its conclusion by distinguishing *Arthur* from Price's case, this court has examined *Young* to determine whether Price's claim merits § 2254(d) relief.  After comparing the factual and legal findings of the *Price* and *Young* cases, it is obvious that Price cannot rely on *Young* to show that the appellate court's ruling in his case was contrary to or an unreasonable application of clearly established federal law.

In *Young*, the Supreme Court did find that  "[t]he prosecutor . . . was in error to try to exhort the jury to 'do its job'[54]; that kind of pressure . . . has no place in the administration of criminal justice[.]"  *United States v. Young*, 470 U.S. 1, at 18 (additional citation omitted). Regardless, the Supreme Court found neither this comment nor the combination of any of several other improper prosecutorial comments resulted in an unfair trial, in part, because of the "overwhelming evidence" of Young's guilt of the crime with which he was charged.  *Id.* at 19. The Court wrote,

---

[54]Earlier in the opinion the Supreme Court had written:

Finally, the prosecutor addressed defense counsel's claim that respondent had acted with honor and integrity.  The prosecutor briefly recapped some of the respondent's conduct and stated:

"I don't know whether you call it honor and integrity, I don't call it that, [defense counsel] does.  If you feel you should acquit him for that it's your pleasure.  I don't think you're doing your jobs as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom and say that's honor and integrity; I don't believe it. . . . "

*Young*, 470 U.S. at 5-6.

> The prosecutor's remarks cannot be said to rise to the level of plain error.  Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were no such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.

*United States v. Young*, 470 U.S. at 16 (other citations omitted).

The *Price* and *Young* cases are not materially indistinguishable.  And even if the court were to assume, for the sake of argument, that it was unreasonable for the state court to refuse to apply the rationale underlying *Young's* improper argument determination in a manner which required it find that the comment in Price's case was improper, *Young* still affords Price no relief.  That is because

> [i]mproper arguments [only] render [a trial] fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case.  *See id.* at 1402. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 1401 *(quoting Strickland v. Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

*Spivey v. Head*,  207 F.3d 1263, 1275-76 (11th Cir. 2000).  Since the guilt phase evidence against Price was overwhelming, there is simply no reasonable probability that the jury would have acquitted Price had the remark not been made.  "The comment [did not] 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  This claim is due to be denied.

The court also notes that the petitioner has inserted an additional, but closely related, legal theory to support this claim in his reply brief.  Specifically, Price declares "[t]he further implication of the prosecutor's statement was that the amount of effort the State had put into the case - at both the investigative and prosecutorial levels - reflected the State's belief in Mr. Price's

guilt[.]"  (Doc. 28 at 75).   Price further argues the comment was "even more 'clearly improper'"

because the Eleventh Circuit has ruled that it is inappropriate for the state to suggest it "'only

prosecute[s] the guilty[,]'", and therefore the jury should be "'heavily persuaded'" by the state's

decision to prosecute.  *Id.* (quoting *Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir. 1985)),  *Hall*

*v. United States*, 419 F.2d 582, 587 (5th Cir. 1969)).

This theory was not raised in the trial court, on direct appeal, in petitioner's Rule 32

petition, or on collateral appeal from the denial of his Rule 32 petition.[55]  Price's failure to raise

this claim until now means that it is procedurally barred from review.  *Bailey v. Nagle*, 172 F.3d

1299, 1305 (11th Cir. 1999) (quoting *Picard v. Connor,* 404 U.S. 270, 276 (1971) (claims are

procedurally defaulted when the petitioner "deprived the state courts of 'the first opportunity to

hear the claim sought to be vindicated in a federal habeas proceeding'")).

Even if the claim - as characterized in the reply brief - was ripe for review, the court does

not find that the prosecutor's remark was improper for the new reason proposed by Price.  The

remark cannot reasonably be interpreted to have been one which encouraged the jury to convict

Price because the prosecutor only sought convictions in cases in which the defendant was truly

guilty.  More importantly, Price cannot show his trial was rendered fundamentally unfair by the

remark, regardless of the related theories behind its alleged impropriety.

### 2.        Vouching for State Witness Micah Donaldson's Credibility

Price next alleges the prosecution improperly vouched for the credibility of "the State's

key witness, Micah Donaldson, . . . [by telling the jury that] 'there wasn't any reason in the world

---

[55]The respondent's answer and brief do not address this aspect of Price's claim because the legal support for the claim did not make its first appearance until Price filed his reply brief in this action.

for him to lie' and . . . Donaldson 'ha[d] no interest in this case whatsoever.'"  (Doc. 28 at 76

(quoting R. Vol. 3 at 386, and citing *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir.

1991), *United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978).[56]  Specifically, Price contends

> this error was especially prejudicial because Mr. Donaldson's testimony was
> critical to the state's case.  His testimony contradicted the statement Mr. Price had
> given to Chattanooga authorities by placing the sword that killed the victim in
> Price's hands.  The fact that both Mr. Johnston and Mr. Moore felt the need to
> vouch for Mr. Donaldson's veracity shows how important they considered his
> testimony to their case.  Concluding Mr. Donaldson's testimony was truthful was
> key to the jury's deliberations; without the prosecutorial error, there is a
> reasonable probability that the outcome of the trial would have been different.
> The jury would have acquitted Mr. Price, or found him guilty of felony murder
> rather than capital murder, or could have sentenced him to life without parole
>                         rather than death.[57]

(Doc. 16 at 30).

   In examining Price's claim on direct appeal, the Alabama Court of Criminal Appeals

made the following findings of fact and conclusions of law.

_____

   [56]In his reply brief, Price explains his reliance on *Eyster* and *Morris*, by writing:

> *See Eyster*, 948 F.2d at 1206 (holding that the prosecution cannot "place[] the
> prestige of the government behind the witness, . . . mak[e] personal assurances of the
> witness' veracity, or implicitly vouch[] for the witness' veracity by indicating that
> information not presented to the jury supports the testimony"); *United States v.
> Morris*, 568 F.2d 396, 402 (5th Cir. 1978) (holding that the "prosecuting attorney
> committed an error when he stated that the government officers who testified had no
> interest in the case" and expressing "dismay[] that an attorney would make this
> statement to a jury.").

(Doc. 28 at 76).

   [57]Although Price contends prosecutor Moore also "vouched" for Donaldson, the only factual
allegations for this claim are based on prosecutor Johnston's comments at the guilt phase of trial.
Moreover, Price provides no support for his conclusory assertion that Johnston's comment rendered
the penalty phase of his trial unfair.  These factually vague and legally unsupported interjections fail
to satisfy the specificity requirements for pleadings under the Federal Rules Governing Habeas
Cases.

The appellant argues that the prosecutor improperly vouched for the credibility of State's witness Micah Donaldson, the appellant's friend in Chattanooga with whom he stayed following the offense and in whose home he was eventually apprehended.  Donaldson testified that the appellant told him that he had murdered Bill Lynn and that he planned to deny having killed Lynn.  The prosecutor, in his rebuttal argument at the guilt phase, commented on this evidence, stating:

> "All right.  What about some other evidence, testimony to identify who that person was?  What was said from the witness stand?  When you listen and look at the evidence that applies, you remember to take into account who has a self interest in this thing.  Who is going to say something to cover themselves up?  He told Micah Donaldson in Chattanooga, 'I did it. It's true.'  That's the words he said. 'It's true.  I did it.'  I killed the man.  That's exactly what I said.  It wasn't the police.  Micah Donaldson, there wasn't any reason in the world for him to lie about that, none.  He has no interest in this whatsoever."

> . . . .

> There was no impropriety by the prosecutor making these comments because they were grounded in the evidence and were proper inferences from the evidence[.]

*Price*, 725 So. 2d at 1029.  The appellate court utilized a comparison case to explain why it found Johnston's statement to be a permissible inference from the evidence, as opposed to personal vouching.  The court stated:

> Similarly, in  *DeBruce v. State*, 651 So. 2d 599 (Ala. Cr. App. 1993), aff'd, 651 So. 2d 624 (Ala. 1994), the prosecutor argued to the jury that a State's witness was telling the truth and that the robbery/murder occurred just as the witness had testified.  The prosecutor further argued that a defense witness was not telling the truth, but had presented "a baldfaced lie."  *Id*. at 610.  This Court found no impropriety by the prosecutor's comments, stating:

>> "A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. '[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.'  *Ex parte Parker*, 610 So. 2d

88

1181 (Ala. 1992).  *See Ex parte Waldrop*, 459 So. 2d 959, 961
(Ala.1984), *cert. denied*, 471 U.S. 1030, 105 S. Ct. 2050, 85 L. Ed.
2d 323 (1985).

> ' "Attempts to bolster a witness by vouching for his
> credibility are normally improper and error.". . .
> The test for improper vouching is whether the jury
> could reasonably believe that the prosecutor was
> indicating a personal belief in the witness'
> credibility. . . .  This test may be satisfied in two
> ways.  First, the prosecution may place the prestige
> of the government behind the witness, by making
> explicit personal assurances of the witness' veracity.
> . . .  Secondly, a prosecutor may implicitly vouch for
> the witness' veracity by indicating that information
> not presented to the jury supports the testimony.'

*United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983), *cert.
denied*, 465 U.S. 1034, 104 S. Ct. 1304, 79 L. Ed. 2d 703 (1984).

> Here, the district attorney did not give any personal
> assurance of McCant's veracity and did not imply that he had
> information that had not been presented to the jury that supported
> McCant's testimony.  'The credibility of a witness is a legitimate
> subject of criticism and discussion.'  *Flint v. State*, 370 So. 2d 332,
> 335 (Ala. Cr. App. 1979).  Here, as in *Smith v. State*, 344 So. 2d
> 1239, 1242 (Ala. Cr. App.), *cert. denied*, 344 So. 2d 1243 (Ala.
> 1977), '[t]he prosecutor's remarks were grounded on some
> testimony given by the witness himself.'  *See also Watson v. State*,
> 398 So. 2d 320, 328 (Ala. Cr. App. 1980), *cert. denied*, 398 So. 2d
> 332 (Ala.), *cert. denied*, 452 U.S. 941, 101 S. Ct. 3085, 69 L. Ed.
> 2d 955 (1981) (reference in closing argument to defendant as a
> 'bald face liar' was 'a hard blow but it was not foul')."

*DeBruce v. State*, 651 So. 2d at 610-11.  *See also Hunt v. State*, *supra*, at 942-943.

*Price*, 725 So. 2d at 1030-31.

After careful examination of Price's allegations and the opinion of the Court of Criminal

Appeals, this court finds that the appellate court's decision was neither contrary to nor an

unreasonable application of clearly established federal law.  It is well established that a

prosecutor's vouching for the credibility of witnesses and expressing his personal opinion of the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize a defendant's right to be tried solely on the basis of the evidence presented to the jury and the prosecutor's opinion carries the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. *See Berger v. United States*, 295 U.S. [78], at 88-89, 55 S. Ct. [629], at 633[, 7 L. Ed. 1314 (1935)].

*United States v. Young*, 470 U.S. 1, 18-19  (1985).

Price has not shown that the prosecutor's remark, when considered in its entirety, constituted anything but comment based on the evidence.  Johnston repeatedly stated that he was drawing the jury's attention to the *evidence* - which in this instance was Donaldson's testimony as heard by the jury from the witness stand.  Contrary to Price's argument (doc. 28 at 93), the fact that the prosecutor stated Donaldson had no motivation to lie and nothing to gain, when considered in the context of the entire remark, is not an intimation by the prosecutor that there was additional evidence to which the jury had not been made privy.  Moreover, the entire record contains such extensive evidence of Price's guilt that there is no reasonable probability that the jury would have acquitted Price had the prosecutor not made his remarks concerning Micah Donaldson's testimony.

Price has failed to show the state court's decision "was contrary to or involved an unreasonable application of clearly established law" or "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d).  This claim is due to be denied.

### 3. Personal opinion.

Price next contends that prosecutor Moore "attempted to impose his opinion of the proper

verdict. . . ." by "announc[ing] to the jury [during his rebuttal closing] that, from his perspective, this was an easy case, [and] the only 'challenge' [for the prosecution was] to get the jury to believe that the victim really was stabbed repeatedly in his front yard."  (Doc. 16 at 30).  To put the weight of the prosecutor's office behind such an affirmative opinion of guilt was improper according to Price.  *Id*. at 31 (citing *United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir. 1991).

When examining this claim on direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> The appellant argues that the prosecutor wrongfully injected his own views into the jury's determination by making the following argument:
>
>> "I tell myself, you know, this is easy, you know, an easy case.  You have an eyewitness.  You have a confession.  You have all this evidence.  Billy Law and Butch and the sheriff and all of them found it exactly where he said it was, right out there, all of it.  The pistol, Barry Corkeren went right to it.  You know, locked case."
>
> However, this comment did not constitute plain error.
>
>> "'The remark of the State's attorney was no more than a comment that a certain phase of the State's evidence was uncontradicted.  Certainly, the State's attorney should be permitted to comment on the character of the evidence presented by the State and its strength.  That certain evidence is uncontradicted tends to show its strength.  Our statute does not abrogate the right of the State'[s] counsel to comment on legitimate inferences in this regard.'"
>
> *Welch v. State*, 263 Ala. 57, 58, 81 So. 2d 901, 902 (1955), quoting *Littlefield v. State*, 36 Ala. App. 507, 512-13, 63 So.2d 565, 570, *cert. denied*, 258 Ala. 532, 63 So. 2d 573 (1952).  *See also Taylor v. State*, 279 Ala. 390, 185 So. 2d 414 (1966); *George v. State*, 54 Ala. App. 90, 92, 304 So. 2d 908 (1974).
>
> The prosecutor had a right to comment on the strength of the evidence the State had presented and to draw any reasonable inferences from it.  There was no impropriety in these comments.

*Price*, 725 So. 2d at 1031.

Price insists the prosecutor's statement was not merely a comment on the strength of the evidence.  (Doc. 28 at 76).  To support this conclusion Price argues, "By leading with the phrase, '*I tell myself*,' the prosecution was conveying to the jury its own impressions of the evidence, which rendered the statement clearly improper."  *Id*. (citing *United States v. Kerr*, 981 F.2d 1050-53 (9th Cir. 1992).

After careful review, it is apparent that Price has failed to show the state court's decision "was contrary to or involved an unreasonable application of clearly established law" or "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d).  Price cites no Supreme Court cases with materially indistinguishable facts to support his contention that the prosecutor's comment was an impermissible expression of his personal opinion, and the Ninth Circuit case upon which he relies is not binding upon this court.

Whenever a prosecutor predicates an argument with "I believe" or "I think," it begs the court's attention for a closer look to determine if together, the predicate and the body of the argument attached to it are truly improper personal opinion, or a comment on the strength of the evidence.  However, in this case, the isolated remark taken in context indeed appears to be comment on the evidence.

Additionally, in *Brooks v. Kemp*, the Eleventh Circuit found that a prosecutor's argument, even if ambiguous, was not improper on the basis that, "[t]he Supreme Court has directed, . . . that 'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw

92

that meaning from the plethora of less damaging interpretations.'"  *Brooks v. Kemp,* 762 F.2d

1410-11 (quoting *Donnelly v. DeChristoforo,* 416 U.S. [637], 647 [1974]).

Again, Price has provided no Supreme Court precedent showing the court's determination

was contrary to or an unreasonable application of clearly established federal law.  Additionally,

for purposes of federal review, even if the comment were improper, it did not render the guilt

phase of Price's trial fundamentally unfair.  This claim is due to be denied.

**4**.      **Inflammatory comment**.
**5**.      **Conflating the role of the prosecutors with that of the jurors**.

The next two complaints regarding prosecutorial comments shall be addressed together

for two reasons.  First, when the particular comments at issue are viewed in the record, they all

flow from the same portion of the prosecutor's rebuttal closing argument at the guilt phase of

trial. (R. Vol. 6 at 851-54).  Second, the manner in which the state appellate court wrote its

opinion appears to have melded its discussion about the complaints together.

Price alleges prosecutor Moore used inflammatory rhetoric by referring to the sword that

caused the death of Mr. Lynn, and simultaneously encouraging the jury to use their "'sword of

justice' on Mr. Price related exclusively to punishment. . ." to "shift[] the jury's attention away

from the proper question of whether Mr. Price had committed capital murder and toward how

Mr. Price ought to be punished for that crime."  *Id*.[58]  Price believes the prosecutor's

"inflammatory allusion" was improper because it directed the jury toward "'"passion and

prejudice rather than to an understanding of the facts and of the law[,]"'" and alleges that

"instructing the jury that it was their turn to dole out sword punishment" is an example of same.

_____

[58]Price then string cites *Stano v. Dugger*, 921 F.2d 1125, 1160 (11th Cir. 1991) with no
explanation.

93

(Doc. 28 at 77) (quoting *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. 1981) (cite for

internal quotation not provided by Price).

Finally, Price contends the comments confused the jury's task, *e.g.*, to determine Price's

guilt, with punishment - punishment being an issue wholly immaterial at the guilt phase of trial.

*Id*. (citing *Weaver v. Bowersox*, 438 F.3d 832, 840-41 (8th Cir.), *cert. dismissed as improvidently*

*granted*, 550 U.S. 598 (2007)).  Price contends the appellate court's adjudication of this claim is

contrary to and an unreasonable application of clearly established "Supreme Court precedent."

(Doc. 16 at 32 and Doc. 28 at 77).  He also contends the State "improperly conflated its

prosecutorial role with the jury's role."  (Doc. 16 at 31).  Specifically, Price alleges that while

prosecutor Moore was

> explaining the jury's job and its responsibility to Fayette County, Mr. Moore
> asked the jury, what are "we" going to do.  By asking "what *we* going to say" and
> "what are *we* going to do," Mr. Moore [improperly] associated his person, and
> consequently his prosecutorial role and perspective on the case, with the person,
> role and perspective of the jurors. . . .[59]

*Id*. at 31 (citing generally, *United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999) (it is

improper for the prosecutor to state that it is the duty of the jury to find the defendant guilty);

*United States v. Pollizi*, 801 F.2d 1543, 1558 (9th Cir. 1986) (same)).

Price concedes the above comments might not have been improper in isolation, and at the

same time insists that in "context [they] exceeded the bounds of prosecutorial rhetoric and served

to exacerbate the prejudicial effect. . ." of other allegedly improper comments.  (Doc. 28 at 77).

The respondent states that the "sword of justice" and "we" claims were addressed on the

---

[59] Price identifies the comments as "'We can't turn our head from [the] crime[,]'" and "'How
are we going to speak for Fayette? . . . What are we going to do?'".  (Doc. 28 at 77 (quoting trial
record at 851 & 854)).

94

merits by the Alabama Court of Criminal Appeals, but contends that Price has failed to show that

the appellate court's decision entitles him to relief pursuant to 28 U.S.C. § 2254.  (Doc. 22 at 45-

47 (citing *Price v. State*, 725 So. 2d at 1031-33)).

This court has carefully reviewed the state appellate court's opinion, and it *appears* that

the portion applicable to Price's claims reads:

> The appellant argues that the prosecutor sought to make the jurors identify
> with the State's position by using the term "we" to refer to both the prosecution
> and the jury as a single group, as well as by certain other of his comments. The
> appellant refers to the following portion of the prosecutor's closing argument to
> the jury during the guilt phase:

>> "I told you at the outset that you would be the sole and
>> exclusive judges of the facts of this case, that it would be up to you
>> to look to the evidence with a view of determining what the true
>> facts are.  I'm not going to belabor it, but I do have to remind you
>> of certain facts.  You're the sole and exclusive judges of the facts.
>> It's not my role in the case and it's not up to me to decide whether
>> or not the State has proved the charges in this case.  That's entirely
>> up to you.

>> Now, what is this evidence that's been before you?  First,
>> various witnesses have testified.  Some of them were lay witnesses;
>> that is, they are just people who come in and testify about the
>> things that they have seen, heard, felt and so forth.  Then there are
>> some that we will call expert witnesses.  An expert is simply one
>> who, because of their education, training or experience, has
>> attained some skill or knowledge or experience of some science,
>> profession, business or occupation which is not of common
>> knowledge to the average lay person.

>> Now, whether a witness is an expert or whether a witness is
>> a lay witness, if a witness, during the trial of the case, during the
>> time they are testifying up here sitting on the stand if they testify
>> and during their testimony they express an opinion, draw a
>> conclusion, the jury is not required to accept the conclusions or
>> expressed opinions of those witnesses, but rather, the jury must
>> determine for yourselves the weight to be given to that testimony
>> and evidence when considered in connection with all of the
>> evidence in the case.

95

I told you at the outset that you are the sole and exclusive judges of the evidence.  You are likewise the exclusive judges of the weight of the evidence, its believability, its credibility, what weight you will accord to that evidence.

When you take your place in the jury box, you do not have to blindly accept anything and everything that comes before you. You have the right to weigh the evidence and in weighing that evidence you have the right to consider anything which you in your everyday affairs would consider in passing upon the truthfulness and the accuracy of statements made to you.  For instance, when witnesses testify before you, those witnesses present themselves in front of you.  You have the right to observe their demeanor; that is, how they appear while they testify.  Thus, you may consider whether they testified frankly and straightforwardly or did they testify evasively.  Were they testifying about facts which were within their knowledge or were they guessing.

You may consider those things which you in your every-day affairs would consider in passing upon the accuracy of statement made to you.   You also have the right to consider any item of impeachment that is against the witness; for instance, whether or not a witness might be biased, if a witness is sympathetic to one side or prejudiced against another side, if they are connected with a party in the case, if they are kin to someone, if they're friends with someone or if they're enemies of someone. You as a jury have right to consider those types of things in passing upon the witness' testimony because in that instance it would be human nature that they might be more favorable to one side or prejudiced against the other side, if there is evidence of ill feelings or friendship or kinship, or if they're connected by their stations in life or something of that nature.

Any connection that they might have to one side or the other can be considered in determining whether or not the witness might be biased in favor of one side or against the other side.

You should attempt in every way that you can to reconcile all of the testimony in this case so that, if possible, to make all the witnesses speak the truth.  But if you cannot do that and you find that the evidence is in conflict on material points, then it's up to you to decide what are the true facts.  In other words, you must weigh the evidence and decide what is believable and what is not believable, but in passing upon the evidence, you cannot

96

capriciously disregard the testimony of a single witness.  You should look at all of the evidence in the case with a view of determining what the true facts are and then make your decision from the evidence.  If you find that some of the evidence is unworthy of belief, then you have the right not to consider that evidence, but you first start out with all of the evidence with a view of determining what the true facts are and then sort through out, always remembering that your job is to determine the truth.”

There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty.  "'We view the comments as a call for justice, not sympathy, and, thus, conclude that they are within the latitude allowed prosecutors in their exhortation to the jury to discharge its duty.' *Ex parte Waldrop*, 459 So. 2d 959 (Ala. 1984), *cert. denied*, 471 U.S. 1030, 105 S. Ct. 2050, 85 L. Ed. 2d 323 (1985); *Rutledge v. State*." *Gentry v. State*, 689 So. 2d 894, 906 (Ala. Cr. App. 1994), *reversed on other grounds*, 689 So. 2d 916 (Ala. 1996).

"The fact that an argument has emotional overtones does not independently indict it as improper, and the propriety of argument rests primarily in the relation of its content to issues relevant to the sentencing jury's concern.  *Brooks v. Kemp* [762 F.2d 1383 (11th Cir. 1985), *cert. denied*, 478 U.S. 1022, 106 S. Ct. 3337, 92 L. Ed. 2d 742 (1986) ].  We view the above arguments as being a general appeal for law enforcement and justice, and an appeal to the jury to discharge its duties in such a manner as to punish for the commission of crime and to deter others from committing like offenses.  *Ex parte Waldrop* [459 So. 2d 959 (Ala.1984) ].  The arguments were directed to a relevant sentencing concern of the jury, they were not delivered in an excessive and intolerable manner, and they did not divert the jury's attention from its proper function.  *Brooks v. Kemp*."

*Rutledge v. State*, 523 So. 2d 1087, 1101 (Ala. Cr. App. 1987), *reversed on other grounds*, 523 So. 2d 1118 (Ala. 1988).  There was no impropriety by the prosecutor in his appeal to the jury for justice, even if this appeal had emotional overtones.

*Price v. State*,  725 So. 2d at 1032-1033.

The prosecutor's entire comment, in context, from the record, read:

You know what's hard about this case?  Is to make ya'll realize that this really happened.  Is to make ya'll realize that this really happened.  This ain't a TV show.  This is not a book.  It's not a movie.  Bazemore, not New York City.

Ten or so miles, as the crow flies, from here. It happened. That's why we show you these pictures, not to shock you or anything like that, but to let you know this happened. It's real. I got to make you face the horror of this thing to realize what happened. That's the hardest part.

You know, in Fayette, you know, the normal topic, we worry about things like how are we going to pay Christmas we just had? Where is our quarterback going to play college ball? Are we going to have a good turkey season this year? Are we going to keep the grandkids this weekend, not what are we going to do by the fact that Bill Lynn was stabbed and hacked thirty-eight times in his yard in Bazemore. That's what's got to sink in with y'all. This is real. We can't turn our head from it.[60] Y'all have got a big responsibility. Y'all are the one [sic] that got to look right into it and decide what we're going to do about it.

The dictionary says that justice is defined as the upholding of what is right, real simple. The doing or upholding of what is right, the right thing to do. Another definition given in the dictionary for justice is fairness. There is great irony here. The judge, the lawyers for the defendant said, we want a fair trial. You went back there and we talked to you one at a time. That's what you were asked. Can you give us a fair trial? That's all me [sic] and Mr. Johnston [another prosecutor] want. I think I can talk for him. That's all we want. All we want is what's fair. I'm sure Mrs. Lynn would tell you the same thing. That's all we want is what's fair.

You've all seen the - - the TV shows or whatever, you've seen the picture of the Statue of Justice, the lady that's standing there and she has the long white robes on. She's blindfolded, and that signifies that under our legal system that justice is blind. It doesn't matter if you're rich, poor, young, old, black, white, whatever religious faith or belief. It doesn't matter.

In her left hand, you've all seen this. She holds the scales of justice. She can't see who is putting that on there, but she holds them up. The evidence is put on the scales and she weighs them to see what the outcome is.

Here is another great irony in this case. What does she hold in her right hand? We never talk about this. She holds the scales in her left hand. She's blindfolded. What does she hold in her right hand? A sword. It ain't like this [referring to the murder weapon, a sword with a bent blade]. It's not a cheap replica, something used for murder and mayhem. The sword she holds is straight and it's true. It's forged from pure metal. It's a tool of justice, not a tool of murder, mayhem. It's a tool for the upholding of what is right, of fairness. That

_____

[60]Price complains about this sentence.  (See Doc. 28 at 77).

tells us that in justice comes punishment.

That man over there has proved to you what kind of punishment can be done with a sword.  As jurors, looking at the Statue of Justice, she also has the right for punishment also.  That's part of the system.  That's part of justice.  It's your turn to use that sword now.[[61]]

Y'all are representatives of Fayette County now when you come up here. You know, the list comes from Montgomery and every from Fayette could be on the jury.  And they pick out certain names and we all met here and now we've whittled it down to here.  Here is where we are.  You're our conscience for Fayette.  You're also going to be the voice of Fayette when you come back with your verdict.  How are you going to speak?  What are you going to say?  How are we going to speak for Fayette?  There is [sic] a lot of people out here listening. The Bessie Lynn's of Fayette are out there listening.  More important than that is the Christopher Price's are out there listening too.  What are we going to say? What are we going to do?[[62]]

(R. Vol. 6 at 851-54).

After careful examination of the "we" comments at issue, this court cannot find the state

court's determination regarding propriety to be an affront to constitutional law.  Taken in

context, it is apparent that the prosecutor was attempting to use "we" in the sense that the jury

needed to ask themselves what they were going to do.  His constant use of the word throughout

closing to refer at times to the prosecution only, or the prosecution, defense, and court, or even

the system as a whole as it was taking place through Price's trial in the Fayette County courtroom

does not alleviate much concern.  Nevertheless, it still appears the prosecutor was trying to use

the word "we" in the instances complained about by Price as a way to get the jury to question

itself.  Therefore, the ambiguous "we" remarks should not be construed in the worst possible

---

[61]Price interprets this as urging the jury to use a sword to inflict punishment.  (See Doc. 28 at 77).

[62]Price complains about these last two sentences.  (Doc. 28 at 77).

light when considered in context.  They are not improper.  Even if they were, they were insufficiently prejudicial to entitle the petitioner to any relief.

The "sword" comment is another matter.  Although the prosecutor began with his Statue of Justice imagery in a rather benign and legally correct manner (that being a decision made on impartiality and fairness), he turned it into a reference to punishment when he repeatedly compared it to the sword used to murder Mr. Lynn.  Had the prosecutor clarified that by punishment, he meant a finding of guilt for a crime the jury believed Price had committed, that clearly would have been a proper argument.  But for most, punishment intrinsically means the penalty meted out after it has been determined the party committed an offensive act, rather than the process to determine whether or not the act has indeed been committed.  And since the sword caused the death of Mr. Lynn, it is but a short leap to infer that death was also the inferential punishment for Price as well.

Thus, while the court believes that the state court's finding that the sword comment was proper is erroneous, it does not find, in light of the entire argument, that the state court's decision represents an unreasonable application of clearly established federal law such that Price is entitled to relief on the first prong of the prosecutorial misconduct argument.

Even if the sword as punishment comment was improper in that it injected punishment into the guilt phase of trial, the court does not find that Price's trial was rendered fundamentally unfair because of it.  The guilt evidence against Price was overwhelming.  Moreover, in its jury instructions, the trial court specifically informed the jury it was to consider only Price's guilt and in no way should it consider punishment.  (R. Vol. 6 at 886-87).

Price's final assertion is that "[i]ndividually and collectively," the above comments

"require reversal under the Fifth, Sixth, Eighth and Fourteenth Amendments." (Doc. 16 at 32).

Price is incorrect.  At most, one of the comments was inappropriate.  Even if the comments were

improper, "remarks made in the course of a prosecutor's closing argument will warrant reversal

if the challenged remarks are . . . prejudicial to a substantial right of the defendant." *United States*

*v. Boyd*, 131 F.3d 951, 955 (11th Cir. 1997) (other citations omitted); *see also United States v.*

*Blakey*, 14 F.3d 1557, 1560 (11th Cir. 1994).  A defendant is prejudiced

> when there is "a reasonable probability that, but for the prosecutor's offending
> remarks, the outcome of the ... [proceeding] would have been different. [A]
> reasonable probability is a probability sufficient to undermine confidence in the
> outcome."  *Id*. (internal quotation marks and citation omitted).

*United States v. Baker*, 432 F.3d 1189, 1252 (11th  Cir. 2005).  As stated by the Supreme Court,

> It "is not enough that the prosecutors' remarks were undesirable or even
> universally condemned."  *Darden v. Wainwright*, 699 F.2d, at 1036.  The relevant
> question is whether the prosecutors' comments "so infected the trial with
> unfairness as to make the resulting conviction a denial of due process."  *Donnelly*
> *v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

*Darden v. Wainwright*, 477 U.S. at 181.

Prosecutorial misconduct only requires a new trial if the arguments are improper and

substantially prejudicial.  *United States v. Hernandez,* 145 F.3d 1433, 1438 (11th Cir. 1998).

The comments the petitioner complains about at the guilt phase, when viewed in the context of

the trial as a whole, fail to satisfy this standard.  These claims are due to be denied.

> **F.    The trial court's charge on evaluating the credibility of witnesses was
> flawed inasmuch as it created a presumption that witnesses were
> truthful, and impermissibly diluted the State's burden of proof
> of guilt beyond a reasonable doubt, in violation of the Fifth, Eighth and
> Fourteenth Amendments**.  **(Paragraphs 71-73 of the petition).**

Price alleges the trial court's jury instruction regarding the credibility of witnesses was

constitutionally deficient under Alabama law and the United States Constitution because it

invaded the factfinding province of the jury, confused the presumption of innocence and diluted

the State's burden of proof.  (Doc 16 at 32-33).  As factual support for the claim, the petitioner

points to the following portion of the instruction:

> You should attempt in every way that you can to reconcile all of the
> testimony in this case so that, if possible, to make all the witnesses speak the
> truth.  But if you cannot do that and you find that the evidence is in conflict on
> material points, then it's up to you to decide what are the true facts.  In other
> words, you must weigh the evidence and decide what is believable and what is not
> believable, but in passing upon the evidence, you cannot capriciously disregard
> the testimony of a single witness.  You should look at all of the evidence in the
> case with a view of determining what the true facts are and then make your
> decision from the evidence.  If you find that some of the evidence is unworthy of
> belief, then you have the right not to consider that evidence, but you first start out
> with all of the evidence with a view of determining what the true facts are and
> then sort through it, always remembering that your job is to determine the truth.
> (emphases added [by Price]).

*Id*.

Price attacks the first underlined sentence because he believes it informed the jurors that

they must presume the witnesses were truthful, and argues such a presumptive charge "invades

the jury's exclusive right to determine the credibility of witnesses."  *Id*. (referring *generally* to

*United States v. Scheffer*, [523 U.S. 303, 313-14], 118 S. Ct. 1261, 1267-68 (1998)).[63]  He

surmises the jury must have been "undoubtedly confused" by the charge since it asked them to

reconcile the testimony to make it speak the truth - "without any assessment of the witnesses'

credibility."  *Id*. at 33.  According to Price, the jurors were left "with the impression they should

---

[63]In *United States v. Scheffer*, the Supreme Court was asked to determine whether an
evidentiary prohibition against the use of scientifically unreliable polygraph tests violated an
accused's Fifth and Sixth Amendment right to present a defense.  The Court held there was a
"legitimate government interest" to uphold the constitutionality of the evidentiary rule, and that was
to preserve "the [jury's] core function of making credibility determinations in criminal trials."  523
U.S. at 313.

both credit all witnesses' testimony (if not contradicted) and also reject some of those same witnesses' testimony." *Id*. Under this scenario, the jurors were allowed "to convict [Price] without making a finding as to reasonable doubt on all elements." *Id*. (citing [*In Re*] *Winship*, 397 U.S. [358] at 361[(1970)]; *Harvell v. Nagle*, 58 F.3d 1541, 1542-43 (11th Cir. 1995)).[64]

Next, Price alleges the second underlined passage "encourages, even requires an initial 'sorting' between the testimony that jurors do and do not believe, before applying the law to the facts." *Id*. He concludes that "strictly speaking, it is <u>not</u> the jury's job to decide where 'the truth' lies (based on opinion, supposition, inadmissible evidence, and so forth); rather the panel is convened <u>solely</u> to determine whether the carefully defined elements of the charges have been proved beyond a reasonable doubt." *Id*. Price demands a reversal and new trial to correct the trial court's errors. *Id*.

Since there was no objection to the charge at trial, the Alabama Court of Criminal Appeals conducted a plain error review of the claim on direct appeal. *Price v. State*, 725 So. 2d at 1036. In doing so, it examined the portions of the instruction about which Price complained and the instruction as a whole before determining that no "plain error" occurred under either of

---

[64]*In Re Winship* is a bedrock Supreme Court case ruling that the Due Process Clause mandates the government, in all criminal cases, prove beyond a reasonable doubt each and every element of an offense against the defendant. In *Harvell,* the Eleventh Circuit advised,

> When reviewing reasonable-doubt charges, we consider the instruction as a whole to determine if the instruction misleads the jury as to the government's burden of proof. *See United States v. Veltman*, 6 F.3d 1482, 1492 (11th Cir. 1992). The Supreme Court has phrased the proper constitutional inquiry as whether " there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard. *Victor* [*v. Nebraska*], 551 U.S. [1, 6 (1994)].

*Id*. at 1542.

Price's theories.  *Id.*   The appellate court's findings of fact and conclusions of law are set out

below.

In the present case, the trial court gave the following entire charge to the jury concerning its role as the trier of fact in examining the credibility of witness testimony:

"Now, whether a witness is an expert or whether a witness is a lay witness, if a witness, during the trial of the case, during the time they are testifying up here sitting on the stand, if they testify and during their testimony they express an opinion, draw a conclusion, the jury is not required to accept the conclusions or expressed opinions of those witnesses, but rather, the jury must determine for yourselves the weight to be given to that testimony and evidence when considered in connection with all of the evidence in the case.

I told you at the outset that you are the sole and exclusive judges of the evidence.  You are likewise the exclusive judges of the weight of the evidence, its believability, its credibility, what weight you will accord that evidence.

When you take your place in the jury box, you do not have to blindly accept anything and everything that comes before you. You have the right to weigh the evidence and in weighing that evidence you have the right to consider anything which you in your everyday affairs would consider in passing upon the truthfulness and the accuracy of statements made to you.  For instance, when witnesses testify before you, those witnesses present themselves in front of you.  You have the right to observe their demeanor; that is, how they appear while they testify.  Thus, you may consider whether they testified frankly and straightforwardly or did they testify evasively.  Were they testifying about facts which were within their knowledge or were they guessing?

You may consider those things which you in your everyday affairs would consider in passing upon the accuracy of statements made to you.  You also have the right to consider any item of impeachment that is against the witness; for instance, whether or not a witness might be biased, if a witness is sympathetic to one side or prejudiced against another side, if they are connected with a party in the case, if they are kin to someone, if they're friends with someone or if they're enemies of someone.  You, as a jury, have a

right to consider those types of things in passing upon the witness's testimony because in that instance it would be human nature that they might be more favorable to one side or prejudiced against the other side, if there is evidence of ill feelings or friendship or kinship, or if they're connected by their stations in life or something of that nature.

Any connection that they might have to one side or the other can be considered in determining whether or not the witness might be biased in favor of one side or against the other side.

You should attempt in every way that you can to reconcile all of the testimony in this case so that, if possible, to make all the witnesses speak the truth. But if you cannot do that and you find that the evidence is in conflict on material points, then it's up to you to decide what are the true facts. In other words, you must weigh the evidence and decide what is believable and what is not believable, but in passing upon the evidence, you cannot capriciously disregard the testimony of a single witness. You should look at all of the evidence in the case with a view of determining what the true facts are and then make your decision from the evidence. If you find that some of the evidence is unworthy of belief, then you have the right not to consider that evidence, but you first start out with all of the evidence with a view of determining what the true facts are and then sort through it, always remembering that your job is to determine the truth."

[R. Vol. 6, Tab. 13 at 865-868].

Even if a particular statement in an instruction may be misleading, confusing, or erroneous, it does not rise to the level of plain error if the instruction, when reviewed completely, properly presents the law. *Williams v. State*, 538 So. 2d 1250, 1253 (Ala. Cr. App. 1988). There was no plain error in these instructions.

The appellant argues that the trial court diluted the State's burden of proof by instructing the jurors to sort the bad testimony from the good testimony, without providing any guidelines as to the reasonable doubt standard. The cited instruction by the trial court informed the jury that it should determine the credibility of the evidence. This is one of the required tasks of examination by a jury in determining whether the evidence presented by the State has proved that the defendant is guilty beyond a reasonable doubt. This was a proper charge by the trial court and was not plain error.

105

*Price v. State*, 725 So. 2d at 1003, 1036-37.

The respondent answers that Price cannot show the state court's decision was contrary to or an unreasonable application of clearly established federal law.  (Doc. 21 at 115-121 and Doc. 22 at 49-50).  In his reply, Price concentrates solely on the presumptive credibility aspect of his claim (doc. 28 at 79-81), arguing that

> the Alabama Court of Criminal Appeals implicitly conceded that the instruction was erroneous.  The Court of Criminal Appeals held only that the jury charge *as a whole* did not dilute the State's burden of proof.  This was contrary to, or an unreasonable application of, *Cupp v. Naughten*:  Unlike in *Naughten*, here the trial court did not cure its 'ailing instruction by charging the jury properly on the State's burden of proof.  Accordingly, the instruction was, *a fortiorari*, a structural violation of the Due Process Clause.  *See Cool v. United States*, 409 U.S. 100, 104 (1972); *Jackson v. Virginia*, 443 U.S. 307, 320 n.14 (1979).  Accordingly, Mr. Price's conviction must be vacated.

*Id*. at 81.

Price is not entitled to 28 U.S.C. § 2254(d) relief pursuant to *Cupp*, *Cool* or *Jackson*. First, the holding in *Cupp v. Naughten* does not warrant any relief in this case.  In *Cupp*, the trial judge read a statutory "presumption-of-truthfulness instruction" regarding witnesses to the jury. *Cupp*, 414 U.S. at 143.  The Ninth Circuit Court of Appeals found that the instruction violated the defendant's right to due process of law because it impermissibly shifted the burden of proof from the State to the defendant, an error uncured by the fact that "the trial court [also had twice given] explicit instructions affirming the presumption of innocence and declaring the obligation of the State to prove guilt beyond a reasonable doubt."  *Id*. at 144.

The Supreme Court reversed, stating, "Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not only that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated

some right which was guaranteed to the defendant by the Fourteenth Amendment." *Naughten*, 414 U.S. at 146.  The Court then stated that "the question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id*. at 147.  In ruling that the instruction did not infect the entire trial process, the Supreme Court held:

> In this case, while the jury was informed about the presumption of truthfulness, it was also specifically instructed to consider the manner of the witness,  the nature of the testimony, and any other matter relating to the witness' possible motivation to speak falsely.  It thus remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible. . . . [and] freed respondent from any pressure to take the witness stand himself. . . .
>
> The jury here was charged fully and explicitly about the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt.  Whatever tangential undercutting of these clearly stated propositions may, as a theoretical matter, have resulted from the giving of the instruction of the presumption of truthfulness is not of constitutional dimension.  The giving of that instruction, whether viewed in terms of the reasonable-doubt requirement in *In Re Winship*, *supra*, or of offense against 'same principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' *Snyder v. Massachusetts*, 291 U.S. 95, 105, 54 S. Ct. 330, 332, 78 L. Ed. 674 (1934), did not render the conviction constitutionally invalid.

*Cupp*, 414 U.S. at 149-150.  *Cupp* and its progeny were recently reaffirmed by the Eleventh Circuit:

> Federal habeas relief is unavailable "for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102, 111 L. Ed. 2d 606 (1990)).  A jury instruction that "was allegedly incorrect under state law is not a basis for habeas relief," *id.* at 71-72, 112 S. Ct. at 482, because federal habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68, 112 S. Ct. at 480.  Unlike state appellate courts, federal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Id.* at 72, 112 S. Ct. at 482 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973)).

*Jamerson v. Secretary for Dept. of Corrections*, 410 F.3d 682, 688 (11th Cir. 2005).

Applying the proper standard of review to this case, the court finds that there is no reasonable probability that the portion of the trial court's credibility instruction at issue so infected his trial that his conviction offends due process.  At most, it is ambiguous or confusing as to whether a witness' statement should carry the presumption of truth.  Even if the instruction had clearly directed the jury to presume the witnesses were truthful, as in *Cupp*, Price still cannot establish that it infected his entire trial.  Elsewhere in its instructions (and unmentioned by Price and the appellate court), the trial court informed the jury that it was the "sole and exclusive judge of the facts. . . . That's entirely up to you."  (R. Vol. 6, Tab13 at 864).  Moreover, the trial court gave repeated instructions on reasonable doubt and the presumption of innocence.  *Id*. at 856-868.  This claim is without merit and is due to be denied.

> **G.**   **The arresting officer's warrantless seizure of Mr. Price's suitcase, the source of a black pair of pants entered into evidence as a prosecution exhibit, violated the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments because it cannot be considered to have occurred incident to Mr. Price's arrest.  (Paragraphs 74-77 of the petition).**

Price alleges the arresting officer's warrantless seizure of his suitcase violated his "Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment[]" constitutional rights because the seizure was not incident to his arrest.  (Doc. 16 at 34).  The State answers that *Stone v. Powell,* 428 U.S. 465, 494 (1976), prohibits this court from considering this claim.  (Doc. 22 at 52) ("[W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial.")).

In his reply, Price concedes "that his prior counsel litigated this Fourth Amendment claim

in the state court[,] . . . [and] agrees with the State [it] is foreclosed by *Stone v. Powell*, 428 U.S. 465 (1976)." (Doc. 28 at 81).  Accordingly, this claim is due to be denied.

> **H.    By arguing, without any basis in the evidence, that Mr. Price would**
> **likely kill again unless put to death, the prosecutor sullied the trial**
> **with inflammatory and unsupported speculation.  (Paragraphs 77-82**
> **of the petition).**

During the penalty phase of his trial, Price alleges the prosecutor engaged in speculative, inflammatory and improper argument concerning his future dangerousness, and as a result, his sentencing proceeding was rendered fundamentally unfair under the Fifth and Fourteenth Amendments to the United States Constitution.  (Doc. 16 at 36-37).  As the factual basis for his claim, Price points to a portion of the prosecutor's closing statement, arguing that

> the prosecutor graphically described the injuries to the victim, urging that "if there
> has even been a more heinous, cruel or atrocious infliction of death on any
> individual in Fayette County, I haven't heard about it."  [Price then takes issue
> with the following prosecutorial argument]:

> > ["]Now, the only way I know of to assure that Chris Price is
> > not a threat, doesn't have any opportunity to inflict this kind of
> > injury on anyone else in Fayette County, is to have the jury
> > recommend a sentence of death for him.  I seriously ask you to
> > make that recommendation to the Court.["]

*Id*. at 36 (quoting Rule 32 R., Vol. 17 at 911).[65]

According to Price, even though life without parole was an obvious alternative, the prosecutor's argument improperly "played on the jury's fears" by arguing that death was "'the only way'" to prevent Price from returning to Fayette County to kill again.  *Id*.  Such an assertion, Price argues, was "as flatly false as it was inflammatory."  *Id*.  (citing *Darden v. Wainwright*, 477

---

[65]This was not the entire comment.  The entire comment is set out in the appellate court's opinion further herein.

U.S. 168, 180 & n.10 (1986); *Davis v. Zant*, 36 F.3d 1538, at 1549-50 (11th Cir. 1994) (quotation omitted).[66]   Price declares the appellate court's determination that the argument did not violate his constitutional right to due process of law was contrary to clearly established federal law.  (Doc. 28 at 82-83).

Moreover, Price states that since "'future dangerousness'" is not a statutory aggravating factor in Alabama[67], the prosecution introduced no evidence from which his future dangerousness

_____

[66]Price also contends, for the first time, that  the prosecutor's "misstatement" encouraged the jury to believe that he would not remain behind bars for the rest of his life if they were to side with his defense counsel's request for life without parole, and that "[n]ot surprisingly, the jurors promptly asked questions to the trial court about the impact of any sentencing recommendation they made." *Id.* at 37.  He does not provide citations to the record.  He also makes no mention of this argument in his reply brief.

Price's failure to first present the above argument to the state court renders this aspect of his claim procedurally defaulted.  Alternatively, Price has cited no constitutional precedent in support of his complaint that the prosecutor wrongfully argued that he could be paroled, and his failure to factually support the claim would necessitate its dismissal as conclusory pursuant to the Rules Governing Habeas Corpus proceedings.  Finally, and as a second alternative, the trial court and opposing counsel repeatedly informed the jury that the only penalties available to Price, if convicted of capital murder, were death or life without parole.  The trial court also instructed the jury that a sentence of life without parole meant that Price would spend the rest of his natural life incarcerated with no possibility of parole. The prosecutor never mentioned parole, life without parole, or even hinted that Price could one day be released from prison on parole.  When the isolated comment is viewed in its context, there is simply no possibility that it could reasonably be construed as an attempt by the prosecutor to create a baseless fear that Price might one day be paroled.  Further, when the comment is also viewed in the context of the trial as a whole, there is certainly no reasonable possibility that the jury could have construed it as such.  The penalty phase proceedings were not rendered fundamentally unfair by the remark.

[67]Price refers to ALA. CODE. §§ 13A-5-49 and 13A-5-45(c) as proof that Alabama does not consider future dangerousness to be a statutory aggravating circumstance, and without additional explanation, cites *Proffitt v. Wainwright*, 658 F.2d 1227, 1266-67 (11th Cir. 1982) to support his contention that the prosecution's reliance on a non-statutory aggravating factor is itself constitutional error.  (Doc. 28 at 82-83).  Price also makes the comment that "'general deterrence'" is not a statutory aggravating factor under Alabama law, and asserts that such an argument could possibly violate individualized sentencing requirements.  *Id.* at 84, n.47 (citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)(other notation omitted)).

could have been inferred, and due process required he be given notice that the prosecution intended to make future dangerousness an issue at sentencing.  (Doc. 16 at 37).  The prosecution's failure to do so allegedly caused Price to be unprepared to rebut the charge, a situation that violated his "fundamental due process rights under the Fifth and Fourteenth Amendments to the United States Constitution."  *Id.* (citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977) ("[S]ending a man to death 'on the basis of information he had no opportunity to deny or explain' violates fundamental notions of due process.")).  Again, Price contends the appellate court's determination to the contrary violated clearly established Supreme Court precedent.

Finally, Price argues that the absence of any evidence of his future dangerousness reduced the prosecutor's argument to one that improperly encouraged the jury to sentence Price to death simply because he killed once, and therefore would necessarily kill again.  (Doc. 16 at 37).  Price further declares the appellate court's determination that "'the prosecutor was not arguing that the appellant would kill again if he was not sentenced to death, but that such a sentence would act as a deterrent to other possible offenders[,]'" is a factual finding "diametrically opposed to the record."  (Doc. 28 at 83-84).  Since Price believes this factual finding is "clearly erroneous," he asserts it is entitled to no deference.  *Id.* at 83, n.46 (citing 28 U.S.C. § 2254(e)(1)).

The respondent answers that Price cannot show he is entitled to relief pursuant to 28 U.S.C. § 2254(d), and contends that § 2254(e)(1) mandates a presumption of correctness with regard to the appellate court's factual findings.  (Doc. 22 at 54-56).  The appellate court's opinion on the issue is as follows:

> The appellant argues that during his closing argument at the sentencing phase of the trial the prosecutor impermissibly commented that the appellant

111

would probably kill again unless he was put to death; the appellant argues that this comment "sullied" the trial with inflammatory and unsupported speculation.  The record indicates that the appellant failed to object to this comment at trial; therefore, any error in the prosecutor's argument to the jury must be analyzed pursuant to the plain error standard.  Rule 45A, Ala. R. App. P.  The comment made by the prosecutor during his closing argument at the sentencing phase was as follows:

> "One of the most vivid descriptions of what happened to Bill Lynn, on the stand that came forth in my listening to the testimony, was what the little EMT girl said about trying to move his head.  Do you remember that?  He was cut so severely that she put her hand entirely, all four fingers, inside the wounds on his head and tried to move it and couldn't even turn his head.  His entire scalp moved around his head and, that is, the bone structure would not move.  If there has ever been a more heinous, cruel, or atrocious infliction of death on any individual in Fayette County, I haven't heard about it.

> Now, the only way that I know of to assure that Chris Price is not a threat, doesn't have an opportunity to inflict this kind of injury on anyone else in Fayette County, is to have the jury recommend a sentence of death on him.  That sentence recommendation to the Court will demonstrate to any individual in this county contemplating a similar action, will demonstrate the conscience of this community that it will not be tolerated.  I seriously ask you to make that recommendation to the Court.  And in asking you to do that, I realize that this is not a duty you would have chosen."

The appellant argues that this argument by the prosecutor was reversible error, based on the Alabama Supreme Court's holding in *Ex parte Smith*, 581 So. 2d 531 (Ala. 1991).  *See also Ex parte Washington*, 507 So. 2d 1360 (Ala. 1986).  However, the comment in *Ex parte Smith*, 581 So. 2d at 532, was made by the prosecutor during the guilt phase of the defendant's trial and, in holding that the comment constituted plain error, the Court determined that the prosecutor had attempted to prove guilt by arguing that the defendant would commit future illegal acts. [footnote omitted].  However, a review of the entire argument by the prosecutor in the present case reveals that the prosecutor was not arguing that the appellant would kill again if he was not sentenced to death, but that such a sentence would act as a deterrent to other possible offenders.  Similarly, in *Carroll v. State*, 599 So. 2d 1253, 1270 (Ala. Cr. App. 1992), *aff'd*, 627 So. 2d 874 (Ala. 1993), *cert. denied*, 510 U.S. 1171, 114 S. Ct. 1207, 127 L. Ed. 2d 554 (1994), the prosecutor stated during his argument at the penalty phase, "How

112

many people does [the defendant] get to kill?"  In construing the prosecutor's argument to be a plea for law enforcement, this Court stated:

> "Although we do not approve of [this argument], we do not consider it to constitute reversible error.  [It] can be interpreted as merely an argument for law enforcement and society's right of self-protection, *Kuenzel v. State*, 577 So. 2d 474, 503-04 (Ala. Cr. App.), *affirmed*, 577 So. 2d 531 (Ala.), *cert. denied*, 502 U.S. 886, 112 S. Ct. 242, 116 L. Ed. 2d 197 (1991), rather than an improper comment on the possibility that the appellant will commit future illegal acts, *Ex parte Smith*, 581 So. 2d 531, 533 (Ala. 1991)."  599 So. 2d at 1270.

> In *Williams v. State*, 601 So. 2d 1062, 1072-73 (Ala. Cr. App. 1991), *aff'd*, 662 So. 2d 929 (Ala. 1992), *cert. denied*, 506 U.S. 957, 113 S. Ct. 417, 121 L. Ed. 2d 340 (1992), the prosecutor, during his closing argument at the guilt phase of the defendant's trial, argued that the defendant admitted the murder by the allegorical statement "'I ate the mouse.'"  The prosecutor then stated that the defendant had also stated, "'I ate the little mouse and I will eat another little mouse if you give me a chance.'"  Although the defendant in *Williams v. State* claimed that this argument was a comment by the prosecutor that he would kill again, this Court held that the statement was a legitimate argument in response to a statement made by the defendant to third parties and admitted earlier at trial. This Court stated, "Furthermore, '[s]tatements of counsel in arguments to the jury must be viewed as having been made in the heat of debate, and such statements are usually valued by the jury at their true worth.'"  *Williams v. State*, *supra*, at 1073, *quoting Stephens v. State*, 580 So. 2d 11 (Ala. Cr. App. 1990), *affirmed*, 580 So. 2d 26 (Ala.1991), *cert. denied*, 502 U.S. 859, 112 S. Ct. 176, 116 L. Ed. 2d 138 (1991).

> This comment made by the prosecutor did not constitute plain error.

*Price v. State*, 725 So. 2d at 1044.

When examining the constitutional standard applicable to claims of improper

prosecutorial argument during the sentencing phase of trial under § 2254(d), it

[has been] pointed out[68 that] prosecutorial arguments will not warrant habeas

---

[68]The Eleventh Court is referring to its *en banc* opinions in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985), *Tucker (William) v. Kemp*, 762 F.2d 1480 (11th  Cir. 1985) and *Tucker (Richard) v. Kemp*, 762 F.2d 1496 (11th Cir. 1985).

corpus relief unless they meet two requirements.  First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations.  *Brooks*, 762 F.2d at 1403.  [FN8]  Second, they must have been so prejudicial, when viewed in the context of the entire sentencing proceeding, as to have rendered that proceeding "fundamentally unfair."  *Id.* at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S. Ct. 1868, 1872, 40 L. Ed. 2d 431 (1974)).  The test for fundamental unfairness is whether "there is a reasonable probability that [the errors] changed the outcome of a case."  *Brooks*, 762 F.2d at 1402; *see also Drake*, 762 F.2d at 1460.

> FN8.  In *Brooks* and its companion cases we identified a number of matters which have been recognized as legitimate sentencing considerations.  These include the character and background of the defendant (including future dangerousness and possible rehabilitation), the circumstances of his offense, and accepted penological justifications such as deterrence and retribution. *See Brooks*, 762 F.2d at 1406-08; *Drake*, 762 F.2d at 1458.

*Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985).

The Supreme Court has also explained how legitimate sentencing considerations are to comport with the establishment of statutory aggravating factors:

> Our cases indicate . . . that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty.  But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.  [FN17]  What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.  See *Eddings v. Oklahoma*, 455 U.S. 104, 110-12, 102 S. Ct. 869, 874, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 601-05, 98 S. Ct. 2954, 2963-65, 57 L. Ed. 2d 973 (1978) (plurality opinion); *Roberts* (*Harry*) *v. Louisiana*, 431 U.S. 633, 636-37, 97 S. Ct. 1993, 1995, 52 L. Ed. 2d 637 (1977); *Gregg* [*v. Georgia*], 428 U.S. [153,] 197, 96 S. Ct. [2909,] 2936 [(1976)] (opinion of STEWART, POWELL, and STEVENS, JJ.); *Proffitt v. Florida*, 428 U.S. [242,] 251-52, 96 S. Ct. [2960,] at 2966 (opinion of STEWART, POWELL, and STEVENS, JJ.) [(1976)]; *Woodson v. North Carolina*, 428 U.S. 280, 303-04, 96 S. Ct. 2978, 2990-91, 49 L. Ed. 2d 944 (1976) (plurality opinion). [footnote omitted]

> FN17.  See *Gregg*, *supra*, 428 U.S., at 164, 196-97, 206, 96 S. Ct., at 2920, 2936, 2940; *Proffitt v. Florida*, 428 U.S. 242, 256-57,

114

> n.14, 96 S. Ct. 2960, 2968-2969, n.14, 49 L. Ed. 2d 913 (1976)
> (opinion of Stewart, POWELL, and STEVENS, JJ.). Similarly, the
> Model Penal Code draft discussed in *Gregg, supra*, 428 U.S., at
> 192-95, 96 S. Ct., at 2934-35, sets forth lists of aggravating and
> mitigating circumstances but also provides that the sentencer "shall
> take into account . . . any other facts that it deems relevant . . ."
> ALI Model Penal Code § 210.06 (Proposed Official Draft, 1962).
> . . . .

*Zant v. Stephens*, 462 U.S. 862, 878-79 (1983).

Thus, the Supreme Court recognizes statutory aggravating factors as a way for states like Alabama to narrow the class of individuals who are *eligible* for the death penalty. If statutory aggravating factors are found, then the defendant is deemed eligible for the death penalty. The jury's next step is to decide whether to recommend (*e.g.*, select) capital punishment for the defendant. In doing so, the jury may consider the legitimate sentencing concerns, among which is future dangerousness based on the character and background of the defendant, if the evidence supports it.

Proper prosecutorial argument, no matter how "'prejudicial' or 'persuasive,' can never be unconstitutional." *Brooks v. Kemp*, 762 F.2d at 1403. The "scope of permissible argument [at sentencing,]" allows the

> prosecutor to urge the jury to find a statutory aggravating circumstance [only on the] basis . . . [of] the relevant facts introduced in evidence and the proper inferences therefrom. [FN 40] . . . [A]fter an aggravating circumstance has been found, arguments [within] the realm of recognized sentencing concerns– *e.g.*, . . . individual circumstances of the crime and defendant, future dangerousness, rehabilitation and penological justifications for the death penalty are [proper] . . . because they urge death for . . . []relevant reasons. . . . [Still,] an argument based upon one of these core concerns may, under certain conditions, be improper in its mode of presentation to the jury. [FN 41].

>> FN40. The [prosecutor's] sentencing argument does not present this problem. The jury had already found facts at the guilt phase which were aggravating circumstances under Georgia law. . . .

FN41.  For example, it would be improper for a prosecutor to argue about individual circumstances of the defendant contained in a presentence report which the defendant had not been able to examine.  *Gardner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).  And, it would obviously be improper for the prosecutor to make argument on valid subjects using facts not introduced in evidence before the jury.  *United States v. Warren*, 550 F.2d 219, 229 (5th Cir. 1977) (conviction reversed because government argued important fact not in evidence), *cert. denied*, 434 U.S. 1016, 98 S. Ct. 735, 54 L. Ed. 2d 762 (1978); *Conner v. State*, 251 Ga. 113, 303 S.E. 2d at 276 (1983) (wrong for prosecutor to "go outside the facts appearing in the case and lug in extraneous matters").

*Brooks v. Kemp*, 762 F.2d at 1408.

*Brooks* took into consideration Georgia's statutory sentencing law when it examined the propriety of the prosecutor's argument.  However, substitution of Alabama's sentencing law, as it was applied in Price's particular case, yields the same result.  Alabama law requires a finding of the existence of  "at least one aggravating [factor] as defined in section 13A-5-49. . . , [or] the sentence shall be life imprisonment without parole."  ALA. CODE § 13A-5-45(f).  Moreover, pursuant to § 13A-5-45(c), at capital sentencing hearings[69], "evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Section[] 13A-5-49."

Two statutory aggravating factors were argued and found at the sentencing stage of Price's case: (1) the murder was committed during the course of a robbery, and (2) the murder was heinous, atrocious and cruel.  (C.R. Vol. 1, 214-15 and ALA. CODE §§  13A-5-49(4) & (8)).  It is noted that the jury had already found Price guilty beyond a reasonable doubt of the capital

_____

[69]This would include the penalty phase as well, which is to be conducted before a jury, unless waived.  ALA. CODE § 13A-5-46.

116

offense of murder during the course of a robbery before the sentencing phase began.  Thus, under Alabama law, the State had already proven the first aggravating factor beyond a reasonable doubt.  ALA. CODE § 13A-5-50.

The existence of two statutory aggravating factors in Price's case satisfied the death eligibility requirement under Alabama law.  Once the eligibility requirement was met, under "the Alabama capital punishment statute and the United States Constitution[,] sentencing judges [are permitted] to consider a defendant's prior criminal record and other nonstatutory aggravating factors in deciding whether to impose the death penalty.  ALA. CODE § 13A-5-45(d)-47(a); [*Zant v.*] *Stephens*, 462 U.S. at 887-88, 103 S. Ct. at 2746-47."  *Lindsay v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987).

Therefore, examination of non-statutory aggravating circumstances and any mitigating circumstances arising from the evidence proffered at each phase of the trial was proper in the determination whether Price should be sentenced to death. These included the individual circumstances of the crime and the defendant, future dangerousness, rehabilitation and penological justifications for the death penalty.  It follows that if future dangerousness is a legitimate sentencing concern, then it was not *per se* improper for the prosecutor to argue the subject, assuming the evidence supported it.

To the extent that Price is arguing that *Darden v. Wainwright,* 477 U.S. 168, 180 & n.10, provides proof that the prosecutor's argument concerning "future dangerousness"[70] was contrary to federal constitutional law, it is without merit.  *Darden* is inapposite because it involved the

---

[70]The court recognizes that the appellate court did not find that the prosecutor's argument, when read in context, pertained to Price's future dangerousness.

impropriety of prosecutorial argument regarding future dangerousness at the guilt phase of trial, a subject wholly irrelevant to whether or not Darden had committed the offense.[71]  Therefore, the state appellate court's decision was not contrary to clearly established Supreme Court precedent pertaining to the narrow issue of relevant sentencing considerations.

However, Price also contends there was no evidentiary basis from which the prosecutor could justify arguing that he was a "threat" and deserved the death penalty because it was the "only way" to prevent further harm to the citizens of Fayette County.  Since Price believes the statement was not supported by the evidence, he contends it was improper and deprived him of a fundamentally fair trial.  He argues that the state appellate court's findings of fact to the contrary are clearly erroneous when compared to the record and therefore entitled to no deference.  Price compares his case to  *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994), where

> [o]n at least five separate occasions during closing, the prosecutor made such statements which were either patently false or misleading with respect to this central defense.  These misstatements portrayed the core of the defense case as an afterthought fabricated during trial after the state closed its evidence.  The statements were not only clearly false, but the record in this case establishes beyond doubt that the misrepresentations were intentional and known to the prosecutor to be false.

*Davis*, 36 F.3d at 1549.

This court disagrees with Price's assertion that *Davis* provides him relief.  First, Price does not allege that the prosecutor repeatedly made patently false and misleading statements about the defense case in closing.  Price's complaint is based upon one comment, taken out of context.  It is true that the prosecutor in Price's case clearly stated that Price was a threat and that

---

[71]Additionally, even though the Supreme Court in *Darden* found the comment to be improper, it still did not find that Darden was constitutionally prejudiced thereby.  *Id*. at 180.

the only way he knew to prevent Price from harming others in the future was to recommend the death penalty.  Examining the argument in context, the record also shows that immediately prior to the questionable comment, the prosecutor reminded the jury of details supporting his argument that the crime was heinous, atrocious or cruel, and immediately after the comment, the prosecutor asked for the death penalty as a means to deter any other individual from committing such an act.

Thus, the prosecutor's comment appears to be argument for the death penalty due to Price's future dangerousness, that dangerousness being based on the heinous, atrocious and cruel nature of the crime he committed.  But it is also, as found by the Court of Criminal Appeals, an argument for the death penalty as a deterrent for the type of heinous crime Price had been convicted of committing.  The state court decision that the comment was proper is not contrary to or an unreasonable application of clearly established federal law.[72]

Even if the comment was improper, it did not prejudice Price.  The Eleventh Circuit has explained:

> In applying [the prejudice prong], we remain aware of the primary importance of examining the entire context of the trial proceeding.  *Brooks*, 762 F.2d at 1413.  Thus, a reviewing court should not assess prosecutorial comments in isolation, shorn of their context.  *See Johnson v. Wainwright*, 778 F.2d 623, 631 (11th Cir. 1985) (evaluating challenged comments in light of "the rest of the prosecutor's speech"), *cert. denied*, 484 U.S. 872, 108 S. Ct. 201, 98 L. Ed. 2d 152 (1987).  "In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity."  *Brooks*, 762 F.2d at 1400.  We also consider the lack of an objection in examining the impact of a prosecutor's closing argument, as the

---

[72]The court is unimpressed with Price's argument that since he was not notified that future dangerousness would be an issue, he was not prepared to rebut the argument.  Any rebuttal could have immediately taken place by way of objection to the comment, and argument that Price had no significant criminal history and no possibility of returning to Fayette County.  The court fails to see what additional information would have been necessary to dispute the prosecutor's remark, such that any lack of notice would have foundered the trial counsel's ability to immediately thwart it with the foregoing pieces of information, information that was already very much a part of the record.

> omission "may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Brooks*, 762 F.2d at 1397 n.19; *see also Davis v. Zant*, 36 F.3d 1538, 1551 n.20 (11th Cir. 1994) ("The failure to object can sometimes serve to clarify an ambiguous record as to whether a particular argument was in fact misleading or prejudicial."). This court also evaluates whether "defense counsel's closing argument ... ameliorate[d] the damage done to the defense by the prosecutor's [statements]." *Davis*, 36 F.3d at 1551; *see also Brooks*, 762 F.2d at 1397-98. Moreover, we consider the trial court's instructions to the jury, as they "may remedy effects of improper comments." *Brooks*, 762 F.2d at 1400. And, of course, we consider the evidence of guilt and the weight of aggravating and mitigating factors. *See Brooks*, 762 F.2d at 1415-16. "A court need not determine whether specific arguments are proper or improper if, taken as a whole, they would not require relief." *Brooks*, 762 F.2d at 1403 n.31.

*Cargill v. Turpin,* 120 F.3d 1366, 1379 (11th Cir. 1997). Reviewing the record, the court finds that the complained-of reference was terse and not "overly damaging." *Cargill*, 120 F.3d at 1379. Trial counsel did not object, supporting the conclusion that the matter does not warrant relief at this juncture. Accordingly, the court finds that this claim is due to be denied.

> I.   **Because the State failed to meet its burden of proving that Mr. Price waived his *Miranda* rights before giving statements to Tennessee authorities and to Alabama officials, the trial court's failure to suppress the statements violated the Fifth, Sixth, Eighth and Fourteenth Amendments. (Paragraphs 83-88 of the petition)**.

Price alleges the trial court erred when it failed to suppress two separate statements he gave to law enforcement officers because the "State failed to meet its burden of proving that [he] waived his *Miranda* rights before giving statements to the Tennessee authorities and the Alabama officials." (Doc. 16 at 38). He argues the suppression hearings before and during trial prove this conclusion because the law enforcement officers "who took each of the statements claimed in broad terms that warnings had been administered pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966)." *Id*. He further argues that the use of broad terms "fail[ed] to show, beyond a reasonable

120

doubt[73], that the warnings were properly given on either occasion." *Id*. Still further, he alleges that Chattanooga Detective Michael Mathis unlawfully induced him to make his first statement, which became the "centerpiece of the prosecution's case" against him. *Id*. at 38-39. Price argues that Mathis misled him into making the Tennessee statement by telling him "that he [Mathis] would vouch for [Price's] cooperation." (Doc. 28 at 87).

The Alabama Supreme Court was the last state court to examine this claim. *Ex Parte Price*, 725 So. 2d 1063 (Ala. 1998). The Court affirmed the appellate court's findings to the extent that it found the State had proven Price was properly advised of his *Miranda* rights prior to giving a statement to Chattanooga detective Michael Mathis. *Id.* at 1067-68. The Alabama Supreme Court also found that Price's statement to Mathis was voluntary, and was not the product of coercion. *Id.* at 1072-73. However, contrary to the opinion of the Court of Criminal Appeals, the Alabama Supreme Court found the State did not prove Alabama authorities advised Price of his *Miranda* rights, and ruled that the motion to suppress should have been granted. *Id.* at 1068-71. It additionally found that admission of the information and physical evidence recovered from Price as a result of that statement did not constitute plain error. *Id.* at 1072.

---

[73]First and foremost, the minimum standard of evidentiary proof for admission of a statement is not beyond a reasonable doubt, but by a preponderance of the evidence:

 "[T]he burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L. Ed. 2d 416 (1975). The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), and the voluntariness of the confession, *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

*Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004).

Price agrees the Alabama Supreme Court was correct when it found the State did not

prove Alabama authorities had properly advised him of his *Miranda* rights, but asserts the

remainder of the Court's opinion is contrary to and an unreasonable application of clearly

established Supreme Court precedent.  (Doc. 28 at 85-89).  With the exception of Detective

Mathis's testimony as to whether he coerced Price into making the Tennessee statement, there is

no indication whatsoever that Price disputes the Alabama Supreme Court's historical findings of

fact.  Accordingly, those findings shall be presumed to be correct (28 U.S.C. § 2254(e)(1)), and

the court will carefully examine whether Price has overcome that presumption with regard to

Detective Mathis.

The Alabama Supreme Court's findings of fact and conclusions of law were lengthy and

are as follows:

Before trial, Price gave two statements to law enforcement authorities.  He gave the first statement to Detective Michael Mathis of the Chattanooga, Tennessee, Police Department on December 29, 1991 (the "Tennessee statement").  The record indicates that Detective Mathis made audiotapes of that interview and later provided the audiotapes to Sheriff James Turner in Fayette County, Alabama.  Sheriff Turner testified that his secretary prepared a typed transcript of the tapes of Detective Mathis's interview.[74]

Price gave the second statement to Sheriff Turner on December 29, 1991, in Fayette County (the "Alabama statement").  Sheriff  Turner testified that this interview was also recorded on audiotape and that a typed transcript was prepared.[75]

Price filed a pretrial motion to suppress, requesting that the trial court suppress "[a]ny statements made by [Price], whether oral, written or videotaped, which the State intends to introduce into evidence or otherwise use at the trial of

---

[74]In footnote, the Court wrote, "Ultimately, the State read the entire typed transcript of the statement, in its entirety, into evidence at trial."  *Ex Parte Price*, 725 So.2d at 1066 n.1.

[75]In footnote, the Court wrote, "Nothing in the record indicates that this statement was introduced into evidence at trial."  *Id*. at n.2.

this case." Price did not specify in the motion why the statements should be suppressed. The trial court conducted a hearing on Price's motion on December 15, 1992, during which the State presented evidence regarding both statements. At the hearing, the trial judge denied Price's motion to suppress, as to both statements.

On appeal, Price contends that both statements should have been suppressed because, he says: (1) with regard to both of the statements, the State failed to adequately demonstrate that the law enforcement authorities had properly advised him of his *Miranda* rights ( *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)) before questioning him; and (2) the Tennessee statement was the product of an improper inducement.

It is well established that extrajudicial confessions and other inculpatory statements are prima facie involuntary and that for such a statement or confession to be admissible the State must prove by a preponderance of the evidence that it was voluntary. *Ex parte Singleton*, 465 So. 2d 443, 445 (Ala. 1985). To satisfy this burden, the State must show: (1) that proper *Miranda* warnings were given before any questioning by the police and (2) that the statement was voluntary, i.e., that it was not procured through coercion or improper inducement. See *Stariks v. State*, 572 So. 2d 1301, 1304 (Ala. Crim. App. 1990); *McLeod v. State*, 718 So. 2d 727, 729 (Ala. 1998). The initial determination of admissibility is made by the trial court, and the trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. *McLeod*, *supra*; *Stariks*, *supra*.

. . . . Although there is no talismanic incantation required to satisfy the requirements of *Miranda*, it is well settled that, before being questioned, an accused in custody must be informed in clear and unequivocal terms that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to have counsel present at the interrogation, and that if he is indigent and cannot afford to pay a lawyer, the court will appoint one to represent him during the interrogation. See *Ex parte Siebert*, 555 So. 2d 780, 781-82 (Ala. 1989), citing, *California v. Prysock*, 453 U.S. 355, 359-60, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981); *Wallace v. State*, 290 Ala. 201, 275 So. 2d 634 (1973). If the defendant is not advised of each of these rights before being questioned, then any statement he makes during the questioning is not admissible against him as evidence of guilt. *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (statements made in response to custodial interrogation are inadmissible as evidence of guilt unless the defendant was advised of the rights established in *Miranda*).

. . . .

123

We will first consider whether the State demonstrated that Price had been properly advised of his *Miranda* rights before being questioned by Detective Mathis in Chattanooga.

Price argues that this Court may consider only the evidence that was before the trial court when it denied the motion to suppress and, therefore, that it may not consider any additional evidence relevant to this issue that was produced subsequently at trial. He contends that the State did not actually produce evidence at the suppression hearing that precisely identified which rights were explained to him before he provided the Tennessee statement; therefore, he argues, the State failed to show that he was properly advised of his *Miranda* rights. However, Price has cited no legal authority or persuasive reason in support of a rule requiring this Court to consider only the evidence presented to the trial court at the pretrial suppression hearing. Accordingly, we will apply the long-standing rule that, in considering whether the trial court properly overruled a defendant's motion to suppress an extrajudicial confession or other inculpatory statement, a reviewing court may consider both the evidence presented at the pretrial suppression hearing and the evidence presented at trial. *See, e.g.*, *Henry v. State*, 468 So. 2d 896, 899 (Ala. Crim. App. 1984); *United States v. Smith*, 527 F.2d 692, 694 (10th Cir. 1975) ("In passing on the correctness of the trial court's denial of [the defendant's] motion to suppress, we are not limited to a consideration of just the evidence introduced at the hearing on the motion to suppress. In addition thereto, we may also consider the evidence adduced at trial, even though such may not have been presented at the pretrial suppression hearing.").[76]

Before he attempted to introduce the Tennessee statement into evidence at trial, the prosecutor questioned Detective Mathis. Detective Mathis testified that before he questioned Price, he informed Price of his constitutional rights and that he used the "standard rights form" required by the Chattanooga Police Department. He testified that he explained every portion of that form to Price and, before continuing, ascertained whether Price understood what was being read to him. Detective Mathis was then asked to describe specifically what he had told Price; he stated that Price was told:

> "[B]efore we ask you any questions, you must understand your
> rights. You have the right to remain silent. Anything you say can
> be used against you in court. You have the right to talk to a lawyer
> for advice before we ask you any questions and have him with you

---

[76]In footnote, the Court wrote, "Because we conclude that it is appropriate to review the evidence adduced at trial, we express no opinion as to whether the evidence produced at the pretrial suppression hearing demonstrated that Price was properly advised of his *Miranda* rights." *Id*. at 1068 n.3.

124

during the questioning.  If you cannot afford a lawyer, one will be appointed for you before any questions if you wish.  If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time.  You also have the right to stop answering questions at any time until you talk to a lawyer."

This statement complied with both Alabama and Federal law regarding the obligation to inform an accused in custody of his rights under *Miranda*.  *See Wallace*, *supra*.  Accordingly, after reviewing the complete record on this issue, we conclude that the State demonstrated that Price was properly advised of his *Miranda* rights before being questioned by law enforcement authorities in Chattanooga, Tennessee.

We will next address Price's argument that the State failed to prove that he was properly advised of his *Miranda* rights before he gave the Alabama statement to Sheriff Turner in Fayette County.[77]  At the outset, we note that the record indicates that the State did not seek to introduce this statement into evidence at trial; indeed, it appears from the record that neither the audiotape of the statement nor the typed transcript of that tape was ever considered directly by either the trial court or the jury.  At first blush, therefore, it appears that Price was not prejudiced by any error in regard to this issue.

However, the record does reflect that Sheriff Turner testified at trial that he had interviewed Price and that, during the interview, they had discussed the location of a .44 caliber pistol and a holster.  Specifically, Sheriff Turner testified

_____

[77]In footnote, the Court wrote,

Price has not contended that his statement given to Sheriff Turner in Fayette County was procured through force, intimidation, or inducement; therefore, the only issue with regard to the Alabama statement is whether it was preceded by an adequate *Miranda* warning.

We note that the record in this case shows that the State met its burden of proving that the Alabama statement was voluntary.  Sheriff Turner testified that Price was not threatened or offered any inducement or reward for providing a statement. He further testified that Price was not told that it would be better for him to make a statement.  In the absence of any evidence to the contrary, we note that this testimony was sufficient to show that Price's statement to law enforcement officials in Fayette County was voluntary.

*Id*. at 1068 n.4.

that Price gave him directions explaining how the police could locate these pieces of evidence. The State also presented evidence indicating that these two items had belonged to Bill Lynn. In short, the State introduced evidence tending to show that Price had provided a statement to Sheriff Turner and that this statement contained information concerning the location of items that had belonged to the victim. There can be no doubt that, by linking Price to the crime, this reference to the Alabama statement was inculpatory to some extent and contributed in at least some measure to Price's conviction. Accordingly, if the State failed to prove that Price had been properly advised of his *Miranda* rights before Sheriff Turner interviewed him, the State should not have been permitted to introduce evidence of that statement. *See*, *e.g.*, *Berkemer*, *supra*.[78]

The facts relevant to whether Price was fully informed of his *Miranda* rights before being questioned by Sheriff Turner are as follows: At the pretrial suppression hearing, Sheriff Turner was asked whether he had advised Price of his "constitutional right to counsel and to not give a statement and the other rights commonly referred to as Miranda rights." Sheriff Turner responded by saying that Price had been advised "of his rights" and that the audiotapes of the interview reflected that fact. However, the record of the suppression hearing does not show that the trial judge reviewed either the audiotapes or the typed transcript of Price's statement to Sheriff Turner before ruling on whether that statement should be suppressed; nor does the record show that Sheriff Turner read the typed transcript aloud at the suppression hearing.

---

[78]In footnote, the Court wrote,

In light of the fact that the State introduced evidence of the statement itself, we do not address whether the trial court erred in admitting into evidence the physical items (i.e., the .44 caliber pistol and the holster) that were apparently located in part as a result of that statement. Cf. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1518 (6th Cir. 1988) (holding, pursuant to *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), that cocaine found as a result of a *Miranda* violation was admissible even though the *Miranda* statement itself was not admissible, because "where police simply fail to administer warnings, the admissibility of nontestimonial physical evidence derived from the uncounselled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment"); *Baker v. State*, 555 So. 2d 273, 280 (Ala. Crim. App. 1989) (holding that clothing that was located based on information obtained during an improper interrogation was admissible under *Elstad*). Our review of this issue is limited to whether the State should have been permitted to present evidence of the statement itself.

*Id.* at 1069, n.5.

During her cross-examination of Sheriff Turner at the suppression hearing, Price's counsel asked Sheriff Turner whether Price had been given the *Miranda* warnings "from a form." Specifically, the record contains the following colloquy:

"[Defense counsel:] Sheriff Turner, did you Mirandize [sic] [Price] from a form?

"[Sheriff Turner:] He was read his rights and advised that he could not talk to us until he obtained an attorney, that he also could stop answering questions at any time or make [sic] any statements until he talked to an attorney, at which time he understood these rights.

"[Defense counsel:] My point is did you Mirandize him from a form?

"[Sheriff Turner:] Yes, ma'am.

"[Defense counsel:] You got it in your files?

"[Prosecutor:] I don't know.

"[Defense counsel:] Is that standard procedure in your office that there is a-

"[Sheriff Turner:] No, ma'am, not necessarily on signing off, but do Mirandize them [sic].

"[Prosecutor:] Did I furnish you such a form?

"[Defense counsel:] I don't think with this statement, no. I think with the other statement.

"[Prosecutor:] If I didn't furnish that, I didn't have it then.

"[Defense counsel:] You were present, then, when Deputy Strickland Mirandized him from a form or a card?

"[Sheriff Turner:] Yes, ma'am."

After hearing further testimony regarding the voluntariness of the Alabama statement,[79] the trial judge denied Price's motion to suppress that statement.

---

[79]In footnote, the Court wrote, "See discussion, supra, note 4." *Id*. at 1069 n.6.

During the State's case-in-chief, the prosecutor questioned Sheriff Turner concerning his role in the investigation of Bill Lynn's murder and, as described above, specifically asked Sheriff Turner if he had interviewed Price.  Sheriff Turner answered that he had interviewed Price.  The prosecutor then asked Sheriff Turner:

> "Prior to talking to [Price], did you advise him of his right to have an attorney if he wanted to, to not make a statement if he did not want to, to stop making a statement at any time and consult an attorney and that if [sic] any statement he did make could be used against him in court?  Did you do that?"

Sheriff Turner answered that a deputy had advised Price of his rights and that the statement of his rights had included all of what the prosecutor had asked about in his question; he did not testify that the statement of his rights contained any information not included in the prosecutor's question.

The record indicates that the evidence set out above is the only evidence presented that was relevant to the question whether Price was advised of his *Miranda* rights before being questioned by Sheriff Turner.  Although Sheriff Turner testified at the pretrial suppression hearing that the Alabama statement had been audiotaped and that the tape reflected that Price had been informed of his rights, there is no indication in the record that either the audiotape or the typed transcript of the statement was introduced as evidence during the trial.  We further note that, on cross-examination, Price's trial counsel did not ask Sheriff Turner any questions concerning what warnings the deputy actually gave Price.  Her questions were limited to whether the warnings were given "from a form," and she did not ask what was printed on the form.

The testimony set out above does not contain a complete statement of the rights provided by *Miranda v. Arizona*.  For example, in his question to Sheriff Turner, the prosecutor did not ask him if Price had been advised that, if he could not afford an attorney, one would be appointed for him.  See *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[i]n order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him"); *Wallace*, *supra*.  Also, it is clear that, although Sheriff Turner presented testimony indicating that Price's rights were read to him from a preprinted card or form, Sheriff Turner did not read that card at trial.  *Cf. Carr v. State*, 640 So. 2d 1064, 1070 (Ala. Crim. App. 1994) (holding that the State demonstrated that the defendant had been fully informed of his *Miranda* rights, because a law enforcement officer testified at trial that he had orally informed the defendant of his *Miranda* rights by reading those rights from a preprinted card and read that

card at trial).  Furthermore, the testimony set out above provides no evidence that Price actually signed a waiver-of-rights form before being interviewed.  In short, the State never articulated precisely which rights were explained to Price before he was questioned by Sheriff Turner.  The question presented, therefore, is whether the State satisfied its burden of proving that Price was properly advised of his rights before he was questioned in Fayette County, when it presented Sheriff Turner's testimony that Price had been read his *Miranda* rights from a form or card, without specifying the contents of that form or card.

> . . . .

> The record in this case does not indicate precisely which rights were explained to Price.  In the absence of any evidence indicating the contents of the form that was read to Price or explaining Sheriff Turner's understanding of what rights must be explained to a suspect, we are forced to conclude that there was no evidence from which the court could have properly concluded that Price was advised of each of the rights established in *Miranda* before he provided his statement to Sheriff Turner. . . .  A court cannot fill in an evidentiary gap with supposition or a presumption concerning a witness's knowledge.  In short, this Court cannot presume that Price was advised of all of his rights, based solely on testimony that Price was "Mirandized" from a form; therefore, the State failed to demonstrate that Price had been informed of his *Miranda* rights before being questioned by Sheriff Turner.  *Cf. United States v. Gilmer*, 793 F. Supp. 1545, 1554-56 (D. Colo. 1992). . . .

> We note that the record shows that, although Price filed a general pretrial motion to suppress any statement he had made to law enforcement authorities, Price's trial counsel did not object when the State asked Sheriff Turner whether he had interviewed Price.  However, because Price was convicted of capital murder, this Court will review the record for plain error and, if it finds such error, correct it by "appropriate appellate action."  *See* Rule 39(k), Ala. R. App.  P.

> Therefore, having determined that the trial court erred in permitting the State to admit evidence of Price's statement to Sheriff Turner, we must determine whether this error was so egregious as to amount to plain error and thus require a reversal of Price's conviction for capital murder.  In order to constitute "plain error," the error must be a particularly egregious one that seriously affects the fairness, integrity or public reputation of judicial proceedings.  *See, e.g., Kuenzel v. State*, 577 So. 2d 474, 481-82 (Ala. Crim. App. 1990), and cases cited therein. In addition, the claimed error must have had an unfair prejudicial impact on the jury's deliberation.  *Id*.

> Our examination of the record in this case leads us to conclude that the admission of the evidence of Price's Alabama statement did not amount to plain

129

error.  As indicated above, the court did not admit into evidence the statement itself.  Instead, the evidence at issue here consisted primarily of Sheriff Turner's testimony that he had interviewed Price and that, during the course of the interview, they had discussed the location of the .44 caliber pistol and the holster Price and his accomplice had taken from the victim's residence.  There is no doubt that this evidence helped link Price to the crimes at issue.  However, Price himself discussed these pieces of physical evidence with Detective Mathis in the Tennessee statement, which, as we discuss in Part VII, 725 So. 2d at 1072, was properly admitted into evidence.  Moreover, the additional evidence connecting Price to the crimes was overwhelming.  In the Tennessee statement, Price directly implicated himself in the crimes and provided law enforcement authorities with the location of most of the physical evidence linking him to the crimes.  Because the State produced overwhelming evidence, beyond Sheriff Turner's testimony concerning the Alabama statement, connecting Price to the crimes, we conclude that the error in allowing Sheriff Turner to testify regarding the statement did not rise to the level of plain error.  *Cf. Bush v. State*, 523 So. 2d 538, 557 (Ala. Crim. App. 1988) (holding that the erroneous admission of the defendant's first statement could not have contributed to the defendant's conviction because the first statement was merely cumulative of the evidence contained in the properly admitted second statement); *Kinder v. State*, 515 So. 2d 55, 69 (Ala. Crim. App. 1986) (any error in the admission of the defendant's statement was rendered harmless when the defendant admitted to the same facts on the witness stand).[80]

---

[80]In footnote, the Court wrote,

We note that in *Taylor v. State*, 337 So. 2d 773, 775 (Ala. Crim. App. 1976), the Court of Criminal Appeals, relying on *Lawn v. United States*, 355 U.S. 339, 78 S. Ct. 311, 2 L. Ed. 2d 321 (1958), held that, in general, "once the court has ruled on a motion to suppress, supported by competent evidence as to the validity vel non of the search and seizure, it is not necessary for the defendant again at the trial to object to the evidence on constitutional grounds, and that the failure to do so does not constitute a waiver," unless special circumstances require further objection.  *See also Tillman v. City of Enterprise*, 627 So. 2d 1160, 1161 (Ala. Crim. App. 1993); *Smith v. State*, 612 So.2d 1314 (Ala.Crim.App.1992) (applying rule to pretrial motion challenging photographic lineup), overruled on other grounds, *Ex parte Thomas*, 659 So. 2d 3 (Ala. 1994).

At first blush, this rule seems to contradict the general rule, expressed in *Liberty Nat'l Life Ins. Co. v. Beasley*, 466 So. 2d 935, 936 (Ala. 1985), that "an appellant who suffers an adverse ruling on a motion to exclude evidence . . . made in limine, preserves this adverse ruling for post-judgment and appellate review only if he objects to the introduction of the proffered evidence or other matters and assigns specific grounds therefor at the time of trial, unless he has obtained express

Price also argues that his statement to Tennessee authorities was not voluntary and should have been suppressed because, he claims, it was the product of an improper inducement; specifically, Price contends that the statement was procured through a promise of leniency.  It is well established that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency.  *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897).  A court should examine the totality of the circumstances to determine if an implied promise of leniency caused the defendant to make a confession.  *Ex parte Gaddy*, 698 So. 2d 1150 (Ala. 1997).  The test of involuntariness of a confession, or other inculpatory statement, is whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by the apprehension of harm or hope of favor.  *McLeod*, *supra*, 718 So. 2d at 729.  To determine whether a defendant's will has been overborne, it is necessary to assess "'the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure' [and] '[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.'"  *McLeod*, 718 So. 2d at 730 (quoting an earlier case).

During cross-examination at the suppression hearing, Price's trial counsel asked Detective Mathis whether he had told Price that if he gave a statement it would go easier on him.  Detective Mathis answered that he had not told Price that.  Price's trial counsel then asked Detective Mathis whether he had told Price that he would give a good report as to his cooperation, and Detective Mathis answered:

---

acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefor are not necessary."

Because this issue has not been addressed by either the parties or the Court of Criminal Appeals, we decline to address whether the rule expressed in *Taylor* is a proper statement of the law and, if so, whether it is applicable to the case at hand.  Moreover, Price did not specifically allege at the pretrial suppression hearing that the State failed to prove that he had been properly advised of his *Miranda* rights; therefore, an objection might have been required even if the rule described above is applicable to this case.  In any event, it is clear that even if Price properly preserved this issue for appellate review, any error with regard to the admission of evidence of the Alabama statement was harmless in this case.  *Cf. Bush v. State*, 523 So. 2d at 557; *Kinder v. State*, 515 So. 2d at 69.

*Id*. at 1072 n.7.

"I very possibly could have said that I would be willing to say that he cooperated. That's something that I frequently will say that I do tell people. You know, if they cooperate, then I will be the first to say that, yes, they did."

Price contends that this testimony shows that the Tennessee statement was not voluntarily given.

We disagree.  Looking at the totality of the circumstances in this case, we cannot conclude that Price's statement to Detective Mathis in Chattanooga was procured through an improper inducement.  Detective Mathis testified he did not tell Price that it would be better for him to confess or to make a statement and that he did not offer him any kind of inducement to obtain the statement.  Likewise, the evidence does not suggest that Price was threatened with physical intimidation or psychological pressure.

Price was 19 years old when he gave his statement to the police, and Detective Mathis testified that Price told him he was about to graduate from high school and that he could read and write.  Detective Mathis further testified that Price signed a waiver-of-rights form, and the transcript of the statement shows on its face that Price was fully informed of his *Miranda* rights.  In addition, the record indicates that Price had had at least some measure of experience with the judicial system as a juvenile.

The evidence shows that Price was not held an inordinate length of time before being interviewed, and it shows that before and during the interview he was fed breakfast, was provided soft drinks, was permitted to smoke, and was permitted to use the rest room.  Finally, we note that the interview lasted approximately one and a half hours and was therefore not inordinately long.

We conclude that the possibility that Detective Mathis might have told Price that he would make Price's cooperation known was insufficient, given the totality of the circumstances, to make Price's confession involuntary.  Cf. *Ex parte Gaddy*, *supra*; *McLeod v. State*, *supra*.  In addition, as indicated above, we conclude that the State demonstrated that Price was fully informed of his *Miranda* rights before being questioned by Detective Mathis.  Accordingly, we hold that the trial court properly denied Price's motion to suppress the Tennessee statement and properly admitted that statement into evidence at trial.

. . . .

*Conclusion*

The State failed to prove that Price had been adequately advised of his

132

*Miranda* rights before he gave his statement to law enforcement authorities in Fayette County, Alabama; however, any error in this regard did not amount to reversible error.  We note that our decision on the admissibility of the Alabama statement does not impact Price's noncapital conviction for robbery in the first degree based on the robbery of Bessie Lynn.  As noted above, Price did not object at trial to the State's reference to the Alabama statement or to the admission of the physical evidence that was located in part because of that statement.  Because Price's conviction for robbery in the first degree is not subject to the plain error rule, we do not review this issue with regard to that conviction.  *See Liberty Nat'l Life Ins. Co. v. Beasley*, 466 So. 2d 935 (Ala. 1985).[81]  Furthermore, the record shows that the State met its burden of proving that the Alabama statement was voluntary.[82]  Finally, we conclude that the State demonstrated that Price had been advised of his *Miranda* rights before he was interviewed by Detective Mathis in Chattanooga and that the Tennessee statement was voluntary.

. . . .

*Ex parte Price,* 725 So. 2d at 1067-74.

Price argues that the state court's adjudication of this claim was contrary to and an unreasonable application of clearly established federal law.  (Doc. 28 at 86-89).  He further alleges that the Alabama Supreme Court gave improper weight to the fact that he signed the Tennessee waiver and had past experiences with the juvenile justice system.  Additionally, he asserts that the Court failed to consider his youth, lack of sleep, and intoxication, particularly in light of Mathis's "misleading instructions."  *Id.* at 87.  Price offers the Eleventh Circuit decision *Hart v. Attorney General of State of Florida*, 323 F.3d 884, 895 (11th Cir. 2003), in support of his contentions.  Price writes as follows:

In *Hart*, an officer told the defendant, "honesty will not hurt you."  [323 F.2d at] 894.  Because this statement contradicted the *Miranda* warning that []anything you say can be used against you in court, the court held that the

_____

[81]In footnote, the Court wrote, "See discussion, *supra*, note 7."  *Id.* at 1074 n.8.

[82]In footnote, the Court wrote, "At the pretrial suppression hearing, Sheriff Turner testified that Price was not threatened or pressured, and was not offered any reward or inducement, to provide his statement."  *Id.* at 1074 n.9.

defendant "did not truly understand the nature of his right against self-
incrimination or the consequences that would result from waiving it." *Id.* at 895;
*see also United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (finding
waiver invalid where the defendant was told signing form would not hurt him.)

(Doc. 28 at 88). Lastly, Price argues that the admission of the physical items into evidence as a

result of his statement to Sheriff Turner prejudiced him. *Id*. at 89.

This court concludes that Price's complaints are without merit. The Alabama Supreme

Court carefully and completely examined and properly applied the "totality of circumstances"

test to Price's Tennessee statement. Furthermore, *Hart* affords Price no relief because, unlike the

officer in that case, Detective Mathis in no way made any statement to Price that blatantly

abrogated or contradicted the *Miranda* warnings given to him. Finally, it was not

unconstitutional for the items found as a result of Price's Alabama statement to be admitted into

evidence. *See United States v. Patane,* 542 U.S. 630 (2004) ("[f]ailure to give *Miranda* warnings

does not require suppression of physical fruits of suspect's unwarned but voluntary statements.").

Thus, he cannot argue he was prejudiced thereby. Even if a prejudice argument was available to

Price, he overlooks the fact that the Alabama Supreme Court expressly found that he had also

revealed the locations of the disputed items in his Tennessee statement. This effectively refutes

any prejudice argument.

The state court's decision was not based on an unreasonable determination of the facts in

light of the evidence, nor are its findings regarding those facts or its legal conclusion – that the

statement was voluntary – contrary to or an unreasonable application of federal law.

> **J.     The introduction of cumulative, inflammatory photographs of the
> decedent's body vitiated the fairness of the trial and deprived
> Christopher Price of the reliable verdicts to which he was entitled
> under the federal constitution**.  **(Paragraphs 89-91 of the petition)**.

Price alleges the State was allowed to introduce "inflammatory [photographs of the victim's wounds], over his objection, and that this error denied him "a [fundamentally] fair trial and introduced unreliability into the factfinding process."  (Doc. 16 at 40-41).  According to Price, admission of the photographs was improper because they had a substantial tendency to prejudice the jury against him and, at most, they had only limited probative value.  *Id.* at 41.

Price also contends the prosecutor "argue[d] intemperately for both a guilty verdict and the death penalty by recalling what the photographs showed" thus injecting "'passion and prejudice' into the jury's calculus'" in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *Id*.  In support of this assertion, Price cites the following as a direct quote of the prosecutor's statement:

> You've seen the diagrams.  There are a lot of pictures.  The one picture I really want to emphasize to you, this case is gruesome and horrible enough without my having to emphasize that to you.  And I really have to kind of divorce myself from how horrible it is in order to be able to talk about it.  It's just the way I guess of insulating ourselves from how horrible it is.  But I believe that the evidence supports the theory that this arm and this bone was completely cut into, practically breaking the arm off, with the sword.  It was a terrible blow, whatever it was, and Chris Price, under the evidence, had the sword throughout the murder.

> [T]he Code says that you may consider that this offense was especially heinous, atrocious or cruel compared to other murders, other capital offenses. . . . The facts really are so atrocious and cruel and heinous – that there is not much I can say to emphasize that, the pictures that you saw, the drawings that the doctor was permitted to explain to you, and that were introduced into evidence about how he was killed.

*Id*. at 41.

Price provides no citation for the above "arguments."  *Id*.  Upon examination of the record, it becomes evident that the first paragraph is derived from the prosecutor's closing

argument at the guilt phase[83] of trial and the second paragraph is derived from the prosecutor's

closing argument at the penalty phase.[84]  To the extent Price suggests the prosecutor made

improper penalty phase comments at the guilt phase of the trial, it is rejected.

In his reply brief, Price devotes his supporting argument exclusively to the comment

made at the guilt phase of the trial.  (Doc. 28 at 89-91).  Federal analysis begins with the

Alabama Court of Criminal Appeals' findings of fact and conclusions of law.

> The appellant argues that the introduction of allegedly cumulative and
> inflammatory photographs of the decedent's body vitiated the fairness of the trial
> and deprived him of reliable (sic) verdict.  However, the location and condition of
> the wounds to the victim were relevant in the present case, because the appellant's
> defense was that he had not committed the murder and he argued that he did not
> have the sword.  There was evidence that both a sword and knife had been used in
> the attack on the deceased; thus, as the prosecutor argued at trial, whether the
> wounds could have been caused by either or both of these weapons, and which
> weapon caused the death, became relevant.  Moreover, the condition of the body
> was relevant because the appellant argued that he did not intend to murder the
> deceased, rather he intended to commit a robbery.
>
> > "As a general rule, photographs are admissible in evidence
> > if they tend to prove or disprove some disputed or material issue, to
> > illustrate or elucidate some other relevant fact or evidence, or to
> > corroborate or disprove some other evidence offered or to be
> > offered, and their admission is within the sound discretion of the
> > trial judge.  *Fletcher v. State*, 291 Ala. 67, 277 So. 2d 882 (1973);
> > *Hopkins v. State*, 429 So. 2d 1146 (Ala. Crim. App.), *cert. denied*,
> > 429 So. 2d 1146 (Ala.1983); *Godbolt v. State*, 429 So. 2d 1131
> > (Ala. Crim. App. 1983); *Carpenter v. State*, 400 So. 2d 417 (Ala.
> > Crim. App.), *cert. denied*, 400 So. 2d 427 (Ala. 1981). Photographs
> > which depict the character and location of external wounds on the
> > body of a deceased are admissible even though they are cumulative

---

[83]R. Vol. 6 at 821.

[84]R. Vol. 6 at 910.  Price makes no intelligible, independent claim concerning the
prosecutor's reference to the photographs during the penalty phase of the trial, as evidence
supporting the heinous, atrocious and cruel aggravating factor.  Even if it could be considered as an
attempt to make a claim, it is so insufficiently supported that it fails to satisfy the specificity
requirements for habeas pleadings, and is due to be dismissed.

and based upon undisputed matters. *Wicker v. State*, 433 So. 2d
1190 (Ala. Crim. App. 1983); *Hopkins v. State*; *Hines v. State*, 365
So. 2d 320 (Ala. Crim. App.), *cert. denied*, 365 So. 2d 322 (Ala.
1978). The fact that a photograph is gruesome and ghastly is no
reason to exclude its admission into evidence, if it has some
relevancy to the proceedings, even if the photographs may tend to
inflame the jury. *Warrick v. State*, 460 So. 2d 320 (Ala. Crim.
App. 1984); *Carpenter v. State*; *Richards v. State*, 337 So. 2d 171
(Ala. Crim. App.), *cert. denied*, 337 So. 2d 173 (Ala. 1976)."

*Magwood v. State*, 494 So. 2d 124, 141 (Ala. Cr. App. 1985), *affirmed*, 494 So.
2d 154 (Ala. 1986), 479 U.S. 995, 107 S. Ct. 599, 93 L. Ed. 2d 599 (1986).
"There is irony in a convicted murder's (sic) contending on appeal that pictures of
the corpse of his victim might have inflamed the jury. That risk 'comes with the
territory.'" *Grice v. State*, 527 So. 2d 784, 787 (Ala. Cr. App. 1988).

    Although he (sic) appellant also argues that the trial court erred in
allowing into evidence photographs depicting the crime scene, he failed to object
to these photographs at trial; therefore, his objection as to these photographs is
subject to the plain error doctrine. Rule 45A, Ala. R. App. P. [footnote omitted].
These photographs were relevant to show the location and exact details of the
offense and were illustrative of a number of witnesses' testimony. "Perpetrators
of crimes that result in gruesome scenes have reason to expect that photographs of
those gruesome scenes will be taken and admitted into evidence." *Jenkins v.
State*, 627 So. 2d 1034, 1045 (Ala. Cr. App. 1992), *affirmed*, 627 So. 2d 1054
(Ala. 1993), *cert. denied*, 511 U.S. 1012, 114 S. Ct. 1388, 128 L. Ed. 2d 63
(1994). In the present case, although these photographs may have tended to
inflame the jury, they had some relevancy and therefore were properly admitted
into evidence.

*Price v. State*, 725 So. 2d at 1052-53.

    Price argues that the appellate court's evidentiary ruling regarding the photographs is

contrary to and an unreasonable application of clearly established federal law. (Doc. 28 at 89).

He further charges that the appellate court neglected to conduct a fundamental fairness analysis

and as such, contends he is entitled to *de novo* examination of this aspect of his claim. *Id.* at 91.

    Price's complaint regarding the appellate court's evidentiary decision in this matter lacks

merit. This court

review[s] state court evidentiary rulings on a petition for habeas corpus to determine only "'whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.'" *Futch v. Dugger*, 874 F.2d at 1487 (quoting *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir. 1983)). Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a "'crucial, critical, highly significant factor' in the [defendant's] conviction." *Williams v. Kemp*, 846 F.2d 1276, 1281 (11th Cir. 1988), *cert. denied*, 494 U.S. 1090, 110 S. Ct. 1836, 108 L. Ed. 2d 965 (1990) (quoting *Jameson v. Wainwright*, 719 F.2d 1125, 1126-27 (11th Cir. 1983), *cert. denied*, 466 U.S. 975, 104 S. Ct. 2355, 80 L. Ed. 2d 827 (1984)). The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair. *Futch v. Dugger*, 874 F.2d at 1487; *see also, e.g., id.* (photograph of victim, nude, showing wounds made by gunshot); *Evans v. Thigpen*, 809 F.2d 239, 242 (5th Cir. 1987), *cert. denied*, 483 U.S. 1033, 107 S. Ct. 3278, 97 L. Ed. 2d 782 (1987) (nine color slides of homicide victim) (cited with approval in *Futch v. Dugger*, 874 F.2d at 1487).

*Jacobs v. Singletary,* 952 F.2d 1282, 1296 (11th Cir. 1992).

This court has carefully reviewed the record. There is no indication that introduction of the photographs was fundamentally unfair such that Price's right to due process of law was violated. Price continues to protest that the guilt case against him consisted of "weak circumstantial evidence," but his rendition of the facts is inaccurate. Proof of his guilt at trial was overwhelming. *See Price v. State*, 725 So. 2d at 1072 ("the State produced overwhelming evidence"). Thus, Price's indirect attempt to argue that the state court's factual findings regarding relevancy were unreasonable in light of the evidence presented at trial also lacks any foundation.

The Court of Criminal Appeals was clear that the photographs were relevant because Price: (1) denied that he murdered Mr. Lynn, and (2) Mr. Lynn's severed arm indicated that the weapon used must have been the sword, as opposed to a knife. *State v. Price*, 725 So. 2d at 1052-53. These two factors, along with a multitude of other evidence, including aspects of Price's statements to Tennessee police and Micah Donaldson, corroborative physical evidence

138

and the eyewitness testimony of Mrs. Lynn, were relevant and powerful indicators showing that Price, not his co-defendant, murdered Mr. Lynn.

This evidence included an admission by Price that the defendants expected to have to murder the Lynns and in fact, wanted the Lynns to be home during the robbery for the express purpose of having a physical confrontation with them, that Price held the interest in and practiced martial arts, that Price dressed in a black shirt and pants with a karate belt around his waist for commission of the crime, that Price owned and purposely brought the sword that caused Mr. Lynn's severed arm to the crime scene, and Mrs. Lynn's testimony that she saw one of the defendants in what appeared to be a karate uniform, in a karate stance with the sword raised in attack mode against her husband.

For the foregoing reasons, Price's claim that the photographs deprived him a fair trial lacks merit whether it is subjected to 28 U.S.C. § 2254(d) or *de novo* review.  This claim is due to be denied.

**K**.  **The "heinous, atrocious or cruel" aggravating circumstance applied in Mr. Price's sentencing lacked a sufficient limiting instruction and is therefore unconstitutionally vague as applied, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and of Alabama law**.  **(Paragraphs 92-95 in the petition)**.

Price alleges the appellate court's approval of the trial court's heinous, atrocious or cruel ("HAC") instruction is contrary to and an unreasonable application of federal law because "it did not satisfy the limiting and channeling requirements of *Furman* [*v. Georgia*, 408 U.S. 238 (1972),] *Godfrey* [*v. Georgia*, 446 U.S. 420, 428 (1980)], [*Maynard v.*] *Cartwright*, [486 U.S. 356 (1988),]" and "*Walton v. Arizona*, 479 U.S. 639, 653 (1990)."  (Doc. 16 at 42-44 and Doc. 28 at 92).  Price's argument in support of the claim is twofold, but since the respondent answers

139

that this claim does not merit habeas relief (doc. 22 at 62-63, doc. 21 at 142-45), and the decision

of the Court of Appeals quotes the trial court's heinous, atrocious or cruel instruction in its

entirety, the court finds it beneficial to set out the applicable portions of that decision prior to

examining the reasons Price alleges the instruction was unconstitutionally vague.  The findings

of fact and conclusions of law articulated by the Court of Criminal Appeals are as follows:

> The appellant argues that the aggravating circumstance that the offense
> was especially heinous, atrocious, or cruel when compared to other capital
> offenses was applied to his sentencing with insufficient limiting instructions and
> was, therefore, unconstitutionally vague.  The record indicates that the appellant
> failed to object on this ground until this appeal; therefore, this claim must be
> reviewed pursuant to the plain error doctrine.  Rule 45A, Ala. R. App. P.  In the
> present case, the appellant relies on *Maynard v. Cartwright*, 486 U.S. 356, 108 S.
> Ct. 1853, 100 L. Ed. 2d 372 (1988), in arguing that the trial court's jury
> instructions concerning the "especially heinous, atrocious, and cruel" statutory
> aggravating circumstance was unconstitutionally vague.  However, the jury was
> extensively instructed as to the meaning of these terms and how they are to be
> applied in the context of capital sentencing.  Similarly, in *Haney v. State*, 603 So.
> 2d 368, 387 (Ala. Cr. App. 1991), *aff'd*, 603 So. 2d 412 (Ala. 1992), *cert. denied*,
> 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993), the defendant relied on
> *Maynard v. Cartwright*, *supra*, in claiming that the trial court's instructions on
> this aggravating circumstance in her case were too vague to adequately guide the
> jury.  This Court held that the instructions in *Haney v. State*, *supra*, at 385-86,
> were distinguishable from those in *Maynard v. Cartwright*, *supra*.  This Court
> held:
>
> > "Unlike *Maynard* [*v. Cartwright*], the jury here was
> > instructed on the meaning of the words of the aggravating
> > circumstances in the context of capital sentencing.  These
> > instructions correctly followed the previously recognized limiting
> > construction of the aggravating circumstance established by the
> > Alabama Supreme Court in *Ex parte Kyzer*, 399 So. 2d 330, 334
> > (Ala. 1981), wherein the court s[t]ated: 'The aggravating
> > circumstance listed in § 13-1-6(8) [now § 13A-5-49(8)] was
> > intended to apply to only those conscienceless or pitiless homicides
> > which are unnecessarily torturous to the victim.'  For other cases in
> > which we applied the rule established in *Ex parte Kyzer*, see
> > *Hallford v. State*, 548 So. 2d 526 (Ala. Cr. App. 1988), *aff'd*, 548
> > So. 2d 547 (Ala.), *cert. denied*, 493 U.S. 945, 110 S. Ct. 354, 107
> > L. Ed. 2d 342 (1989); *Bui v. State*, 551 So. 2d 1094 (Ala. Cr. App.

1988), *aff'd*, 551 So. 2d 1125 (Ala. 1989).  See also *Ex parte Bankhead*; *Bush v. State*, 431 So. 2d 555 (Ala. Cr. App. 1982), *aff'd*, 431 So. 2d 563 (Ala.), *cert. denied*, 464 U.S. 865, 104 S. Ct. 200, 78 L. Ed. 2d 175 (1983)."

*Id*. at 387.

In the present case, the trial court instructed the jury concerning this aggravating circumstance as follows:

"The other aggravating circumstance which you may consider in this case is, if you find from the evidence that it has been proved beyond a reasonable doubt, you may consider whether the capital offense was especially heinous, atrocious or cruel when compared to other capital offenses.  The State asserts in this case the killing of Bill Lynn was especially heinous, atrocious, and cruel when compared to other capital murders.  You will have to determine whether or not the evidence in this case, in fact, has proved beyond a reasonable doubt that, in fact, the killing of Bill Lynn was especially heinous, atrocious and cruel when compared to other capital murders.

The term 'heinous' means extremely wicked or shockingly evil.  The term 'atrocious' means outrageously wicked and violent.  The term 'cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.  What is intended to be included in this aggravating circumstance is only those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.

For a capital offense to be especially heinous, atrocious or cruel, it must be a conscienceless or pitiless crime which is unnecessarily tortuous to the victim.  All capital offense (sic) are heinous, atrocious, and cruel to some extent, but not all capital offenses are especially heinous, atrocious, cruel compared to other capital offenses.

You should not find or consider this aggravating circumstance unless you find that this particular capital offense involved a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

Now, the fact that death has occurred or that a death scene

141

may appear gruesome does not prove that the crime was especially heinous, atrocious, and cruel.  Instead, the jury must determine if these elements are present based upon a careful and rational review of all the evidence that has been submitted to you during the trial of this case, both in the guilt/innocence phase and in the sentence phase of the case.

As I stated to you before, the burden of proof is on the State to convince you beyond a reasonable doubt as to the existence of the aggravating circumstance asserted that the capital offense in this case was especially heinous, atrocious, or cruel when compared to other capital offenses."

These instructions are substantially the same as the relevant instruction in the "Proposed Pattern Jury Instructions Use in the Sentence Phase of Capital Cases Tried Under Act No. 81-178."  A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error.  *Ex parte Harrell*, 470 So. 2d 1309, 1315 (Ala. 1985), *cert. denied*, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985).

In the present case, there was no plain error as to the trial court's charge to the jury.

*Price v. State*, 725 So. 2d at 1057-58.

The court now turns to Price's complaints regarding the HAC instruction.  As stated earlier, Price's argument is twofold.  First, Price alleges the instructions were not sufficiently limited because the definitions of "heinous", "atrocious" and "cruel" used by the trial court were "virtually identical to those used in the instructions issued [and found to be constitutionally defective] in *Cartwright*."  *Id*. (citing *Cartwright*, 483 U.S. at 356).  Price further alleges that in his case and in the *Cartwright* case, the trial court defined "'heinous' as 'extremely wicked or shockingly evil' . . . . [and] 'atrocious' as 'outrageously wicked and violent'" as compared to *Cartwright's* "'outrageously wicked and vile.'"  *Id*.  Additionally, in Price's case, the trial court defined

"cruel" as "designed to inflict a high degree of pain with utter indifference to or

142

even enjoyment of the suffering of others"; [while] *Cartwright* defined it as "pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others. *Id*. Further, by describing the circumstance as encompassing "conscienceless or pitiless crime[s] which are unnecessarily tortuous to the victim[,]" the instruction assigned jurors the task of establishing what level of torture would be "necessary." Because most reasonable jurors would be unable or unwilling to carry out such a ruthless calculation, the instruction fails to provide the "clear and objective standards" that *Godfrey* requires."

*Id*. at 43-44.[85]

Second, Price complains the instruction was not sufficiently limited because the trial court urged the jurors to compare "the crime to 'other capital offenses' or 'other capital murders,'" and then failed to describe the nature of any other capital crimes to the jurors. *Id*. at 44.[86] Price dedicates his reply brief to this second complaint, and insists the Court of Criminal Appeals' ruling offends the Supreme Court's decision in *Cartwright*, as interpreted by the Eleventh Circuit in a three-pronged vagueness test first enunciated in *Lindsay v. Thigpen*, 875 F.2d 1509 (11th Cir. 1989). (Doc. 28 at 92-93).

Price does correctly identify the Supreme Court and Eleventh Circuit cases that discuss the subject and the standards necessary to address his claims. However, his conclusion that the cases prove the decision of the Court of Criminal Appeals decision in this matter was contrary to or an unreasonable application of clearly established federal law is belied by the cases upon which he relies and their progeny. For instance, in *Lindsay v. Thigpen*, the Eleventh Circuit wrote,

---

[85]Price does not actively pursue this argument in his reply brief. Nevertheless, the court will address it in its discussion.

[86]This particular aspect of Price's claim was not clearly raised on direct appeal. *See* (C.R. Vol. 8, Tab. 26 at 76-78 and C.R. Vol. 9, Tab. 32 at 80-82).

We read *Godfrey* and *Cartwright* to require that, in order to survive an eighth-amendment vagueness challenge, a sentencing court's consideration of the "especially heinous, atrocious or cruel" aggravating factor in a capital case must satisfy a three-part test. First, the appellate courts of the state must have narrowed the meaning of the words "heinous, atrocious or cruel" by consistently limiting their application to a relatively narrow class of cases, so that their use "inform[s] [the sentencer of] what [it] must find to impose the death penalty." *Cartwright*, 108 S. Ct. at 858. Second, the sentencing court must have made either an explicit finding that the crime was "especially heinous, atrocious, and cruel" or an explicit finding that the crime exhibited the narrowing characteristics set forth in the state-court decisions interpreting those words. [FN5]. Third, the sentencer's conclusion - that the facts of the case under consideration place the crime within the class of cases defined by the state court's narrowing construction of the term "heinous, atrocious, or cruel" - must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply.

> FN5. Where the jury is the sentencer, a recitation that the murder was "especially heinous, atrocious or cruel" would not satisfy the second prong of this test unless the jury had been properly instructed regarding the narrow meaning of those words as interpreted by the state courts. Unlike a state-court judge, who is presumed to know and apply the appropriate, narrow construction of the term, an uninstructed lay jury could reasonably conclude that any intentional taking of human life was "especially heinous, atrocious or cruel." *Godfrey*, 446 U.S. at 428-29, 100 S. Ct. at 1764-65; *Cartwright,* 108 S. Ct. at 1859.

A survey of Alabama cases reveals that the first prong of the analysis is satisfied. Since the 1981 case of *Kyzer v. Alabama*, 399 So. 2d 330 (Ala.1981), the Alabama appellate courts have confined the application of the "heinous, atrocious or cruel" aggravating factor to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Kyzer*, 399 So. 2d at 334 (citing *State v. Dixon*, 283 So. 2d 1 (Fla. 1973)). [FOOTNOTE OMITTED]. The class of cases that are "unnecessarily torturous to the victim" is not too indefinite to serve the narrowing function mandated by the eighth amendment. *See Proffitt v. Florida*, 428 U.S. 242, 255-56, 96 S. Ct. 2960, 2986, 49 L. Ed. 2d 913 (opinion of Stewart, Powell, Stevens, JJ.), *reh'g denied*, 429 U.S. 875, 97 S. Ct. 198, 50 L. Ed. 2d 158 (1976). Thus, when Lindsey was sentenced in 1982, the courts of Alabama had already developed and consistently applied a narrowing construction of the term "heinous, atrocious or cruel as compared to other capital offenses."

*Lindsey v. Thigpen*, 875 F.2d 1509, 1513-14 (11th Cir. 1989).

Based on the foregoing portion of *Lindsay*, it is impossible for Price to refute that the trial

court's definitions of "heinous," "atrocious" and "cruel", as given to the jury and as understood to be followed by the trial court in his case, satisfied the proper channeling requirements mandated by *Cartwright* and this Circuit.

The court now turns to the second argument in support of this claim.  In addition to the "heinous, atrocious or cruel" portion of Alabama's statutory HAC factor, Price adds that the statute lacks even more constitutional limitation because it "requires that the homicide must be 'heinous atrocious or cruel compared *to other capital offenses*."  (Doc. 28 at 96 (quoting ALA. CODE 1975, § 13A-5-49(8) (emphasis added [by Price]).  This argument is raised for the first time in the present habeas petition.  As such, this court finds it to be procedurally defaulted.

Even if this claim were not defaulted, it is without merit.  In order to successfully argue this aspect of his claim, Price attacks the *Lindsay* and *Kyzer* decisions for "abbreviat[ing] and misstat[ing]" Alabama's HAC statute for failing to address the "compared to other capital offenses" language in the statute - language that Price believes fails to sufficiently channel the instruction such that it overcomes constitutional vagueness.  (Doc. 28 at 96).  Price then contends the comparative language causes the HAC factor to lose its "'specific and detailed guidance,' as well as its ability to "'make rationally reviewable the process for imposing a sentence of death [for the jury and judge].'"  *Id*. at 92-93 (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) and referring to *Walton v. Arizona*,  497 U.S.639, 653 (1990) and *Maynard v. Cartwright*, 486 U.S. 356 (1988)).

Price cites no Supreme Court case in which it has been held that a HAC instruction identical to Alabama's is unconstitutionally vague as applied.  Price also fails to mention that in *Bradley v. Nagle*  212 F.3d 559, 570 (11th Cir. 2000), the Eleventh Circuit found Alabama's

channeling instruction and the comparative aspect of it to be constitutionally adequate for equal

protection purposes.  Finally, Price can point to no Supreme Court, Eleventh Circuit or Alabama

case in which it has been held, in order to deliver a constitutionally satisfactory HAC instruction,

that the trial court must instruct the jury by engaging in a factually comparative study of capital

murders for which the death penalty was imposed to those capital murders for which life without

parole was imposed.

The court now turns to the remaining two prongs of this analysis.  In the most recent

application of *Lindsay*, the Eleventh Circuit reaffirmed HAC instructions such as the one

delivered in Price's as being a consistent, narrowed interpretation of the factor.  *Marquard v.

Secretary for the Dept. of Corrections*, 429 F.3d 1278 (11th Cir. 2005).  In *Marquard*, the Court

explained:

> The Supreme Court has held that the words "especially heinous, atrocious or
> cruel," when used alone as an aggravating factor, are so vague as to offend the
> Eighth Amendment.  *See Maynard v. Cartwright,* 486 U.S. 356, 365, 108 S. Ct.
> 1853, 100 L. Ed. 2d 372 (1988); *Bradley v. Nagle*, 212 F.3d 559, 570 (11th Cir.
> 2000).  "Thus, in order to apply that aggravating factor in a constitutional manner,
> the sentencing court must give a limiting instruction to the jury."  *Bradley*, 212
> F.3d at 570.
>
> Under this Court's precedent, a "court's consideration of the 'especially
> heinous, atrocious or cruel' aggravating factor must satisfy a three part test."
> *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir.1989).  "First, the appellate
> courts of the state must have narrowed the meaning of the words by consistently
> limiting their application to a relatively narrow class of cases, so that their use
> informs the sentencer of what it must find before it imposes the death penalty."
> *Lindsey*, 875 F.2d at 1514 (quotation marks and citations omitted).  This Court
> already has established that . . . . [pursuant to] *Bradley* [*v. Nagle*,]  212 F.3d [559,]
> at 570-71 [(11th Cir. 2000)] . . . Alabama['s] HAC statutory aggravating factor
> was sufficiently limiting as to be constitutional.)

146

*Marquard v. Secretary for the Dept. of Corrections*, 429 F.3d at 1315-16.[87]

The trial court's application of *Lindsay's* second prong, as affirmed by the Court of

Criminal Appeals, is also constitutionally sound.  Again, the second prong requires

> "the sentencing court [to make] either an explicit finding that the crime was 'especially heinous, atrocious or cruel' or an explicit finding that the crime exhibited the narrowing characteristics" implemented by the state courts.  *Lindsey*, 875 F.2d at 1514; *Bradley*, 212 F.3d at 570.

*Marquard*, 429 F.3d 1278 at 1316.  Price's trial judge did made an express written finding that

the crime was HAC, and listed those facts he considered in support of the finding in his

sentencing order.  He wrote:

> 2.  The capital offense was especially heinous, atrocious or cruel compared to other capital offenses.  This crime was one of those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.  This Court finds beyond a reasonable doubt that this capital homicide was especially heinous, atrocious or cruel when compared with other capital offenses.
> The evidence proved beyond a reasonable doubt that Christopher Price helped plan and participated in the crime that was committed on the 22nd day of December, 1991, at the home of Bill and Bessie Lynn.
>
> At the trial of this cause a sword and dagger were introduced into evidence as being the instruments that were used in the killing.  There were a total of thirty-eight (38) cuts, lacerations and stab wounds.  Some of the stab wounds were a depth of three (3) or four (4) inches.  Other wounds to the body and head indicated that the victim was repeatedly struck in a hacking or chopping motion.  One of his

---

[87]In *Bradley*,

the jury was instructed that the term "heinous" means extremely wicked or shockingly evil, the term "atrocious" means outrageously wicked or violent, and the term "cruel" means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.  They were also informed that the degree to which this crime is heinous, atrocious, or cruel must exceed that which exists in all capital offenses, and that in order to find the aggravating circumstance, they must find that the crime was "unnecessarily torturous to the victim."

*Bradley v. Nagle,* 212 F.3d 559, 570 (11th Cir. 2000).

arms was almost severed and his head was lined with numerous wounds three (3) to four (4) inches in length.  His scalp was detached from the skull of his head in places.  The victim died a slow, lingering and painful death probably from the loss of blood.  He was still alive when an ambulance attendant got to him probably thirty (30) minutes to an hour after the initial attack began.

(C.R. Vol. 1 at 214-15).

Finally, the undersigned uses *Marquard* as the application template to analyze and decide the third prong of *Lindsey* in Price's case.

Third, the sentencer's conclusion as to step two "must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply."  *Lindsey*, 875 F.2d at 1514; *Bradley*, 212 F.3d at 570-71.  In other words, to reverse under step three, this Court would have to find that the [Alabama] courts' determination that [Price's] conduct was "unnecessarily torturous to the victim" was clearly erroneous.  *Bradley*, 212 F.3d at 571. Given the evidence in this case . . . [this court] cannot conclude that the state court's determination was clearly erroneous. [footnote omitted]

Accordingly, [the state court's] decision . . . that the HAC constitutionality claim lacks merit . . . was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

*Marquard*, 429 F.3d 1278 at 1317.  This claim is due to be denied.

**L.      The trial court's repeated failure to question prospective jurors adequately about their ability to set aside bias arising from publicity, personal relationships, or past events, violated Mr. Price's right to due process, to a fair trial, to a fair and impartial jury, and to freely exercise his peremptory challenges, contravening the federal constitution.  (Paragraphs 96-99 in the petition ).**

Price alleges "it is 'the trial judge's responsibility [during *voir dire*] to remove prospective jurors who will not be able [to serve] impartially,'" that the judge presiding in his case failed to do so, and the failure constitutes "'reversible error.'"  (Doc. 16 at 46 (quoting *Rosalez-Lopez v. United States*, 415 U.S. 182, 188 (1981) and *Swain v. Alabama*, 380 U.S. 202, 219 (1965)).  He complains generally that some potential venire members answered questions

148

pertaining to "relationships" and "acquaintances" with the victims in a manner that raised

"'flags' of possible bias[,]" but the trial court "routinely failed to assure itself that [said

venirepersons] would render a verdict on the evidence alone." *Id.* at 45.  From this premise,

Price concludes that he was deprived of his "rights to freely exercise his peremptory challenges,

to due process, and to a fair trial by an impartial jury under the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 723,

727 (1961)).

      As the factual basis for the claim, Price declares venire man Benjamin Tucker stated that

he was a longtime acquaintance of the victim, and "would try" to consider only the evidence

presented to him.  (Doc. 16 at 45).  Price faults the trial court for failing to inquire further into

Mr. Tucker's potential bias.  *Id.*  Later, during individual *voir dire,* Price alleges Tucker stated he

"had worked with several of the victim's family members," and when counsel asked him if

wanted to sit as a juror in the case, Tucker refused to directly answer the question.  *Id.*  Again,

Price faults the trial court for failing to inquire further into Mr. Tucker's potential bias.

      Price also complains that venireperson Harbin testified that "she had heard the victim

preach on several occasions," but the trial court failed to inquire whether this "would affect her

ability to deliberate impartially."  *Id.*

      Finally, Price contends that the trial court failed to inquire further when four prospective

venire persons (Tucker included) asserted that "their relatives had been crime victims. . . . despite

the distinct possibility that their loved ones' experiences would give rise to bias against Price."

*Id.* at 45-46.  Price does not reveal the names of the three (3) remaining venire persons in his

petition.  Still, he believes the respondent's contention that this aspect of his claim should be

149

dismissed as conclusory (doc. 21 at 149) is "absurd" because the respondent quoted the Alabama Court of Criminal Appeals' opinion in its brief, and the opinion "extensively discussed each of the 'five specific potential jurors' whose questioning has been challenged by Mr. Price."  (Doc. 28 at 102 (citing Respondent's Brief (doc. 21 at 146-48) (in turn quoting *Price*, 725 So. 2d at 1053-54)).

Price believes the State "essentially blames" him for failing to adequately question and ferret out biased jurors.  (Doc. 28 at 103 (citing Respondent's Br. (doc. 21) at 146) and *Price*, 725 So. 2d at 1053-54 n.8).  Price declares "[t]his argument completely ignores the Supreme Court's mandate that '"the obligation to empanel an impartial jury lies in the first instance with the trial judge.""'  *Id.* at 103 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991) (quoting *Rosalez-Lopez*, 451 U.S. at 189)).

Price also accuses the State of "emphasizing" that his claim must fail because none of the prospective venire members about whom he complains were even chosen to sit on the jury.  *Id.* (citing Respondent's Br. (doc. 21) at 149) and *Price*, 725 So. 2d at 1053-54).  He argues "that fact alone will defeat such a claim only when the 'jury that sits is impartial[,]'" and that his jury was not impartial for various other reasons.  *Id.* (quoting *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).

This claim was denied by the Alabama Court of Criminal Appeals, *see Price v. State*, 752 So. 2d 1053-54, and the Alabama Supreme Court affirmed that decision.  *See Ex Parte Price*, 725 So. 2d at 1074.  In his reply brief, Price declares the appellate court's decision to "reject this claim, [by] holding that the trial court's *voir dire* discharged [its] responsibility[,]" is "contrary to and an unreasonable application of existing federal law. . ."  (Doc. 28 at 101).  He makes no

complaints about the appellate court's historical factual findings.  The opinion reads:

> The appellant argues that the trial court repeatedly failed to question prospective jurors concerning their ability to set aside bias arising from publicity, personal relationships, or past events, and that its failure to do so violated his rights to due process, a fair trial, an impartial jury, and hampered his ability to exercise his peremptory challenges freely.  Specifically, the appellant alleges that certain veniremembers made statements indicating that they may have had biases concerning the present case, but the trial court failed to further inquire into the possible biases.  He refers to five specific potential jurors.

> The appellant first refers to a potential juror who indicated that he had been an acquaintance of the decedent for a long time; he further indicated that he "would try" to follow the trial court's instructions in considering only the evidence in the case in arriving at a verdict.  The appellant also submits that, during individual questioning, this potential juror was equivocal as to his ability to fairly consider the evidence because of his acquaintance with the victim's family.  Thus, the appellant argues that the trial court should have further questioned this potential juror, *sua sponte* based on these responses.  However, the record indicates that the appellant neither objected to the lack of questioning nor challenged this potential juror for cause.  The potential juror was thoroughly questioned, and the appellant was in no way limited as to his ability to question him.  This potential juror indicated that he would try "to the best of [his] knowledge" to render a fair and impartial verdict based on the evidence.  He also responded that he thought he could disregard his prior general knowledge concerning the case.  At the close of his questioning, the defendant himself asked this potential juror if he would be able to give him a fair trial if he were to sit on the jury, and the potential juror stated that he believed that he could.  Although the record is silent as to which party exercised the peremptory challenge as to this juror, this potential juror did not sit on the jury.

> Thus, the appellant has failed to show any prejudice that he might have suffered based on the trial court's failure to further question this potential juror.  Moreover, as the potential juror's responses were consistent and straightforward, there is no indication that further questioning was necessary.

> > "The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt or innocence.  *Ex parte Grayson*, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S. Ct. 189, 88 L. Ed. 2d 157 (1985).  A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, *id*."

*Oryang v. State*, 642 So. 2d 989, 993 (Ala. Cr. App. 1994). *Cf. Williams v. State*, 710 So. 2d 1276 (Ala. Cr. App. 1996) (the trial court's failure to sua sponte excuse a veniremember who had indicated that she had "one foot already over" on a verdict of guilt and a sentence of death was not error where the defendant allowed the veniremember to remain as an alternate on the jury; moreover, the defendant's reliance on *Hunter v. State*, 585 So. 2d 220 (Ala. Cr. App. 1991) was distinguishable in that the Hunter case "involved an erroneous denial by the trial court of a challenge for cause, which forced the defendant in that case to use a peremptory strike to correct the court's error."  [FN8])

> FN8.  The appellant in the present case also relies on *Hunter v. State*; however, that case is also distinguishable from the present case in that the appellant failed to make a challenge for cause of the veniremember, nor is there an indication in the record that he used a peremptory strike against this potential juror.

The appellant also argues that the trial court erred in failing, *sua sponte*, to further question a potential juror who indicated that her husband had been the victim of a stabbing a year before trial.  The record indicates that the appellant did not object to the trial court's failure to question this potential juror; he also did not challenge this veniremember for cause.  This failure to object weighs against any finding of prejudice.  *Kuenzel v. State, supra*.  The record indicates that, during individual questioning of this potential juror, the appellant determined that the veniremember's husband had been wounded in a previous stabbing.  His ability to further question the potential juror concerning this matter was in no way limited, and there was no indication that further questioning was required.  The potential juror stated that, if she were to be selected as a juror, she would base her judgment on the evidence presented at trial and the law as instructed by the trial court.  Moreover, this record contains no jury strike list from which to determine which party struck this potential juror.  Therefore, the appellant has failed to demonstrate any possible prejudice, *Williams v. State*, 710 So. 2d at 1325, and his reliance on *Hunter v. State* is again misplaced.  See footnote 8.

The appellant also argues that the trial court should have, *sua sponte*, further questioned a potential juror who indicated that her father had been murdered.  The appellant neither objected to this failure to question at trial, nor did he raise a challenge for cause against this potential juror.  This failure to object weighs against any finding of prejudice.  *Kuenzel v. State, supra*.  A review of the individual questioning of this potential witness indicates that she stated that, if she were to be selected as a juror, she would listen to the evidence and render a fair and impartial verdict based only on the evidence and the law as instructed by the trial court.  This questioning does not demonstrate any need for further questioning concerning any possible bias.  Moreover, this potential juror did not serve on the jury, and there is no indication in the record as to which party

152

struck her from service.  Thus, the trial court's failure to further question this veniremember was not error.

The appellant further complains of the trial court's failure to *sua sponte* further question two potential jurors concerning their biases: one who indicated that she had heard the decedent preach and another who had indicated that his nephew had been murdered.  Following questioning by defense counsel of each of these veniremembers, the appellant challenged them for cause.  The trial court granted both challenges; therefore, the appellant suffered no prejudice by the trial court's failure to further question them.  Moreover, the appellant did not request further questioning and did not object to the trial court's failure to do so.  There was no plain error on this ground.

*Price v. State*, 752 So. 2d 1053-54.

The respondent asserts that Price is not entitled to habeas relief because the appellate court's decision is neither contrary to nor an unreasonable application of clearly established federal law.  (Doc. 22 at 63-65).  This court agrees.

As stated by the Eleventh Circuit:

The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors.  *Irvin v. Dowd*,  366 U. S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961);  *see Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988)  ("It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury.").  Claims that the jury was not impartial must focus on the jurors who actually sat.  *See Ross*, 487 U.S. at 86, 108 S. Ct. 2273; *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir. 1991) (holding that habeas petitioner can only raise the trial court's denials of challenges for cause of those venire members who eventually sit on the jury).

*Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000).  Moreover,

As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  *See Reynolds v. United States*, 98 U.S. 145, 157, 25 L. Ed. 244 (1879).  It is then the trial judge's duty to determine whether the challenge is proper.  This is, of course,

the standard and procedure outlined in *Adams*[88], but it is equally true of any situation where a party seeks to exclude a biased juror.  *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984) (where a criminal defendant sought to excuse a juror for cause and the trial judge refused, the question was simply "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed").

*Wainwright v. Witt*, 469 U.S. 412, 423-24 (1985).  Additionally, utilization of a peremptory strike by a defendant to rid himself of an undesirable venireperson cannot bootstrap the claim into a constitutional realm.  These edicts were reexamined and reaffirmed in *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992), wherein the Supreme Court wrote,

> [I]n *Ross v. Oklahoma*, *supra*, a state trial court refused to remove for cause a juror who declared he would vote to impose death automatically if the jury found the defendant guilty.  That juror, however, was removed by the defendant's use of a peremptory challenge, and for that reason the death sentence could be affirmed.  But in the course of reaching this result, we announced our considered view that because the Constitution guarantees a defendant on trial for his life the right to an impartial jury, 487 U.S., at 85, 108 S. Ct., at 2276-77, the trial court's failure to remove the juror for cause was constitutional error under the standard enunciated in *Witt*.  We emphasized that "[h]ad [this juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned."  487 U.S., at 85, 108 S. Ct., at 2277 (citing *Adams* [*v. Texas*, 448 U.S. 38, 45 (1980)], *supra*).

504 U.S. at 728-29.

Since neither Tucker nor Harbin served on his jury, it is immaterial for federal

---

[88]*Adams v. Texas* and its progeny decree that a member of the jury venire may be examined by or at the request of counsel, and challenged for cause if he harbors such a fixed opinion "those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."   They do not mandate that the trial court conduct its own *voir dire* of the jury venire *sua sponte*.  *Adams v. Texas,* 448 U.S. at 43 (*relying upon Witherspoon v. Illinois*, 391 U.S. 510, 522-23 n.21 (1968)); *see also, Turner v. Murray,* 476 U.S. 28 (1986); *Wainwright v. Witt,* 469 U.S. 412, 424 (1987); and *Gray v. Mississippi*, 481 U.S. 648, 657-658 (1987).

constitutional purposes even if Price had to use a peremptory strike to rid himself of them. (Price's motion to remove Harbin for cause was actually granted).  This claim is due to be denied.  As for the three remaining unknown prospective jurors, this court specifically finds that to extent the claim pertains to them, it is due to be dismissed because it is conclusory in nature and because it fails to state a valid claim for relief under § 2254.  (Doc. 21 at 149).  Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted)).  The petitioner must specify all the grounds for relief available to him, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254 Rule 2(c)(1)(2) & (3).  A "general reference to the transcripts, case records and brief on appeal patently fails to comply with Rule 2(c)."  *Phillips v. Dormire*,  2006 WL 744387, *1, (E.D. Mo. 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)).  Price has continuously failed to meet this requirement.

Price offers no Supreme Court precedent to support his contention that it is solely the trial court's responsibility to, *sua sponte*, conduct its own examination of potentially biased jurors in an effort to satisfy its obligation to seat fair and impartial jury.  Price's contention incorrectly implies that, if a petitioner simply claims - for whatever reason - that his jury was not impartial, then the petitioner's responsibility to question, challenge and/or use a peremptory strike against a potentially biased juror is obviated and instead becomes the sole responsibility of the trial judge. Additionally, Price has made no attempt to overcome the factual findings of the Court of Criminal Appeals concerning this issue.  The decision of the Court of Criminal Appeals, as affirmed by the Alabama Supreme Court, was neither contrary to nor involved an unreasonable

application of clearly established federal law.  Therefore, he is not entitled to any relief.

**M**.   **The double counting of robbery[89] as element of the offense and aggravating circumstances violated Christopher Price's right to an individualized sentence and his protection against double jeopardy guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama law.  (Paragraph 100 of the petition)**.

Price alleges that the State "double counted" his robbery charge and conviction as both an aggravating circumstance during the penalty phase of the trial and as intentional murder during a robbery during the guilt phase of the trial in violation of his right to fair and reliable sentencing. (Doc. 16 at 46).  Price acknowledges that both the Alabama Supreme Court in *Ex Parte Kennedy*, 472 So. 2d 1106, 1108 (Ala. 1985), and the United States Supreme Court in *Lowenfeld v. Phelps*, 484 U.S. 231 (1988), have upheld the constitutionality of such double-counting.  However, he "believes that the governing law may be reversed in light of the unsettled circuit split relative to 'weighing' jurisdictions like Alabama."  *Id*. at 46-47 (citing *United States v. McCullah*, 87 F.3d 1136 (10th Cir. 1986).

This claim is without merit.  It is well known that dual use of an aggravating circumstance to satisfy an element of the capital offense during the guilt phase and as a factor in the sentencing phase is constitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 971 (1994) (citing *Lowenfeld v. Phelps*, 484 U.S. at 244-246 (wherein the Supreme Court stated, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . .  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)").  Price's

---

[89] In the title of his claim in the petition, Price uses the word burglary.  However, the body of the claim reveals that same was a scrivener's error since robbery is the term utilized there.

claim, therefore, is due to be denied.

      **N.**     **The trial court's finding that the defense failed to present a prima facie case of racial discrimination in the exercise of the State's challenges to prospective jurors was erroneous and contrary to the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.  (Paragraphs 101-03 of the petition)**.

      Price alleges the trial court erred when it ruled that defense counsel had failed to make a prima facie case of discrimination against the State for striking Annie Sanders, Annie Smith and Shelia Cannon, who constituted three out of five African-Americans on the venire.  He also declares the prosecution, under the guise of a *Witherspoon v. Illinois*, 391 U.S. 510 (1968), challenge, struck three other African-American venire members; namely Ray Enis, Harriet Kemp and Christopher Savage.  *Id*. at 47-48.

      The Alabama Court of Criminal Appeals addressed this matter:

      The appellant argues that the trial court's finding that the defense failed to present a prima facie case of racial discrimination in the exercise of the State's peremptory challenges to prospective jurors was erroneous.  The record indicates that, following the striking of the jury and before it was seated, the following transpired:

      "[Defense counsel]:  At this time, Your Honor, I would like to place on the record the information that during the selection process there were five black jurors who were available to us.  The State struck three, number 59, number 66 and number 5, all being black females. . . .  I ask that the race of each of those jurors be noted on the record and I would like the State to justify each of their strikes.

      "THE COURT:  Is that all you have?

      "[Defense counsel]:  Well, no sir.  Based on the Sixth and the Fourteenth Amendments and my client's right to a fair cross-section, I would argue that by the elimination of those jurors, we no longer have a fair cross-section of his peers because the number has been diminished, . . . leaving us with 2 black jurors out of 14 with 2 alternates not being the black ones.  He has a right to a

fair cross-section and I would argue that by their elimination he no longer has any fair cross-section. In cases as important as this, he is entitled.

"[Prosecutor]: I'd like to point out, Your Honor, that the venire that we began with was 10% black. We had 49 to strike from, of whom 5 were black. The number seated is-of the jurors seated is 1/6 or 16%-16 2/3 black, and of those, including alternates, is 14% black, so based strictly on the number, it is a fair cross-section of the racial continuity of the venire itself.

"THE COURT: Do you have anything else to offer in support of your motion?

"[Defense Counsel]: No, nothing more than I've already argued. I just wanted to note it for the record.

"THE COURT: Then your motion will be denied.

"[Prosecutor]: Your Honor, could I ask you to include on the record whether or not the basis for your denial is that they have not made a prima facie showing of a racial discriminatory jury strike pattern?

"THE COURT: I think the record would reflect that.

"[Prosecutor]: Is that the basis of your ruling, sir?

"THE COURT: Yes."

Thus, the trial court held that the appellant failed to establish a prima facie case of racial discrimination. In support of the appellant's motion, the only assertion made by defense counsel was that there were five black potential jurors and the State struck 3 of them. Two blacks served on the appellant's jury, neither of whom were alternates. Defense counsel also made a blanket allegation that the appellant was deprived of a fair cross-section of his peers because the number of blacks on the venire panel had been diminished in arriving at the number of blacks actually serving on the appellant's jury.

"'A defendant claiming a *Batson* [*v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. *Jackson v. State*, 594 So. 2d 1289 (Ala. Cr. App. 1991). Only when the defendant establishes facts and

158

circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes. *Carter v. State*, 603 So. 2d 1137 (Ala. Cr. App. 1992).'

*Stokes v. State*, 648 So. 2d 1179, 1180 (Ala. Cr. App. 1994). We will reverse a trial court's ruling on a *Batson* motion only when that ruling is clearly erroneous. *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987)."

*Clemons v. State*, 720 So. 2d 961, 974 (Ala. Cr. App. 1996).

In *Edwards v. State*, 628 So. 2d 1021, 1024 (Ala. Cr. App. 1993), the trial court found that the defendant had failed to establish a prima facie case of racial discrimination where there had been 6 black members on a 35-40 member venire, i.e., the venire was 15%-17% black. One black veniremember was removed for cause, and the State struck two blacks, apparently leaving three on the jury, so that blacks comprised 25% of the jury. The defendant objected based only on the fact that the State struck two blacks who had never answered any questions during voir dire questioning. The trial court held that the defendant had failed to make a prima facie showing of racial discrimination, stating:

"*Batson*, *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987), and their progeny make it very clear that '"[t]he burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination."' *Ex parte Bird*, 594 So. 2d 676, 679 (Ala. 1991) (quoting *Ex parte Branch*, 526 So. 2d at 622). Until this burden is met, the challenged party 'is under no obligation to offer explanations for its peremptory strikes.' *Jackson v. State*, 594 So. 2d 1289, 1292 (Ala. Cr. App. 1991). See also *Huntley v. State*, 627 So. 2d 1013 (Ala. 1992). Merely showing that the challenged party struck one more members of a particular race is not sufficient to establish a prima facie case. *Harrell v. State*, 571 So. 2d 1270, 1271 (Ala. 1990), cert. denied, 499 U.S. 984, 111 S. Ct. 1641, 113 L. Ed. 2d 736 (1991); *Ashley v. State*, 606 So. 2d 187, 192 (Ala. Cr. App. 1992); *Jones v. State*, 603 So. 2d 419, 420-21 (Ala. Cr. App. 1992). See also *Hood v. State*, 598 So. 2d 1022, 1023 (Ala. Cr. App. 1991). 'When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created.' *Harrell v. State*, 571 So. 2d at 1271. The trial court properly denied the appellant's *Batson* motion."

*Edwards v. State, supra*, at 1024.

> "'In *Ashley v. State*, 606 So. 2d 187 (Ala. Cr. App. 1992), the prosecution used three of its seven strikes to remove blacks from the pool of potential jurors. This court held that the "appellant failed to establish a prima facie case under *Batson* and *Ex parte Branch* [526 So. 2d 609 (Ala. 1987) ] because the appellant failed to show any evidence of discrimination other than the number of blacks struck." *Ashley*, 606 So. 2d at 192. Similarly in the present case, the only evidence presented to the trial court by the appellant was the fact that three out of the seven potential black jurors were struck by the prosecution. There was no evidence presented that any of the factors set out in *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987), which may be used to establish a prima facie case, existed. The evidence presented at trial was not sufficient to prove a prima facie case of a *Batson* violation. The trial court did not err in denying the appellant's *Batson* motion.'

*Moore v. State*, 677 So. 2d 828, 829 (Ala. Cr. App. 1996).

> "'When determining whether a challenging party has shown a prima facie case of racial discrimination in the use of peremptory strikes, "the court is to consider 'all relevant circumstances' which could lead to an inference of [such] discrimination." *Ex parte Branch*, 526 So. 2d 609, 622 (Ala. 1987). The challenging party "may establish a prima facie case of *purposeful* discrimination in selection of the petit jury *solely* on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723 (emphasis added). Normally, the challenging party has not shown that the prosecution used its peremptory strikes in a racially discriminatory manner where the *only* evidence presented in support of a prima facie case of discrimination is the fact that blacks were struck by the prosecution. *Ex parte Branch*, 526 So. 2d 609, 622-23 (Ala. 1987), contains a nonexclusive list of factors that a challenging party might use to establish a prima facie case of discrimination. This list includes, "[a] *pattern of strikes* against [jurors of a certain gender or race] on a particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors." *Branch*, 526 So. 2d at 623 (emphasis added). A pattern "'implies that the action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group,' *Hernandez [v. New York* ], 500 U.S. 352, 360, 111 S. Ct. [1859] at 1866 [114 L. Ed. 2d 395 (1991)] (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442

160

U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L. Ed. 2d 870 (1979))
(footnote and citation omitted in *Hernandez*)."  *Freeman v. State*,
651 So.2d 576, 583 (Ala. Cr. App. 1994).  When determining
whether peremptory strikes were used in a manner to suggest
discriminatory "pattern of strikes," "[m]erely showing that the
challenged party struck one or more members of a particular race is
not sufficient to establish a prima facie case [of discrimination]."
*Edwards v. State*, 628 So. 2d 1021, 1024 (Ala. Cr. App. 1993).'

*Bell v. State*, 676 So. 2d 1349, 1350 (Ala. Cr. App. 1995)
(Emphasis in original.)"

*Clemons v. State*, 720 So. 2d at 975.

In the present case, the appellant relied solely on the number of strikes
against blacks made by the State, without any supporting evidence indicating a
discriminatory intent or purpose.  Thus, the appellant has failed to make a prima
facie showing of racial discrimination by the State in removing blacks from the
jury.

*Price v. State,* 725 So. 2d at 1058-60.

Price now argues that the Alabama Court of Criminal Appeals' opinion offends federal

law because it erroneously "rejected this claim for failure to state a prima facie case of racial

discrimination [by] emphasizing that the jury included a slightly higher percentage of African-

Americans (two of twelve, or 16.7%) than did the original venire (five of forty-nine) or 10.2%)."

*Id*. at 104.  Price's premise is incorrect.  The court found that a *prima facie* case had not been

demonstrated because Price "relied solely on the number of strikes against blacks made by the

State, without any supporting evidence indicating a discriminatory intent or purpose."  *Price*, 725

So. 2d at 1060.

Furthermore, Price argues

that a defendant who suspects racial bias in the use of peremptory strikes "may
make out a prima facie case of purposeful discrimination by showing that the
totality of relevant facts gives rise to an inference of discriminatory purpose."
[*Batson v. Kentucky*, 476 U.S. 79,] 94 (citing *Washington v. Davis*, 426 U.S. 229,

161

239-42 (1976)).  Upon such a showing, the burden shifts to the prosecution to offer a race-neutral explanation for the strikes.  As the Supreme Court recently confirmed, the initial burden of establishing a prima facie case is not intended to be "onerous" because often facts about discriminatory intent "are impossible for the defendant to know with certainty."  *Johnson v. California*, 545 U.S. 162, 170 (2005) (holding that defendant does not have to show, at the prima facie stage, that the prosecution's strikes were more likely than not racially motivated).  The Supreme Court has sensibly concluded that a defendant should not be forced to "engag[e] in needless and imperfect speculation when a direct answer can be obtained by asking a simple question" of the prosecution.  *Id*. at 172.  For that reason, "*Batson* [leaves] a defendant free to challenge the prosecution without having to cast [such a] wide net."  *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005).

(Doc. 28 at 104-05).

Price correctly pinpoints that a reasonable inference is the guiding standard for establishing a *prime facie* showing of discrimination in the *Batson* context.  However, he fails to adequately address the internal requirements of that standard, which were explained in *Batson*:

> The standards for assessing a *prima facie* case in the context of discriminatory selection of the venire have been fully articulated since *Swain*.  See *Castaneda v. Partida*, *supra*, 430 U.S., at 494-95, 97 S. Ct., at 1280; *Washington v. Davis*, 426 U.S., at 241-42, 96 S. Ct., at 2048-49;  *Alexander v. Louisiana*, *supra*, 405 U.S., at 629-31, 92 S. Ct., at 1224-26.  These principles support our conclusion that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.  To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida*, *supra*, 430 U.S., at 494, 97 S. Ct., at 1280, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.[90]  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."  *Avery v. Georgia*, 345 U.S., at 562, 73 S. Ct., at 892.  Finally, the defendant must show that these facts and any other relevant

---

[90]Subsequent to *Batson*, the Supreme Court ruled that, as a matter of equal protection, the defendant had the right to a jury selected by non-discriminatory means.  Thus, *Batson* was expanded beyond the race correlation between the defendant and potential jurors.  *See Powers v. Ohio*, 499 U.S. 400 (1991).  As a consequence, Price, as a white defendant, had standing to make a *Batson* motion against a prosecutor who has moved to exclude black jurors.

circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.  This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.  For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference[91] of discrimination.  Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.  These examples are merely illustrative.  We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson v. Kentucky*  476 U.S. at 96-97.  *See also*, *Johnson v. California*, 545 U.S. at 169 (2005)

("[A] *prima facie* case of discrimination can be made out by offering a wide variety of evidence .

. . . so long as the sum of the proffered facts give 'rise to an inference of discriminatory purpose.'

[*Batson*,]  476 U.S. at 94").

Price's reliance on selected quotes from *Johnson v. California*, 545 U.S. 162, and *Miller-*

*El v. Dretke,* 545 U.S. 231, do not provide persuasive constitutional support for his position

because the specific factual circumstances and legal issues giving rise to his claim are different.

First, the Supreme Court granted certiorari review in *Johnson*[92] because California had enacted a

---

[91]"An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a logical consequence from them.'"  *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting Black's Law Dictionary 781 (7th ed. 1999)).

[92]After challenges for cause were completed in *Johnson*, the prosecutor used three of his 12 peremptory challenges to strike all three remaining black veniremen on the 43 member panel. Defense counsel made a *Batson* objection after each strike, but the trial court refused to demand the prosecutor explain the basis for his challenge, by finding counsel had not satisfied a California statute that required the defendant to meet a "strong likelihood" standard in connection with prima facie showing of discrimination.  *Id*. at 165.  Instead, the trial judge conducted her own examination of the record, and surmised that there was a sufficient basis for the strikes based on equivocal or confused answers on jury questionnaires.  *Id*. at 165-66.  In addition to the statistical disparity of

state statute requiring the defendant to show a "strong likelihood" of discriminatory intent in order to satisfy his burden of showing *prima facie* discrimination during jury selection. The Supreme Court ruled that the two standards were not the same, that the State of California had no authority to require this additional step at the *prima facie* stage of a discrimination challenge, and that *Batson's* "reasonable inference" test was the absolute control for equal protection purposes. *Id.* at 165-69.

Moreover, the first prong of the *Batson* test was never an issue in *Miller-El v. Dretke*, 545 U.S. 231. In *Miller-El*, the trial court examined the *voir dire* record and held an evidentiary hearing where the prosecutor was questioned as to his reasons for striking black venire persons.[93] Thereafter, the trial court found no purposeful discrimination. *Id.* at 236. As such, unlike Price's case, all three *Batson* prongs were examined by the trial court, and an ultimate ruling as to whether discrimination occurred was made. The Supreme Court reversed, and held that the trial court's[94] reasoning was contrary to and an unreasonable application of federal law, and its factual

---

strikes against black veniremen, the *Johnson* case also involved a black defendant charged with killing his white girlfriend's child. *Id.*

[93]This hearing took place on remand by the Texas Court of Criminal Appeals as *Batson* was decided while Miller-El's direct appeal was pending.

[94]The court also notes that *Miller-El v. Dretke* is actually the second of two habeas cases to reach the Supreme Court, the first being *Miller-El v. Cockrell*, 534 U.S. 1122 (2002). In *Miller-El v. Dretke*, the Supreme Court referred to the same relevant factual circumstances pertinent to its *prima facie* discrimination discussion in *Miller-El v. Cockrell*:

> The numbers describing the prosecution's use of peremptories are remarkable. Out of 20 blacks members of the 108- person venire panel for Miller-El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution. *Miller-El v. Cockrell*, 537 U.S. at 331, 123 S. Ct. 1029. "The prosecutors used their peremptory strikes to exclude 91% of the eligible African- American venire members . . . . Happenstance is unlikely to produce this disparity." *Id.* at 342. 123 S. Ct. 1029.

findings regarding the third *Batson* prong were unreasonable based upon the evidence before it.

It is true that *Johnson* holds that a state court cannot subject a defendant to a higher burden than the "reasonable inference" standard, but application of a constitutionally deficient state standard is not the issue in Price's case.  Price's assertion that "*Batson* [leaves] a defendant free to challenge the prosecution without having to cast [such a] wide net[]" also affords him no assistance.  (Doc. 28 at 105 (quoting *Miller-El*, 545 U.S. at 239)).  The Supreme Court made this observation in *Miller-El* when describing the unworkable and ineffectual *pre-Batson* rules for establishing jury discrimination.  *Id*. at 238-40 (citing *Swain v. Alabama,* 380 U.S. 202 (1965) (wherein the defendant was required to allege and prove a history of systemic discrimination in order to satisfy a jury discrimination challenge).

The foregoing does not mean that *Johnson* and  *Miller-El* are of no assistance.  Both cases recapitulated and adhered closely to *Batson's* inference of the discrimination standard.  In so doing, the Supreme Court set out all relevant circumstances it deemed pertinent to each defendant's *prima facie* showing of discrimination.  In *Johnson*, the relevant facts were that the prosecutor utilized three peremptory strikes to rid the jury of all black venirepersons in a case where a black defendant was accused of killing a white child.  *Johnson*, 545 U.S. at 164-65.  In *Miller-El*, the relevant facts were that the prosecutor struck ten black individuals from the venire, a total of 91% of the eligible black veniremembers, and "more powerful [evidence through]. . .

_____

      *More powerful than these bare statistics*, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. . . .

*Miller-El v. Dretke*, 545 U.S. at 240-41.  (emphasis added).

side by side comparisons of some black venirepersons who were struck and white panelists

allowed to serve."  *Miller-El*, 545 U.S. at 240-41.

Soon after the *Johnson/Miller -El* decisions, the Eleventh Circuit was afforded an

opportunity to examine and discuss exemplar relevant circumstances for consideration when

faced with a *prima facie Batson* question.  *See United States v. Ochoa-Vasquez*, 428 F.3d 1015,

1039-45 (11th Cir. 2005).  The Eleventh Circuit wrote,

> This [Circuit] has cautioned that "the mere fact of striking a juror or a set
> of jurors of a particular race does not necessarily create an inference of racial
> discrimination."  [*Central Alabama Fair Housing Ctr. v.* ] *Lowder* [*Realty Co.,*]
> 236 F.3d [629,] at 636 [(11th Cir. 2000)]; [*United States v.*] *Novaton*, 271 F.3d
> [968,] at 1002 [(11th Cir. 2001)].  While statistical evidence may support an
> inference of discrimination, it can do so "only" when placed "in context."
> *Lowder*, 236 F.3d at 638;  [*United States v.*] *Allen-Brown*, 243 F.3d [1293,]at
> 1298 [(11th Cir. 2001)].  For example, "the number of persons struck takes on
> meaning *only* when coupled with other information such as the racial composition
> of the venire, the race of others struck, or the voir dire answers of those who were
> struck compared to the answers of those who were not struck."  *Lowder*, 236 F.3d
> at 636-37 (emphasis in original); *see also Novaton*, 271 F.3d at 1002 (same);
> *Allen-Brown*, 243 F.3d at 1298 (evaluating the strike pattern in light of the racial
> composition of remaining potential jurors); *Stewart*, 65 F.3d at 925 (stating that
> "no particular number of strikes against blacks automatically indicates the
> existence of a prima facie case," and considering, *inter alia*, the number of struck
> black jurors as a percentage of the black venire members).
>
> In determining whether the totality of the circumstances shows a "pattern"
> that creates an inference of discrimination, this Court has considered a number of
> factors.  First, whether members of the relevant racial or ethnic group served
> unchallenged on the jury.  *See Lowder*, 236 F.3d at 638  ("[T]he unchallenged
> presence of jurors of a particular race on a jury substantially weakens the basis for
> a prima facie case of discrimination in the peremptory striking of jurors of that
> race."); *Novaton*, 271 F.3d at 1002, 1004 (same); [*United States v.*] *King*, 196
> F.3d [1327] at 1335 [(11th Cir. 1999)] (finding that "not only was there no pattern
> of discriminatory strikes, there was a sort of 'antipattern'" where the State
> accepted one black juror and then struck the second of three black venire
> members); *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995)
> ("Although the presence of African-American jurors does not dispose of an
> allegation of race-based peremptory challenges, it is a significant factor tending to
> prove the paucity of the claim."); *Cochran v. Herring*, 43 F.3d 1404, 1412 (11th

Cir. 1995) (same); *Stewart*, 65 F.3d at 926 (same).

Similarly, we have considered whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes. *See Lowder*, 236 F.3d at 637 ("[T]he number of jurors of one race struck by the challenged party may be sufficient by itself to establish a prima facie case where a party strikes all or nearly all of the members of one race on a venire" (citing *United States v. Williams*, 936 F.2d 1243, 1246 (11th Cir.1991))); *cf. Dennis*, 804 F.2d at 1210-11 (affirming finding of no prima facie case where the government did not use all of its strikes and thus "did not attempt to exclude all blacks, or as many blacks as it could, from the jury"); *Allison*, 908 F.2d at 1537 (same, where "the prosecutor preserved three black jurors, even though he had enough peremptory challenges to strike all the black jurors").

Second, we have considered whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire. *Lowder*, 236 F.3d at 637. For example, in *Lowder*, we concluded that there was no prima facie case of discrimination where the plaintiffs used both of their peremptory strikes against white jurors. In so holding, we stated that there was no significant disparity between the plaintiffs' 100% rate of challenging white jurors and the 80% representation of white jurors on the venire. *Id.* On the other hand, in *Stewart*, we upheld a finding of a prima facie case based in part on the fact that, in exercising three peremptory challenges against black jurors, the defense struck 75% of black venire members. 65 F.3d at 925.

Third, this Court has considered "whether there is a substantial disparity between the percentage of jurors of one race [or ethnicity] struck and the percentage of their representation on the jury." FN39 *Lowder*, 236 F.3d at 637; *Novaton*, 271 F.3d at 1002.

> FN39. The factors discussed here do not constitute an exhaustive list of potentially relevant factors in determining whether an inference of discrimination arises. Rather, the heart of Ochoa's argument seems to be that the statistical evidence creates a "pattern" of discrimination, and thus we focus on the factors relevant to establishing such a pattern. However, in other cases, other factors may be relevant.
>
> For example, the court may consider "the voir dire answers of those who were struck compared to the answers of those who were not struck." *Lowder*, 236 F.3d at 637. In some *Batson* claims, the subject matter of the case may be relevant if it is racially or ethnically sensitive. For example, in *Stewart*, the defense used its peremptory challenges to strike 3 of the 4 potential

167

black jurors, causing the jury to have only one black member.  65
F.3d at 925.  The district court found a prima facie case of race
discrimination and this Court affirmed.  *Id*.  This Court noted that
"no particular number of strikes against blacks automatically
indicates the existence of a prima facie case," but it concluded that
a prima facie case existed in part because the defendants were
being prosecuted for a racially motivated hate crime against blacks.
*Id*.  In contrast, there is no contention that the subject matter in
Ochoa's case is relevant.

*United States v. Ochoa-Vasquez*, 428 F.3d at 1044-45.

In the present case, Price relies on the fact that the prosecutor used his peremptory

challenges to strike three out of five black venirepersons as the basis to support his *prima facie*

showing.  He also attempts to add three additional black individuals who were successfully

challenged for cause by the prosecutor on *Witherspoon/Witt* grounds, by arguing the *Witherspoon*

challenges were a guise to hide discrimination based on race.  As to the latter complaint, Price

completely fails to show any inference of discrimination on the basis of prosecutorial subterfuge.

This declaration is both conclusory and completely belied by the record.  Each of these venire

persons repeatedly and unequivocally testified that he/she was against the death penalty and

would not recommend a death sentence under any circumstances.  *See infra*, Claim  D.  Finally,

considering that the *Witherspoon* challenged jurors were properly excused for cause, their

dismissal is irrelevant to Price's complaints regarding the remaining three black venirepersons

peremptorily struck by the prosecutor.  Even if it were relevant, because they were properly

excused, they provide no weight in favor of Price's *prima facie* showing.  This aspect of Price's

claim is due to be denied.

The next question is whether the state court's determination that the prosecutor's use of

three of his peremptory strikes against black venirepersons did not satisfy Price's *prima facie*

showing that an inference of discrimination was contrary to or an unreasonable application of clearly established law.  Based upon the applicable Supreme Court precedent previously discussed and the Eleventh Circuit's interpretation and application of same, it is evident that Price is not entitled to relief.  The Alabama Court of Appeals accurately identified and applied the first prong of the *Batson* standard in Price's case.  His contention that the state court erroneously rejected his attempt at a *prima facie* claim because it improperly relied on jury composure of 16.7% blacks compared to venire composure of 10.2% is incorrect.

Price is also incorrect when he argues that it is immaterial there were two black jurors. Supreme Court and Eleventh Circuit dictate that such information is absolutely relevant to the question of whether, as a statistical matter, a defendant has shown the prosecutor was engaging in a pattern of peremptory strikes against a racial group during the selection of a jury.  Other than pointing to the fact that the prosecutor used peremptory strikes against three of the five jurors, Price offers and has never offered any other relevant evidence in his case to support a reasonable inference of discrimination.

> **O.  Comments by the prosecutor and the trial court allowed the jury to convict Mr. Price of capital murder without the requisite intent to kill, depriving Mr. Price of due process and rendering the verdict unreliable within the meaning of the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Paragraphs 104-05 of the petition).**

Price alleges the prosecutor made statements during his summation that likely "confuse[d] the jury and [led] them to believe incorrectly that [he] could be found guilty of capital murder as long as he participated in the robbery and was not 'surprised' by the killing." (Doc. 16 at 49).  Price concedes the trial court's jury instruction pertaining to felony murder was an accurate statement of the law, but takes umbrage with the capital murder instruction's use of

169

the word "surprise" as a means to clarify the intent element of capital murder.  *Id*.  According to Price, the word actually muddied the jury's understanding of the *mens rea* requirement for capital murder and diluted the State's burden of proof.  (Doc. 28 at 125).

Price complains that "[t]he confusing effect of the combination of the prosecutor's statement and the trial court's charge deprived the jury of clear direction on this point by using confusing and contradictory language."  (Doc. 16 at 49).  He then concludes the inconsistent instructions to the jury deprived him of a fair trial because "an actual intent to kill is required for a capital murder conviction[]" under the Eighth Amendment.  (Doc. 28 at 109).  Price concludes that the guilty verdict is unreliable, and demands a new trial for relief.  (Doc. 16 at 50).  The respondent answers[95] that Price's claim cannot withstand § 2254(d) review.  (Doc. 22 at 70).

Price did not object to the prosecutor's statement or the judge's instructions at trial.  The Court of Criminal Appeals properly conducted a plain error review of the claim.  *Price v. State*, 725 So. 2d at 1016-17.  According to the appellate court,

> [the prosecutor argued,] "[Price] was in it up to his eyeballs from the very beginning to the very end. . . .  Under either theory of capital murder, either that Chris Price himself wielded this weapon which inflicted wounds on Bill Lynn and killed him, which we feel the evidence sustains, either that way, if you should decide in your deliberations under the judge's charge that he merely was there and only intended to kill although he did not wield this weapon, there is still evidence to support that he knew what was going to happen, that he supported what was going to happen, and in no way was that any surprise to Chris Price of the outcome.  Nothing surprised him."

---

[95]The respondent also asserts that this claim is procedurally defaulted because Price did not fairly present it as a federal claim in state court.  (Doc. 22 at 69).  However, on direct appeal, the Court of Criminal Appeals acknowledged that Price was presenting a federal claim.  *Price v. State,* 725 So. 2d at 1016 ("comments made by the prosecutor and the trial court allowed the jury to convict him of capital murder without finding he intended to kill the victim, in violation of the state a federal Constitutions").

. . . .

[Moreover,] [t]he record indicates that the trial court charged the jury as follows:

"In order to be guilty of capital murder, the person on trial, whether that person physically committed the act which proved fatal or not, must have formed an intent in his mind to participate in the capital murder, the actual killing of that person, whether the person on trial physically committed the act or not or whether he merely stood by ready to take up the killing if necessary or to assist in the killing, which, in fact, was perpetrated by another.  He has to have actually formed the intent to murder as opposed to being surprised by the act of some fellow actor in a robbery or other crime.  That requires that an individual specifically have informed an intent to commit a murder, distinguishes capital murder from the other types of homicide, specifically felony murder.

In this case the defendant is charged with capital murder. He is charged with participating in the death of Bill Lynn intentionally while engaged in robbery in the first degree.  Whether or not he physically committed the act which proved to be fatal, he had to be a participant in the act of killing Bill Lynn either by intentionally killing himself or participating in the events with complicity by assisting or standing by to assist or encouraging or aiding or being a part in the actual, intentional murder of Bill Lynn. It is not enough that he was merely a bystander who was surprised by the acts of another person or something of that nature.

A person commits the crime of intentional murder if, with the intent to cause the death of another person, he causes the death of that person or yet another person.   A person acts intentionally then when, with respect to a result or to conduct, his purpose is to cause that result or to engage in that conduct.  So then when we speak of someone acting intentionally, we're speaking of someone acting with respect to a result with a purpose to cause that result, what many of us in Alabama would say, that a person meant to do that which they did.  If they meant to do it, if their purpose was to do it and they carried it out, then that's the type of intent that we're speaking of.  So a person accused of an intentional homicide must intentionally, as opposed to negligently, accidentally, or recklessly cause the death of the deceased in order to invoke the capital statute.

Now, in this case, as I say, if the defendant, during the

171

commission of a robbery, intentionally killed Bill Lynn himself, then under the laws of the State of Alabama, he would be guilty of capital murder if he was engaged in committing robbery in the first degree.

Now, the fact that someone died or is killed during the commission of a robbery does not automatically provide the intent in the instance of capital murder.  The intent to kill must be real and specific in order to invoke the capital statute.  In determining whether or not a person acted intentionally, of course, the jury has a right to look at all of the facts and circumstances surrounding the death of the person who is now deceased with a view of determining how that individual met his or her death and what might have been the intention of anyone who inflicted the wound or wounds or participated in the acts which caused the death of that person.

It is also a fundamental point in the state of Alabama that, when, by pre-arrangement or even on the spur of the moment, two or more persons intentionally determine to enter upon a common enterprise or adventure and a capital offense is contemplated in their mind, then if that purpose and collusion to kill is carried out, each would be guilty of the offense committed, whether that individual did any overt act or not.  This rests upon the principle that anyone who, with the intent to participate in the intentional killing, is then present and encouraging, aiding, abetting or assisting the active perpetrator in the commission of that offense, is a guilty participant and in the eyes of the law is equally guilty as the one who actually did the physical act.

This community of purpose or collusion in the killing need not be established by direct, positive testimony due to its inherent nature, but a jury must determine whether or not there has been such a collusion and intent on the part of the defendant and its extent, if any, from all of the evidence and the testimony in the case.

Now, if a person actively participates in the robbery or intending to assist and encourage, aid, abet or in any way carry out or help perpetrate an intentional murder during the commission of that robbery, then that individual would be guilty whether or not he personally committed the fatal act, but he could not be guilty of capital murder if he did not take some part in and form the intent to participate in the killing."

172

*Price v. State,* 725 So. 2d at 1016-18.

Thereafter, the appellate court concluded,

There was no error in the trial court's charge on intent as it relates accomplice liability for a capital offense or for the offense of felony murder. These charges were clearly necessary to distinguish that element as it relates to the charged capital offense and the lesser included offense of felony murder. *Starks v. State*, 594 So. 2d 187, 193-94 (Ala. Cr. App. 1991) (the trial court failed to properly instruct the jury as to the intent element of capital murder, thereby failing to clearly distinguish that offense from the lesser included offense of felony murder). *Davis v. State*, 440 So. 2d 1191, 1194 (Ala. Cr. App. 1983), *cert. denied*, 465 U.S. 1083, 104 S. Ct. 1452, 79 L. Ed. 2d 770 (1984) (the trial court had properly charged the jury as to the intent necessary for capital murder, the felony murder doctrine, and as to the distinction between the intent required for a capital felony and that required for the lesser included offense of non-capital murder); *Womack v. State*, 435 So. 2d 754, 763 (Ala. Cr. App.), *aff'd*, 435 So. 2d 766 (Ala.), *cert. denied*, 464 U.S. 986, 104 S. Ct. 436, 78 L. Ed. 2d 367 (1983) (the trial court properly instructed the jury as to the "intent to kill requirement" by instructing the jury that the felony murder doctrine was relevant only as a lesser included offense of noncapital murder, and that the jury could not convict the defendant for capital murder without finding beyond a reasonable doubt that he had possessed the intent to kill). *See also Ex parte Brown*, 686 So. 2d 409 (Ala. 1996), *cert. denied*, 520 U.S. 1199, 117 S. Ct. 1558, 137 L. Ed. 2d 705 (1997).

This charge was also proper given the evidence presented at trial; the State's theory of the case was that the appellant and his accomplice committed the capital murder of Bill Lynn, while the appellant's theory of the case was that he merely intended to commit a robbery but never intended to, and never actually participated in, the murder of Bill Lynn. Moreover, it was permissible for the prosecutor to argue the State's theory of the case as supported by the evidence to the jury. The State had presented sufficient evidence to provide a foundation for the jury to consider the offense of capital murder. " '[A] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.' *Ex parte Oliver*, 518 So. 2d 705, 706 (Ala. 1987). This is true regardless of 'however weak, insufficient, or doubtful in credibility' the evidence is concerning that offense. *Chavers v. State*, 361 So. 2d 1106, 1107 (Ala. 1978)." *Fletcher v. State*, 621 So. 2d 1010, 1019 (Ala. Cr. App. 1993). A trial court should also give a charge as to a lesser included offense even when " " "the evidence supporting the defendant's position is offered by the State." *Silvey v. State*, 485 So. 2d 790, 792 (Ala. Cr. App. 1986).' " *Fletcher v. State, supra*, quoting *Starks v. State*, 594 So. 2d 187, 195 (Ala. Cr. App. 1991). Furthermore, the prosecution may properly argue to the jury its version of the facts and evidence that support the State's theory of the case. "When these comments

173

> are examined in light of the entire record, it is clear that the prosecutor's purpose
> in making these statements was to comment on evidence in this case and to draw
> legitimate inferences therefrom; specifically, to point out the weaknesses in the
> appellant's theory of the case, as established by the appellant's testimony."
> *Gaddy v. State*, 698 So. 2d 1100 (Ala. Cr. App. 1995), *aff'd*, 698 So. 2d 1150
> (Ala. 1997). Thus, there was no error as to this claim.

*Id.* at 1018-19.

Price contends the appellate court's decision "that the jury charge accurately instructed

the jury on the meaning of 'intent to kill' was contrary to and an unreasonable application of

clearly established Supreme Court precedent." (Doc. 28 at 109). He supports this argument with

a single quotation from *Enmund v. Florida*, 458 U.S. 782, 793 (1982) ("[T]he death penalty may

not be imposed where defendant 'did not kill, attempt to kill or intend to kill.'"). *Id.*

After careful review, the court finds Price is not entitled to relief on this claim. The

applicable standard of review is well-established:

> Federal habeas relief is unavailable "for errors of state law." *Estelle v.
> McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991) (quoting
> *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102, 111 L. Ed. 2d 606
> (1990)). A jury instruction that "was allegedly incorrect under state law is not a
> basis for habeas relief," *id.* at 71-72, 112 S. Ct. at 482, because federal habeas
> review "is limited to deciding whether a conviction violated the Constitution,
> laws, or treaties of the United States." *Id.* at 68, 112 S. Ct. at 480. Unlike state
> appellate courts, federal courts on habeas review are constrained to determine only
> whether the challenged instruction, viewed in the context of both the entire charge
> and the trial record, "'so infected the entire trial that the resulting conviction
> violate[d] due process.'" *Id.* at 72, 112 S. Ct. at 482 (quoting *Cupp v. Naughten*,
> 414 U.S. 141, 147, 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973)).

*Jamerson v. Secretary for Dept. of Corrections*, 410 F.3d 682, 688 (11th Cir. 2005).

The court finds that there is no reasonable probability that the use of the word "surprise"

in the trial court's capital murder instruction, when viewed in the context of the entire charge and

trial record, so infected Price trial that his conviction offends due process. Price attempts to

174

persuade the court that he suffered constitutional prejudice from confusion arising from the remark and instructions because the State's capital murder case against him was weak and that the State relied heavily on accomplice liability to support its capital theory. This is an unduly narrow description of the evidence and the prosecution's theory. In reality, the evidence that Price committed capital murder was very strong and it is clear that the prosecution's theory rested not only on Price being the primary mastermind and orchestrator of the crime, but his having been the primary perpetrator as well. There is no reasonable probability the jury would have acquitted Price had the word "surprise" not been used for descriptive purposes in the trial court's capital murder instruction. This claim is due to be denied.[96]

> **P.**     **The trial court's failure to ask each prospective juror whether he or she had heard or been affected by improper discussions outside the courtroom during jury selection, violated Mr. Price's rights under the federal constitution and Alabama law. (Paragraphs 106-09 of the petition).**

Price alleges venire person Shepherd, before jury selection, discussed the murder with other jurors, including that Price was guilty and speculation that Price killed someone with an axe. (Doc. 16 at 50). Counsel moved for a mistrial, which was denied by the trial court. *Id.* Price now faults the trial court for its failure to question all venirepersons about Shepherd's conversation and to determine whether Shepherd's statements prejudiced their view. *Id.* (citing *Parker v. Gladden*, 385 U.S. 363, 364 (1966); *United States v. Brantley*, 733 F.2d 1429, 1439 (11th Cir. 1984) (quoting *United States v. McKinney*, 429 F.2d 1019, 1026) (5th Cir. 1970) ("In response to such an allegation, the trial judge 'must conduct a full investigation. . . .'")).

---

[96]To the extent Price complains that the instructions contravened Alabama precedent (doc. 28 at 109), this court has no jurisdiction to interfere with a state court's interpretation of its own law.

The respondent counters that the trial court's decision was affirmed by the Court of Criminal Appeals and Price cannot show that court's decision was either contrary to or an unreasonable application of clearly established federal law or that the decision was based upon an unreasonable interpretation of the facts in light of the evidence. (Doc. 22 at 71-73).

The opinion of the Court of Criminal Appeals reveals that the court examined the individual *voir dire* of venire person Shepherd in its entirety. *Price v. State*, 725 So. 2d at 1012-16. It acknowledged, and Price does not dispute, that Shepherd's demeanor was so evasive and obstinate that immediately after his individual *voir dire*, the parties and the trial judge agreed to his removal from the venire. *Id.* at 1014. Nevertheless, the trial court denied Price's motion for mistrial. In affirming the decision of the trial judge, the Court of Criminal Appeals found

> [t]he prospective juror clearly informed the court that the conversation he had with the other prospective jurors was in jest. Moreover, the only subject matter concerned the possibility that the victim had been killed with an ax. In the present case, the evidence at trial was clear that a knife and a sword had been used either separately or together as the murder weapon or weapons. There was no issue raised concerning the murder weapon; thus, any initial speculation that an ax may have been the murder weapon could not have prejudiced the appellant.
>
> . . . .
>
> [T]he potential juror who had been privy to the conversation was removed for cause. Thereafter, defense counsel asked a number of potential jurors whether they had heard such a conversation taking place; however, none indicated that they had and defense counsel refrained from asking any other potential jurors whether they too had heard the conversation. Although a reversal may be mandated when juror misconduct "might have influenced the verdict," which "casts a 'light burden' on the defendant," *Ex parte Lasley*, 505 So. 2d 1263, 1264 (Ala. 1987), in the present case the appellant has not met even this burden. In *Riddle v. State*, 661 So. 2d at 276-77, this Court noted that, as in the present case, "the defense did not request individual voir dire of the empaneled jury. There is no indication in the record that individual voir dire was necessary." *Id.*, citing *Brown v. State*, 571 So. 2d 345, 350-52 (Ala. Cr. App.), *cert. quashed*, 571 So. 2d 353 (Ala. 1990), *vacated*, 501 U.S. 1201, 111 S. Ct. 2791, 115 L. Ed. 2d 966 (1991). Thus, in the present case, where the potential jurors who were not struck

176

for cause all indicated that they could eliminate the influence of any previous feelings and could render a verdict according to the evidence, *Rowell v. State*, 570 So. 2d 848, 855 (Ala. Cr. App. 1990), and the subject matter of the conversation concerned an aspect of the case that was not contested by either party, the trial court's decision to deny the motion for a mistrial and his failure to *sua sponte* question the venire panel was not erroneous.

*Price v. State*, 725 So. 2d at 1016.

When the factual circumstances and legal rulings in Price's case are compared to the cases cited[97] by Price, his argument must fail for two reasons. First, Shepherd's conversation was benign compared to the type and source of information at issue in the cases cited by the petitioner (*Parker*, *Brantley* and *McKinney*). Second, the issue with venireperson Shepherd was discovered and examined during *voir dire*, while the difficulties in *Parker, Brantley and McKinney* involved prejudicial extraneous information and juror misconduct during deliberations, all of which were discovered post-trial, and litigated by way of post-conviction proceedings. By way of example, in *Parker*,

> a court bailiff assigned to shepherd the sequestered jury [in a second degree murder case], which sat for eight days, stated to one of the jurors in the presence of others, while the jury was out walking on a public sidewalk: "Oh that wicked fellow (petitioner), he is guilty"; and on another occasion said to another juror under similar circumstances, "If there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." [footnotes omitted].

385 U.S. at 363-64. These statements were heard by one and possibly up to three jurors. In *Brantley*, the court learned after trial that a juror had informed the other members of the jury during deliberations that she knew the defendant's daughter and that the defendant had "been in this kind of trouble before." 733 F.2d at 1439. Finally, in *McKinney* , the jurors, while

_____

[97]"*See e.g. Parker v. Gladden*, 385 U.S. 363, 364 (1966); *United States v. Brantley*, 733 F.2d 1429, 1439 (11th Cir. 1984) (quoting *United States v. McKinney*, 429 F.2d 1019, 1026 (5th Cir. 1970))."  (Doc. 16 at 50).

deliberating the guilt of a defendant charged with escape, discussed how they read newspaper articles saying the defendant had escaped before and was essentially an escape artist.  429 F.2d at 1019.

The comment made by Shepherd and the other venireperson in this case was inappropriate and in poor taste, but it certainly did not render Price's trial fundamentally unfair. The Court of Criminal Appeals correctly noted that the comment did not contain information which the jury was not made privy to at trial, nor did it create some sort of disputable issue regarding the murder weapon in any material sense.

Considering the foregoing, counsel's probing the matter through questioning of a few venirepersons was adequate.  Additionally, as Price himself points out, it was within the trial court's "broad discretion" to examine the circumstances of Shepherd's behavior and gauge whether the incident warranted examination of every single venireperson.  (Doc. 28 at 110 (quoting *United States v. Harris*, 908 F.2d 728, 733 (11th Cir. 1990)).  Considering all circumstances surrounding the comment, the trial court did not compromise Price's right to a fair and impartial jury.  Price has not shown the state court's decision is contrary to or an unreasonable application of clearly established federal law nor has he shown it was an unreasonable determination of the facts in light of the evidence before it.

**Q.    Mr. Price did not receive effective assistance of counsel during his direct appeal.  (Paragraphs 110-14 of the petition)**.

Price contends his appellate counsel failed to raise several trial errors on direct appeal, and that, had he raised the claims, there was a reasonable probability the outcome of his appeal would have been different.  (Doc. 16 at 51-53).  Specifically, Price contends his trial counsel failed to object to two improper prosecutorial comments.  The first comment occurred at the guilt

178

phase of the trial, that being the prosecutor's appeal to law enforcement. *Id.* at 52. This claim is due to be dismissed outright. Appellate counsel did raise this claim on direct appeal and same was reviewed on the merits. It has also already been examined extensively in the habeas petition and has been found insufficient to afford the petitioner any relief. (See Claim E(1) herein).

The second comment took place at sentencing when the prosecutor informed the jury that Price deserved the death penalty because he had already been shown more mercy than he had shown the victim in that Price was at least afforded a trial and other due process. (Doc. 16 at 52). Price contends the latter comment improperly urged the jury to sentence him to death because he exercised his Sixth Amendment guarantee to a jury trial. *Id*. This bare allegation is insufficient to state a claim entitling him to any relief.

Price lastly alleges that appellate counsel did not raise as error the fact that trial counsel did not object to the admission of Dr. Kirkland's mental health report at sentencing. *Id*. This conclusory assertion does not merit any further discussion, particularly in view of the court's previous discussion of the report. (See Claim A.2 herein). Price is entitled to no relief on this claim.

**V.      CONCLUSION**

Having now carefully reviewed the record, pleadings, briefs, and arguments presented,

the court finds that Price is not entitled to relief from his conviction or sentence.  Accordingly, by

separate order, the court will deny Price's request for an evidentiary hearing, and deny his

petition for a writ of habeas corpus.

Done this 25th day of February 2009.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

153671